IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| STRUCTURLAM MASS TIMBER U.S., INC., *et al.*,[1] | Case No. 23-10497 (CTG) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF MATTHEW KARMEL,
INTERIM CHIEF EXECUTIVE OFFICER OF THE DEBTORS,
IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Matthew Karmel, hereby declare under penalty of perjury:

1. I am the interim Chief Executive Officer ("Interim CEO") of each of the above-captioned debtors and debtors in possession, consisting of the following entities: SLP Holdings Ltd. ("SLP"), Structurlam Mass Timber Corporation (formerly SLP Operations Ltd., "SMTC"), Structurlam Mass Timber U.S., Inc. ("SMTU"), and Natural Outcomes, LLC ("NOLLC" and together with SLP, SMTC, and SMTU, the "Company" or the "Debtors"). I have served as Interim CEO of the Debtors since May 2022.

2. I have over 20 years of experience in c-suite leadership roles and have substantial knowledge and experience in the industrial and manufacturing industries. Prior to joining the Debtors, I have served as CEO of Crenlo Engineered Cabs, Operating Partner at Atlas Holdings, CEO and Chairman of Klenk Holz AG, the largest saw-mills group in Germany, and I have led other companies in North America and Europe in a broad range of industries. I received a Ph.D.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number or Canadian business number, as applicable, include: Structurlam Mass Timber U.S., Inc. (6287); Natural Outcomes, LLC (n/a); Structurlam Mass Timber Corporation (5050); and SLP Holdings Ltd. (3114). The location of the Debtors' headquarters is: 2176 Government Street, Penticton, British Columbia, Canada V2A 8B5. The address of the registered agent for Structurlam Mass Timber U.S., Inc. is: 8 The Green, Suite A, Dover, Delaware 19901.

in Mechanical and Aeronautical Engineering from Princeton University and completed a general-management executive program at INSEAD Business School in France.

3. In my capacity as Interim CEO I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records. I am above 18 years of age, competent to testify, and authorized to submit this declaration on behalf of the Debtors.

4. I submit this declaration to assist the United States Bankruptcy Court for the District of Delaware (the "Court") and parties in interest in understanding: (a) the Debtors, their operations, and their capital structure; (b) the circumstances related to the commencement of these cases, which were filed on April 21, 2023 (the "Petition Date"), under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and related proceedings to be filed under the Companies' Creditors Arrangement Act ("CCAA") in Canada; and (c) the relief requested by the Debtors pursuant to the motions and applications filed substantially contemporaneously herewith (collectively, the "First Day Motions").

5. Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, information obtained from the Debtors' management team and advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge. If called as a witness, I would testify competently to the statements set forth in this declaration.

6. This declaration is organized in the following five parts:

- Part I provides an overview of the Debtors' anticipated chapter 11 process, including the proposed debtor-in-possession financing, sale process, and expected case timeline.

- Part II describes the Company's business, both in terms of its history, as well as its current operations;

- Part III summarizes the Company's organizational and capital structure;

2

- Part IV describes the circumstances that led to the commencement of these chapter 11 cases; and

- Part V addresses the factual bases for the relief requested in the First Day Motions, and other information related to these chapter 11 cases.

**I.    Overview of the Chapter 11 Cases.**

7.    The Company is a leading manufacturer of mass timber and ground protection solutions, including the production of Glulam and CLT (defined below), used in construction and industrial markets with U.S. facilities in Conway, Arkansas and Canadian facilities in Penticton, Okanagan Falls, and Oliver, British Columbia. The Company has completed or assisted in supplying mass timber for numerous projects throughout North America including, among others: the University of British Columbia Brock Commons in Vancouver, British Columbia in 2016 and 2017, at the time the tallest wood structure building in the world; the Microsoft Silicon Valley Campus in Mountain View, California in 2019, at the time the largest mass timber structure built in the United States; and the Google Mountain View California campus in 2020.

8.    The Debtors faced significant operational and liquidity challenges in the months preceding the Petition Date. As a result of these challenges, in January 2023, the Debtors were forced to cease operations at the Debtors' U.S. manufacturing facility (the "US Facility") and terminate a majority of employees at that location. Following these events, the Company, in coordination with and with the support of its prepetition lender, Bank of Montreal ("BMO" and, in such capacity the "Prepetition Lender") and the Company's advisors, conducted an approximately 70 day prepetition marketing process that culminated in the selection of a stalking horse for the purchase of substantially all of the Debtors' assets, all as described in further detail below. The Debtors enter chapter 11 to effectuate the sale, subject to higher and better offers, with the support of the stalking horse bid to preserve the value of the Debtors' business as a going concern as well as the jobs of many of its remaining employees.

9. To meet the Debtors' urgent liquidity needs and provide for the necessary funding requirements of the Debtors' operations in chapter 11, the Debtors, in consultation with their advisors, engaged in negotiations with potential lenders regarding the provision of debtor-in-possession financing. Contemporaneously herewith, the Debtors filed a motion seeking court approval of a senior secured superpriority $7.5 million (CAD) million debtor-in-possession loan (the "DIP Facility") to be provided by BMO (in such capacity, the "DIP Lender") fund the Company through the sale process and exit from chapter 11.

10. The Debtors believe that the proposed sale transaction represents the only viable option for preserving and maximizing the value of the Company and that, if the relief requested in the First Day Motions, the proposed debtor-in-possession financing, and the anticipated sale process are not approved and consummated, or if they are delayed, the Debtors could be forced to liquidate under chapter 7 of the Bankruptcy Code, which would severely diminish the value of the Debtors' assets. Accordingly, the Debtors have commenced these chapter 11 cases, with the support of their key constituents, and are pursuing the anticipated sale transaction to maximize the value of the Debtors' estates for the benefit of all stakeholders.

**II.     Company Background and Operations.**

    **A.     History.**

11. The Company was founded in 1962 in Penticton, British Columbia and originally operated as a producer of highly distinctive architectural glue laminated beams ("Glulam"), which were typically used in hockey arenas and places of worship. In 2012, the Company expanded its construction offerings by becoming the first North American manufacturer of construction cross laminated timber ("CLT"), which is a multi-layer, mass timber panel that can act as a replacement for concrete in any floor, wall, roof, or core, with the benefits of being significantly lighter. Also in 2012, the Company commenced production and introduction into the market of CLT industrial

matting, which has strength and weight advantages relative to incumbent bolted hardwood mats. SMTC acquired the business in 2017 and by 2019 had expanded to the United States through the incorporation of SMTU and the acquisition of the US Facility. The Company differentiates itself as a high-end custom producer of technically complex and design intensive products while also providing a suite of intensive design and other support services to its construction customers.

**B.      Corporate Structure.**

12.     Debtor SLP is a holding company incorporated pursuant to the laws of British Columbia, Canada with no operations or employees, and it owns 100 percent of the voting shares in SMTC and SMTU (and, indirectly through SMTU, controls 100 percent of the membership interests in NOLLC). SMTC is the Company's Canadian operating entity, incorporated under the laws of British Columbia, Canada with operations in Penticton, Okanagan Falls, and Oliver, British Columbia. SMTC also hosts the head office and chief executive function for the entire Company from its offices in Penticton, British Columbia. SMTU is the Company's United States operating entity incorporated under the laws of the state of Delaware. SMTU's primary asset is the US Facility, a new state-of-the-art production facility in Conway, Arkansas. NOLLC is a limited liability company incorporated under the laws of the state of Delaware. The member interests of NOLLC are 100 percent held by SMTU.

13.     The Debtors are privately owned, with six series of Class A Preferred stock, one series of Class B Preferred stock, and three series of Class C Preferred stock, (collectively, the "Preferred Stock"), which is held primarily by KF Arc Holding LP (approximately 57.1 percent) and Bentonville KF SLP Holdings LP (approximately 27.5 percent), with the remaining approximately 15.4 percent of Preferred Stock held among certain minority shareholders. In addition to the Preferred Stock, SLP has also issued the common shares of SLP (the "Common Stock") being held among 13 individual holders. SLP currently has 1,364,350 shares of Common

Stock issued and outstanding, with options for an additional 2,914,703 shares of Common Stock held by certain members of the Company's management team who participate in the management incentive common equity options and shares program. A chart summarizing the Debtors' organizational structure is attached hereto as **Exhibit A**.

  C. **The Company's Assets and Operations.**

  14. The Company operates out of five manufacturing facilities, four of which are leased and located in British Columbia, Canada and one of which is owned by the Debtors (subject to certain municipal tax saving arrangements) in the United States, as follows:

| Location | Opened | Products Manufactured | Estimated Annual Production Capacity (ft$^3$) |
|---|---|---|---|
| Penticton, BC | 1962 | Glulam beam and column finishing | 880,000 (combined among Penticton and OK Falls facilities) |
| Maple Street, Okanagan Falls, BC | 2012 | CLT, Glulam, and industrial mats manufacturing | 880,000 (combined among Penticton and OK Falls facilities) |
| Wallis Road, Okanagan Falls, BC | 2012 | CLT and industrial mats manufacturing | 880,000 (combined among Penticton and OK Falls facilities) |
| Oliver, BC | 2018 | Industrial mats manufacturing | 1,250,000 |
| Conway, AR (operated by SMTU) | 2021 | Custom CLT and Glulam, distributor Glulam, and industrial mats manufacturing | 1,350,000 |

### (i) The Canadian Facilities.

15. SMTC leases the following facilities in Canada:

- the facilities located at units 104, 105a, and 105b, Coop Avenue, Oliver, British Columbia (the "<u>Oliver Facility</u>");

- the facility located at 1675 Maple Street Okanagan Falls, BC (the "<u>Maple Facility</u>");

- the facility located at 1716 Wallis Road, Okanagan Falls, BC (the "<u>Wallis Facility</u>", and together with the Maple Facility, the "<u>OK Falls Facilities</u>"); and

- a production facility and corporate offices at 2176 Government Street, Penticton, BC (the "<u>Penticton Facility</u>").

The Penticton Facility was used by the business prior to its acquisition by SMTC and houses the corporate headquarters of the Company.

### (ii) The US Facility.

16. In December 2019, the Company began its expansion into the United States to, among other things, capture the rapidly accelerating demand for mass timber products in the United States. As part of the expansion, the Company invested $69 million (USD) to build a state of the art manufacturing facility which was completed in 2022 on land owned by the Debtors in Conway, Arkansas.[2] As a result the Debtors operational and liquidity issues in the months preceding the Petition Date, SMTU was forced to terminate the majority of its employees at the US Facility and to suspend operations. As of the Petition Date, operations at the US Facility remain largely suspended.

---

[2] The real estate for the U.S. Facility was previously owned by NOLLC and then transferred to SMTU and ultimately to the City of Conway, Arkansas as a part of a tax incentive program entered into by the Debtors and the City of Conway in 2019.

7

### (iii) The Company's Employees.

17. The Company currently employs approximately 210 total employees. Approximately 178 employees are located in Canada, consisting of 62 salaried employees, 3 contractors, and 116 hourly manufacturing employees. The hourly manufacturing employees employed at the Penticton Facility, the OK Falls Facilities, and the Oliver Facility are subject to a collective bargaining agreement (collectively, the "Unionized Employees"). All eligible Unionized Employees participate in a Registered Retirement Savings Plan.

18. Prior to the Petition Date, SMTU employed approximately 175 employees at the US Facility, including a sales and management team, none of whom were subject to a collective bargaining agreement. Due to the liquidity constraints facing the Company, on January 18, 2023, STMU made the difficult decision to terminate 144 of its employees. Today, we have only 32 full-time employees at the US Facility, consisting of 18 salaried employees, including a sales and management team, and 14 hourly manufacturing employees for the maintenance and care of the US Facility and certain limited production. The vice president of human resources and myself, as Interim CEO, are contractors hired by SMTU.

## III. Prepetition Capital Structure.

### A. Prepetition Credit Facilities.

19. On or about December 21, 2017, SMTC, as borrower, and SLP, as guarantor, entered into a letter agreement (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Prepetition Credit Agreement") with BMO, as lender. On December 3, 2019, SMTU was added as a borrower under the Prepetition Credit Agreement. NOLLC has also been added as a guarantor the obligations under the Prepetition Credit Agreement.

20. At the date it was originally entered into, the Prepetition Credit Agreement established certain credit facilities, including: a committed revolving credit facility in the maximum principal amount of $6,500,000 (CAD); a non-revolving term credit facility in the maximum principal amount of $21,333,317 (CAD); a revolving letter of credit facility in the maximum principal amount of $2,000,000 (CAD); and a committed, reducing, non revolving term credit facility in the maximum principal amount of $40,500.000 (USD).

21. The facilities available under the Prepetition Credit Agreement were amended over time, including most recently pursuant to the eighth amendment to the Prepetition Credit Agreement, dated as of April 21, 2023 (the "Eighth Amending Agreement"), which was executed prior to the filing of these chapter 11 cases and, among other things, provided the Company much needed access to $900,000 (CAD) in additional funds under the committed revolving credit facility. As a result, as of the Petition Date, the Company's secured debt liabilities total approximately $20.5 million (CAD) and $34.9 million (USD) in principal amount, and include the following facilities under the Prepetition Credit Agreement (collectively, the "Prepetition Credit Facilities"):

| Facility | Maturity | Interest Rate | Approx. Principal Amount Outstanding |
|---|---|---|---|
| Committed Revolving Credit Facility | May 2025 | Adjustable, currently approximately 10.2% | $3.9 million (CAD) |
| Non-Revolving Term Credit Facility | May 2025 | Adjustable, currently approximately 10.2% | $16.2 million (CAD) |

| Facility | Maturity | Interest Rate | Approx. Principal Amount Outstanding |
|---|---|---|---|
| Revolving Letter of Credit Facility | May 2025 | Adjustable fees, currently approximately 12.2% in respect of CAD Letters of Credit and approximately 13.5% in respect of USD Letters of Credit | $0.413 million (CAD) |
| Committed, Reducing, Non-Revolving Term Credit Facility | May 2025 | Adjustable, currently approximately 11.5% | $34.9 million (USD) |

22. The Debtors' obligations under the Prepetition Credit Facilities are secured by substantially all of the Debtors assets in accordance with the following security and guarantee documents: (a) that certain Unlimited Guarantee in favor of BMO from each of SMTC, SMTU, and NOLLC; (b) those two certain Limited Recourse Guarantees in an unlimited amount in favor of BMO from SLP; (c) that certain Limited Guarantee up to the amount of $13,500,000 (USD) in favor of BMO from SMTU's largest customer; (d) that certain General Security Agreement providing a first-ranking security interest over all present and after-acquired personal property and a floating charge on all land from SMTC; (e) that certain General Security Agreement providing a first-ranking security interest over all present and after-acquired personal property and a floating charge on all land from SMTU; (f) that certain General Security Agreement providing a first-ranking security interest over all present and after-acquired personal property and a floating charge on all land from NOLLC; (g) that certain Collateral Mortgage in favor of BMO from SMTU for the US Facility lands; (h) that certain Securities Pledge Agreement in favor of BMO in the shares

of SMTU by SLP; (i) a bond pledge and security agreement from NOLLC to BMO dated as of December 27, 2019; (j) a leasehold mortgage and security agreement dated as of December 27, 2019 and filed of record in Faulkner County, Arkansas as Instrument No. L201919704 on December 27, 2019 by and between SMTU, as borrower, and BMO, as lender; (k) a construction mortgage, security agreement, fixture filing, and assignment of rents and leases dated as of December 27, 2019 and filed of record in Faulkner County, Arkansas as Instrument No. L201919701 on December 27, 2019 by and between SMTU, as mortgagor, and BMO, as mortgagee; and (l) a collateral assignment of option rights entered into as of December 27, 2019 and filed of record in Faulkner County, Arkansas as Instrument No. L201919705 on December 27, 2019 by SMTU, as borrower, in favor of BMO, as lender.

  **B.**  **Equipment Lease Obligations.**

  23.  The Debtors currently lease equipment through various lessors (the "Equipment Leases"). The interest and maturity terms of these leases vary, but they all provide the lessor with a security interest in the vehicle or equipment that is subject to the lease. The total amount of all remaining payments under the Equipment Leases is approximately $4.3 million (CAD) as of the Petition Date. The Company's monthly equipment lease expense is approximately $44,672 (CAD).

  **C.**  **Land Lease Obligations.**

  24.  The total amount of all remaining payments under the leases for the Oliver Facilities, the OK Facility, and the Penticton Facility is approximately $3.2 million (CAD) as of the Petition Date. SMTC's monthly lease payment is approximately $139,033 (CAD).

  **D.**  **Trade Payables**

  25.  As of the Petition Date, the Company has approximately $3.1 million (CAD) and $3.4 million (USD) in trade payables outstanding.

### E. Equity Interests.

26. The Company is privately held and none of its equity interests are traded on public exchanges. SLP's Preferred Stock is held primarily by KF Arc Holding LP (approximately 57.1 percent) and Bentonville KF SLP Holdings LP (approximately 27.5 percent), with the remaining approximately 15.4 percent of Preferred Stock held among certain minority shareholders. SLP's Common Stock is held among 13 individual holders, with options for an additional 2,914,703 shares of Common Stock held by certain members of the Company's management team. SLP owns 100 percent of the voting units of SMTC and SMTU. SMTU, in turn, owns 100 percent of the membership interests in NOLLC.

### IV. Events Leading to Chapter 11.

27. The Debtors have faced significant operational and liquidity challenges in the months leading to the filing of these chapter 11 cases. As a result, the Debtors, with the assistance of their advisors, and in consultation with the Prepetition Lender, evaluated potential strategic and restructuring alternatives, which ultimately led to the Debtors' conducting a prepetition marketing process that resulted in the Stalking Horse Purchase Agreement described below. In conjunction with those efforts, the Debtors and their advisors also sought debtor-in-possession financing to fund the Debtors' restructuring, including the postpetition auction and sale process supported by the Stalking Horse Purchase Agreement, which ultimately resulted in the DIP Lender agreeing to provide the DIP Facility. However, notwithstanding the essential funding provided under the DIP Facility, the Debtors' liquidity remains very limited and, as a result, it is important for the Debtors to secure first-day relief that will allow them to continue to maintain current operations while concluding the marketing and sale process for their assets in an efficient and effective manner.

A.     **Prepetition Restructuring Efforts.**

28.     In December 2022 the Company engaged Alvarez & Marsal Canada Inc. ("A&M") as financial advisor to assist the Company in effectuating a turnaround strategy through identifying potential opportunities to add value to the organization.  In this capacity, A&M assisted the Company in its negotiations with BMO, advised the Company as to its strategic alternatives, and assisted the Company with understanding its liquidity position.  A&M assisted in achieving additional operating efficiencies through a remodeling of the Company's financials and produced materials that assisted in achieving additional operating efficiencies.

29.     The Company operates in an industry that requires significant lead time for production and securing alternative projects.  On January 17, 2023 the boards of both SMTC and SMTU ultimately determined that there was insufficient liquidity to continue to operate the US Facility.  Accordingly, on January 18, 2023, the Company terminated 144 employees at the US Facility and suspended its operations.

30.     The resulting cessation of operations at the US Facility significantly impacted the Debtors' cash flow.  In response to this, on February 7, 2023, the Company executed the sixth amendment to the Prepetition Credit Agreement (the "Sixth Amending Agreement") which, among other things, allowed the Company to access critically needed $1.7 million (USD) in additional funds.  The additional funding under the Sixth Amending Agreement was conditional on the Company hiring an investment banker to conduct a marketing process.  On March 3, 2023, the Company executed the seventh amendment to the Prepetition Credit Agreement (the "Seventh Amending Agreement") which, among other things, allowed the Company to make drawdowns under the Revolving Facility (as each is defined in the Prepetition Credit Agreement) by way of weekly drawdowns acceptable to the Prepetition Lender in its sole discretion.

31. In conjunction with the amendments to the Prepetition Credit Facilities, the Company evaluated the possibility for certain strategic alternatives, but ultimately, the Company was unable to realize any such strategic alternative due to its inability to raise sufficient capital in time to consummate such a transaction. As a result, and despite all of the efforts described above, the Company was unable to resolve their immediate cash flow issues and was forced to evaluate other potential restructuring alternatives.

      **B.**      **Prepetition Marketing and Sale Process.**

32. Following the Debtors' entry into the Sixth Amending Agreement, by an engagement letter dated February 10, 2023, the Company retained Stifel, Nicolaus & Company, Incorporated and its indirect wholly owned subsidiary, Miller Buckfire & Co., LLC, as strategic business advisor and consultant (together, the "Sales Advisor") for the purpose of soliciting offers for the sale or recapitalization of the Company outside of a court process (the "Marketing Process").

33. The Sales Advisor launched the Marketing Process on February 10, 2023, beginning by identifying and contacting a broad group of potential strategic and financial sponsor parties for both sale and financing options. Seventy-four prospective buyers were solicited of which thirty-seven executed non-disclosure agreements and eighteen prospective investors were solicited of which seven executed non-disclosure agreements. The parties that executed non-disclosure agreements received access to the Company's virtual data room and were offered management meetings and site visits.

34. By March 8, 2023, five prospective buyers provided non-binding indications of interest. Of these five parties, four were selected to continue to the second round of the process and provided with access to additional diligence in the data room, continued access to Company management and site visits, and a draft asset purchase agreement. The Sales Advisor requested

binding bids from these four parties by March 24, 2023. On March, 24, 2023, the Sales Advisor received two bids and provided them to the Company.

35. On March 24, 2023 the Sales Advisor received and provided to the Company two unexecuted bids for some or all of the assets of the Company. Due to scheduling difficulties a third potential purchaser was unable to conduct a site visit until Saturday March 25, 2023. That party submitted a non-binding bid on March 27, 2023

### C. The Stalking Horse Purchase Agreement.

36. Following the receipt of two second round bids, the Company and its advisors worked with the initial bidders to evaluate, solidify, and improve the initial bids received. Ultimately, after such evaluation and analysis, the bid by Mercer International Inc. (the "Stalking Horse Bidder") was determined as the highest or otherwise best initial offer and the Company and its advisors engaged with the Stalking Horse Bidder concerning the terms of a purchase agreement.

37. On April 21, 2023, the Debtors and the Stalking Horse Bidder entered into that certain Asset Purchase Agreement (the "Stalking Horse Purchase Agreement").

38. The Stalking Horse Purchase Agreement provides, among other things, for the purchase of the Debtors' US and Canadian Assets, along with assumption of certain assumed liabilities, as set forth in the Stalking Horse Purchase Agreement, for a purchase price of $60 million (USD). The Stalking Horse Purchase Agreement is also subject to certain bid protections in favor of the Stalking Horse Bidder, subject to Court approval, consisting of a break-up fee of $1.8 million (USD) and an expense reimbursement not to exceed $600,000 (USD).

39. Contemporaneously herewith, the Debtors filed a motion seeking the Court's approval of the Debtors' entry into the Stalking Horse Purchase Agreement and certain procedures to govern the submission, evaluation, and selection of bids for the Company's assets, and, if necessary, conducting an auction (the "Bidding Procedures"). Due to the very limited funding

available, and to preserve the going-concern value of the Company's business, the Debtors anticipate that these chapter 11 cases will progress quickly with the expected closing of the sale to occur by June 5, 2023.

**D.     Operations During the Chapter 11 Cases.**

40.    Based on the forgoing, the Company's management believes that the value available to the various stakeholders will be maximized by implementing a sale of substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code while simultaneously (a) continuing operations at the Canadian facilities to permit the completion of ongoing, profitable contracts and permit SMTC to perform profitable contracts that are awarded to it after the commencement of the chapter 11 cases, and (b) keeping the US Facility in care and maintenance with some limited production for smaller-size projects, to maximize its value as a "turn-key" facility ready for a purchaser to restart operations. These operations are essential to preserve the value of the Debtors' business and, thereby, will maximize the value of the estates for the benefit of all stakeholders.

**V.     First Day Motions.**

41.    To ensure a smooth transition into chapter 11 and limit the operational disruption of these chapter 11 cases, the Debtors filed several First Day Motions. I have reviewed each of the First Day Motions filed to date, or filed substantially contemporaneously herewith, and the facts set forth in the First Day Motions are true and correct to the best of my knowledge, information, and belief, and are incorporated herein by reference. It is my belief that the relief sought in each of the First Day Motions is tailored to meet the goals described above and, ultimately, will enhance the Debtors' ability to maximize the value of their estates for the benefit of all of the Debtors' stakeholders.

42. The relief requested by the First Day Motions, including the requested authority to pay discrete prepetition claims or continue selected prepetition programs, is essential to preserve the value of the Debtors' estates and necessary to avoid immediate and irreparable harm to the Debtors and their stakeholders.  I believe that payment of those selected prepetition claims identified in the First Day Motions will forestall irreparable harm, thus maximizing the value of the Debtors' estates to the benefit of all stakeholders.  Further, I believe that such relief will enable the Debtors to stabilize and preserve their operations, thereby maximizing the going-concern value of the Debtors' business, and avoid a chaotic post-filing period that results in diminution of estate value.

43. I understand that the Bankruptcy Rules permit the Court to grant relief within the first 21 days after the Petition Date where such relief is necessary to avoid immediate and irreparable harm.  I believe an immediate and orderly transition into chapter 11 is critical to the viability of the Debtors' operations and that any delay in granting the relief requested in the First Day Motions could hinder the Debtors' ability to maintain the going-concern value of the Company's business and cause irreparable harm.  Furthermore, the failure to receive the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' ability to maintain their operations at this important juncture.

44. For the reasons set forth above, I believe that the relief requested in the First Day Motions is necessary to avoid immediate and irreparable harm to the Debtors and is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.  Accordingly, on behalf of the Debtors, I respectfully submit that each of the First Day Motions should be approved.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

| | |
|---|---|
| Dated: April 24, 2023<br>Penticton, British Columbia | /s/ *Matthew Karmel*<br>Matthew Karmel<br>Interim Chief Executive Officer of the Debtors |

**<u>Exhibit A</u>**

**Organizational Chart**



