## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| STRUCTURLAM MASS TIMBER U.S., INC., *et al.*,[1] | Case No. 23-10497 (CTG) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' MOTION SEEKING ENTRY OF AN ORDER (A)(I) APPROVING BIDDING PROCEDURES, (II) APPROVING STALKING HORSE PROTECTIONS AND DEBTORS' ENTRY INTO STALKING HORSE PURCHASE AGREEMENT, (III) SCHEDULING THE BID DEADLINES AND THE AUCTION, (IV) SCHEDULING HEARINGS AND OBJECTION DEADLINES WITH RESPECT TO THE SALE, (V) APPROVING THE FORM AND MANNER OF THE NOTICE THEREOF, (VI) APPROVING CONTRACT ASSUMPTION AND ASSIGNMENT PROCEDURES, AND (VII) GRANTING RELATED RELIEF AND (B)(I) APPROVING THE SALE OF THE ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, (II) APPROVING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (III) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this motion (this "Motion"), pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), and rules 2002, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of the following orders:

(a)    an order, substantially in the form attached hereto as **Exhibit A** (the "Bidding Procedures Order"):

(i)    authorizing and approving the proposed bidding procedures (the "Bidding Procedures") attached to the Bidding Procedures Order as Exhibit 1 in

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number or Canadian business number, as applicable, include: Structurlam Mass Timber U.S., Inc. (6287); Natural Outcomes, LLC (n/a); Structurlam Mass Timber Corporation (5050); and SLP Holdings Ltd. (3114).  The location of the Debtors' headquarters is:  2176 Government Street, Penticton, British Columbia, Canada V2A 8B5. The address of the registered agent for Structurlam Mass Timber U.S., Inc. is:  8 The Green, Suite A, Dover, Delaware 19901.

connection with the sale (the "Sale") of all, or substantially all, or any combination of the Debtors' assets (collectively, the "Assets"), free and clear of all liens, claims, interests, and encumbrances;

(ii)     approving the Stalking Horse Protections (defined below) and the Debtors' entry into that certain Asset Purchase Agreement dated April 21, 2023, by and between the Debtors and Mercer International Inc. (the "Stalking Horse Purchaser"), attached to the Bidding Procedures Order as Exhibit 2 (the "Stalking Horse Purchase Agreement"), subject to higher or better offers in accordance with the terms of the Stalking Horse Purchase Agreement;

(iii)    scheduling an auction in connection with the Sale (the "Auction"), a hearing date for the approval of the Sale subject to the Court's availability (the "Sale Hearing"), and the objection deadlines for the Sale Hearing (the "Sale Objection Deadline");

(iv)    approving the form and manner of notice of the Auction and Sale, attached to the Bidding Procedures Order as Exhibit 3 (the "Auction and Sale Notice");

(v)     approving procedures (the "Assumption and Assignment Procedures") for the assumption and assignment of the Assigned Contracts (as defined below), and approving the form and manner of notice thereof, attached to the Bidding Procedures Order as Exhibit 4 (the "Cure Notice"); and

(vi)    granting related relief; and

(b)    an order (the "Sale Order"), substantially in the form attached hereto as **Exhibit B**:

(i)     authorizing the Sale to the Stalking Horse Purchaser or, in the event the Stalking Horse Purchaser is not selected as the Winning Bidder (as defined in the Bidding Procedures) in accordance with the Bidding Procedures, to the Winning Bidder free and clear of all liens, claims, interests, and encumbrances;

(ii)     authorizing the assumption and assignment of the Assigned Contracts;

(iii)    authorizing the Debtors to pay the net proceeds from the Sale, up to the amount of the DIP Obligations and the Prepetition Obligations (defined below), to Bank of Montreal as lender under (i) the Debtors' debtor-in-possession financing facility (in such capacity, the "DIP Lender," such facility, the "DIP Facility," and the obligations under such facility, the "DIP Obligations") and (ii) the Debtors' prepetition secured lending facility (in such capacity, the "Prepetition Lender," such facility, the "Prepetition Facility," and the obligations under such facility, the "Prepetition Obligations"); and

(iv)    granting related relief.

In support of this Motion, the Debtors submit the *Declaration of Kevin Haggard in Support of Debtors' (A) Bidding Procedures Motion and (B) Motion to Shorten Notice Regarding Bidding Procedures Motion*, filed contemporaneously herewith (the "Haggard Declaration") and the *Declaration of Matthew Karmel, Interim Chief Executive Officer of the Debtors in Support of Debtors' Chapter 11 Petitions and First Day Motions*, filed contemporaneously herewith (the "First Day Declaration"),[2] each of which is incorporated herein by reference.  In further support of this Motion, the Debtors respectfully state as follows:

### Jurisdiction and Venue

1.    The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  The Debtors confirm their consent, pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[2]    The First Day Declaration and other relevant case information are available on the following website maintained by the Debtors' proposed claims and noticing agent Kurtzman Carson Consultants LLC ("KCC"): https://www.kccllc.net/Structurlam.  Capitalized terms used but not otherwise defined in this Motion shall have the meanings ascribed to them in the First Day Declaration, as applicable.

3.     The bases for the relief requested herein are sections 105(a), 363, 365, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007, and 9014, and Local Rule 6004-1.

**Background**

### I.     General Background

4.     The Debtors are a leading manufacturer of mass timber solutions and ground protection solutions used in construction and industrial markets, with U.S. facilities in Conway, Arkansas and Canadian facilities in Penticton, Okanagan Falls, and Oliver, British Columbia.  The Debtors have completed or assisted in supplying mass timber for numerous projects throughout North America including, among others: the University of British Columbia Brock Commons in Vancouver, British Columbia in 2016 and 2017, at the time the tallest wood structure building in the world; the Microsoft Silicon Valley Campus in Mountain View, California in 2019, at the time the largest mass timber structure built in the United States; and the Google Mountain View California campus in 2020.

5.     On April 21, 2023 (the "Petition Date"), the Debtors commenced with the Court voluntary cases (the "Chapter 11 Cases") under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee has been appointed in the Chapter 11 Cases.

6.     Contemporaneously with the filing of this Motion, the Debtors have filed with the Court a motion requesting joint administration of the Chapter 11 Cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b).

7.    The factual background regarding the Debtors, including their business operations, their capital and debt structures, and the circumstances leading to the commencement of the Chapter 11 Cases, is set forth in greater detail in the First Day Declaration.

**Prepetition Marketing Process**

8.    On February 10, 2023, the Debtors retained Miller Buckfire & Co. LLC, a wholly owned subsidiary of Stifel, Nicolaus & Co., Inc., a U.S. broker-dealer and investment banking subsidiary of Stifel Financial Corp. ("Miller Buckfire") to assist the Debtors in, among other things, a potential sale of all or substantially all of their assets and obtaining potential financing. Promptly thereafter, Miller Buckfire launched a process for the purpose of soliciting offers for the sale or recapitalization of the Company outside of a court process (the "Marketing Process"). Miller Buckfire began the Marketing Process by identifying and contacting a broad group of potential strategic and financial sponsor parties for both sale and financing options, which included all of the potential strategic buyers focused on or interested in expanding into the mass timber product industry, including glue laminated beams and cross laminated timber.  Seventy-four prospective buyers were solicited of which thirty-six executed non-disclosure agreements and eighteen prospective investors were solicited of which seven executed non-disclosure agreements. The parties that executed non-disclosure agreements received access to the Company's virtual data room and were offered management meetings and site visits.  At that stage, three parties conducted site visits and five parties conducted meetings with Company management.

9.    By March 8, 2023, five parties provided non-binding indications of interest.  These five parties were provided with access to additional diligence in the data room, continued access to Company management and site visits, and a draft asset purchase agreement.  Miller Buckfire requested binding bids from these five parties by March 24, 2023 which was an extension from an earlier target date of March 22, 2023.

10.     On March 24, 2023, Miller Buckfire received and provided to the Company two unexecuted bids for some or all of the assets of the Company.  Due to scheduling difficulties a third potential purchaser was unable to conduct a site visit until Saturday March 25, 2023.  That party submitted a non-binding bid on March 27, 2023.

### The Stalking Horse Purchase Agreement and Stalking Horse Protections

11.     Following the receipt of the initial non-binding bids, the Company and its advisors worked with initial bidders to evaluate, solidify, and improve the initial bids received.  Ultimately, after such evaluation and analysis, the bid by the Stalking Horse Purchaser was determined as the highest or otherwise best initial offer and the Company and its advisors engaged with the Stalking Horse Purchaser concerning the terms of a purchase agreement.

12.     On April 21, 2023, the Debtors and the Stalking Horse Purchaser entered into the Stalking Horse Purchase Agreement.  The following chart summarizes the terms of the Stalking Horse Purchase Agreement:[3]

| MATERIAL TERMS OF THE STALKING HORSE PURCHASE AGREEMENT[4] | |
| --- | --- |
| **Purchased Assets / Excluded Assets**<br><br>Local Rule 6004-1(b)(iv)(K)<br><br>Local Rule 6004-1(b)(iv)(M) | <u>Purchase and Sale of Assets</u>.  On the terms and subject to the conditions set forth herein, subject to Section 1.8, at the Closing, Sellers shall Transfer to Buyer, and Buyer shall purchase and acquire from Sellers the entirety of Sellers' right, title, and interest in and to all of the Sellers' assets, properties and rights of every kind and nature, whether real, personal or mixed, tangible or intangible (including goodwill), wherever located, in the physical possession of Sellers or another Person, including the following, in each case free and clear of |

---

[3]     The summary of the Stalking Horse Purchase Agreement provided herein is qualified in its entirety by reference to the provisions of the Stalking Horse Purchase Agreement.  In the event of any inconsistencies between the provisions of the Stalking Horse Purchase Agreement and the summary set forth herein, the terms of the Stalking Horse Purchase Agreement shall govern.  Capitalized terms that are used but not defined in the following summary shall have the meanings ascribed to such terms in the Stalking Horse Purchase Agreement.

[4]     Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Stalking Horse Purchase Agreement.

all Liens, claims, encumbrances, and interests (other than Permitted Encumbrances) and Excluded Liabilities (the "<u>Transferred Assets</u>"):

(a) [Reserved];

(b) Inventory;

(c) Transferred Leased Property;

(d) Transferred Owned Property;

(e) Fixtures and Equipment, including, for greater certainty, all of those assets listed on <u>Schedule 1.1(e)</u> of the Seller Disclosure Schedule;

(f) Transferred Intellectual Property and all the goodwill of the Business and/or associated with or related to such Transferred Intellectual Property;

(g) each Seller Contract listed on <u>Schedule 1.1(g)</u> of the Seller Disclosure Schedule and each Transferred Lease with respect to which an Order has been entered by the U.S. Bankruptcy Court (which may be the U.S. Sale Order) or the Canadian Court (which may be the Canadian Sale Order) authorizing the assumption and assignment of such Contract (such Contracts collectively, the "<u>Closing Assumed Contracts</u>");

(h) each non-executory Seller Contract;

(i) pursuant to <u>Section 1.6(c)</u>, each Additional Assumed Contract with respect to which an Order has been entered by the U.S. Bankruptcy Court or the Canadian Court authorizing the assumption and assignment of such Contract;

(j) the Books and Records, subject to <u>Section 6.9</u>;

(k) to the extent their transfer is permitted by Law, all Permits that are held by Sellers and applications therefor or related thereto;

(l) all rights under the Seller Plans and any trusts, funding vehicles and other assets related thereto, Unionized Employees or Continuing Employees as set forth in <u>Schedule 1.1(l)</u> of the Seller Disclosure Schedule (collectively, the "<u>Transferred Seller Plans</u>");

(m) all credits, prepaid expenses, deferred charges, advance payments, refunds, security deposits, prepaid items and duties to the extent related to a Transferred Asset, but excluding any refunds of

| | |
|---|---|
| **MATERIAL TERMS OF THE STALKING HORSE PURCHASE AGREEMENT[4]** | |

|  | Taxes to the extent included in <u>Section 1.2(h)</u> and any prepayments or deposits of any Asset Taxes prior to the date hereof for which Sellers shall receive credit to the extent provided in <u>Section 6.4(b)</u>; and

(n)    any claim, right, award, recovery, indemnity, warranty, right to insurance proceeds, refund, reimbursement, audit right, duty, obligation, liability or other intangible right in favor of or owed to any Seller (other than rights arising under or relating to this Agreement, the Transaction Documents or Sellers' or any of their Affiliates' directors' and officers' insurance policies (the "<u>D&O Insurance Claims</u>")), to the extent (i) related to any Transferred Seller Plan, (ii) related to any other Transferred Asset and arising or attributable to the period of time on or after the Closing or (iii) related to any insurance proceeds as set forth in Section 6.10(a) other than the Excluded Insurance Proceeds.

<u>Excluded Assets</u>.  Notwithstanding anything to the contrary set forth in this Agreement or in any of the other Transaction Documents, the Parties expressly acknowledge and agree that nothing in this Agreement shall be construed to obligate any Seller to Transfer to Buyer any of the assets, properties or rights of any Seller other than the Transferred Assets specifically listed in Section 1.1, and all such assets, properties or rights of any Seller (the "<u>Excluded Assets</u>") shall be excluded from the Transferred Assets.  Each Seller shall retain all of its respective right, title and interest in and to the Excluded Assets and Buyer shall not acquire and shall have no rights or Liabilities with respect to the right, title and interest of each Seller in and to the Excluded Assets, including, the following:

(a)    any claim, right, award, recovery, indemnity, warranty, refund, reimbursement, audit right, duty, obligation, liability or other intangible right in favor of or owed to any Seller (i) to the extent arising under or related to the D&O Insurance Claims, (ii) to the extent related to a Transferred Asset (other than a Transferred Seller Plan) and arising or attributable to the period of time prior to the date hereof, (ii) to the extent related to any of the Excluded Liabilities, (iii) related to any insurance proceeds from Sellers' or any of their Affiliates' third party insurance policies to the extent such proceeds arise on account of acts or omissions that occurred prior to the date of this Agreement (together with the D&O Insurance Claims, the "<u>Excluded Insurance Proceeds</u>"); |

## MATERIAL TERMS OF THE STALKING HORSE PURCHASE AGREEMENT[4]

(b)    all trade credits or refunds of costs or expenses borne by any Seller, in each case, attributable to the Transferred Assets and attributable to any period of time prior to the Closing Date;

(c)    any shares or other interests in any Person or any securities of any Person;

(d)    the articles and notice of articles, corporate charter, seal, minute books, stock record books and other similar documents relating to the organization, maintenance and existence of any Seller or any Affiliate of any Seller;

(e)    all invoices, shipping documents, purchase orders and other preprinted business forms that have any Trademark thereon other than those included in the Transferred Intellectual Property;

(f)    all Intellectual Property owned by any Seller or any of their Affiliates, other than the Transferred Intellectual Property;

(g)    all personnel records (including all human resources and other records) of any Seller or any of their Affiliates relating to employees of any Seller or any of their Affiliates, in either case, other than the personnel records of the Unionized Employees and Continuing Employees;

(h)    any refund of any Taxes paid by or on behalf of any Seller, other than refunds of Asset Taxes allocable to Buyer pursuant to Section 6.4(b);

(i)    all deposits, cash and cash equivalents, checks and funds, bank accounts and other similar cash items;

(j)    all consideration received by any Seller or their Affiliates pursuant to, and all rights of any Seller and their Affiliates under, this Agreement or any Transaction Document, subject to the terms hereof and thereof;

(k)    all of the following documents prepared or received by Sellers, their Affiliates or any of their respective Representatives, in each case, with respect to the Transferred Assets:    (i) lists of prospective buyers; (ii) offers, bids or proposals submitted by any prospective buyer; (iii) analyses by Sellers of any offers, bids or proposals submitted by any prospective buyer; (iv) correspondence between or among Sellers, their Representatives and any prospective buyer; and (v) correspondence between Sellers, their Affiliates or any of their respective Representatives with respect to any offers, bids or

| | |
|---|---|
| | **MATERIAL TERMS OF THE STALKING HORSE PURCHASE AGREEMENT**[4] |

| | |
|---|---|
| | prospective buyers, the transactions contemplated hereby or otherwise contemplated by the Bid Procedures; |
| | (l) all Retained Accounts Receivable (which, for the avoidance of doubt, shall not include the Buyer Accounts Receivable, to which Sellers shall have no entitlement under this Agreement); |
| | (m) all Seller Contracts that are not Closing Assumed Contracts or Additional Assumed Contracts (the "Excluded Contracts"); |
| | (n) all Intracompany Receivables; |
| | (o) all Tax Returns; |
| | (p) all Actions owned by or available to any Seller, whether in Law or equity and under any forum (including, purely by way of example and without limitation, Canadian or United States federal courts, any provincial court or state court, any foreign court and any extrajudicial dispute resolution mechanism), including any (i) Action set forth on Schedule 1.2(p)(i) and (ii) Avoidance Action, attributable to any period of time prior to the Closing Date including, in each case, without limitation any Action (w) related to the acquisition, ownership, management, operation, use, function or value of any Transferred Asset or Excluded Asset, (x) against any counterparty to a Closing Assumed Contract, or any Affiliate of such counterparty or (y) against any director, officer, manager, employee, contractor, consultant or advisor employed by or providing services to any Seller (such Actions, the "Excluded Actions") unless (1) related to any Transferred Assets and (2) is attributable to any period of time following the Closing Date; |
| | (q) any prepayments and good faith and other bid deposits submitted by any third party under the terms of the Bid and Contract Procedures Order; and |
| | (r) any claim, right, aware, recovery, reimbursement, or other benefit arising prior to the Closing Date from the Rebate Program and any federal matching program related thereto. |
| **Purchase Price** | Consideration. At the Closing, Buyer will pay to Sellers, by wire transfer in immediately available funds to the account or accounts designated by Sellers, an amount equal to US$60,000,000, *less* the Deposit Amount and, if applicable in accordance with Section 8.3, the |

| **MATERIAL TERMS OF THE STALKING HORSE PURCHASE AGREEMENT**[4] | |
|---|---|
| | Break-Up Fee and the Expense Reimbursement Amount (the "<u>Purchase Price</u>"). |
| **Provisions Providing Bid Protections to "Stalking Horse" or Initial Bidder**<br><br>Local Rule 6004-1(c)(i)(C) | <u>Break-Up Fee and Expense Reimbursement Amount</u>.  In consideration of Buyer and its Affiliates having expended considerable time and expense in connection with this Agreement and the negotiation thereof, and the identification and quantification of assets to be included in the Transferred Assets, and to compensate Buyer as a stalking-horse bidder in connection with the Auction, should Seller enter into a written binding agreement with respect to a Competing Transaction, then in such event, Buyer shall be entitled to:<br><br>      (a)     the Expense Reimbursement Amount, not to exceed US\$600,000; and<br><br>      (b)     an amount equal to US\$1,800,000 (the "<u>Break-Up Fee</u>").<br><br>No bidder other than Buyer shall be entitled to a Break-Up Fee or Expense Reimbursement Amount.  For the avoidance of doubt, (x) the Break-Up Fee and Expense Reimbursement Amount shall be free of any Liens and shall be payable or credited to Buyer only upon closing of the sale of the Transferred Assets (or a material portion of them) and (y) notwithstanding anything contained herein to the contrary, (i) Buyer shall have the right, but not the obligation, to increase its bid for the Transferred Assets at the Auction, and (ii) the amount of the Break-Up Fee and Expense Reimbursement Amount, once triggered pursuant to the terms of this Agreement, shall act as a credit toward any Closing by the Buyer as the high bidder or as the Backup Bidder (as defined in the Bid Procedures).  Notwithstanding anything to the contrary set forth in this Agreement, Buyer agrees that the amount of the Break-Up Fee and the Reimbursement Amount credited to Buyer against the Purchase Price at the Closing as set forth in <u>Section 2.1</u> (the "<u>Closing Credit Amount</u>") shall be reduced to the extent such credit would result in the Sellers receiving less than US\$60,000,000 in proceeds at the Closing, taking into consideration (i) any amount of the Deposit of the Winning Bidder (as such terms are defined in the Bidding Procedures) under a Competing Transaction that is payable to Sellers pursuant to the Bidding Procedures and is not disputed by the Winning Bidder, or if disputed (such amount, a "<u>Disputed Amount</u>"), such dispute has been resolved in favor of Sellers prior to the Closing and (ii) the purchase price paid by Buyer at the Closing (taking into account the Deposit Amount payable to Sellers by Buyer in accordance with <u>Section 2.2</u>); provided, that if any Disputed Amount is excluded from consideration under the foregoing subclause (i) because such amount |

| **MATERIAL TERMS OF THE STALKING HORSE PURCHASE AGREEMENT[4]** | |
|---|---|
| | remained in dispute at the time of the Closing and such Disputed Amount is later disbursed to Sellers (or Sellers' representative) following the Closing, Sellers (or Sellers' representative) shall calculate the amount that would have been credited to Buyer at the Closing pursuant to this Section 8.3 had the Disputed Amount been undisputed at the Closing (the "Final Credit Amount"), and Sellers (or Sellers' representative) shall pay Buyer the difference between the Final Credit Amount and the Closing Credit Amount, by wire transfer of immediately available funds to an account directed by Buyer, without further consideration from Buyer. |
| **Private Sale / No Competitive Bidding and Interim Arrangements with Stalking Horse Purchaser**<br><br>Local Rule 6004-1(b)(iv)(D)<br><br>Local Rule 6004-1(b)(iv)(G) | None. |
| **Privacy Ombudsman**<br><br>Local Rule 6004-1(b)(iii) | The Debtors expect that the Stalking Horse Purchaser or another Winning Bidder will agree that any personally identifiable information will be transferred subject to the Debtors' current privacy policy, which authorizes the Debtors to transfer such information in the context of the sale contemplated by this Motion. If the Stalking Horse Purchaser or another Winning Bidder seeks a transfer of such property in a manner that is contrary to such policy or otherwise requires the appointment of a consumer privacy ombudsman, the Debtors will seek such relief expeditiously, if necessary to comply with applicable law. |
| **Sale to Insider**<br><br>Local Rule 6004-1(b)(iv)(A) | None. |
| **Agreements with Management and Interim Arrangements with Proposed Buyer**<br><br>Local Rule 6004-1(b)(iv)(B) | None. |

| MATERIAL TERMS OF THE STALKING HORSE PURCHASE AGREEMENT[4] | |
|---|---|
| Local Rule 6004-1(b)(iv)(G) | |
| **Closing and Other Deadlines** Local Rule 6004-1(b)(iv)(E) | The "<u>Closing Date</u>" means the third Business Day following the date on which the last of the conditions set forth in Article VII of the Stalking Horse Purchase Agreement (other than those conditions that by their nature are to be satisfied at the Closing but subject to the fulfillment or waiver of those conditions) has been satisfied or waived, or at such other date, time and place as the Parties may mutually agree. |
| **Releases** Local Rule 6004-1(b)(iv)(C) | None. |
| **Good Faith Deposit** Local Rule 6004-1(b)(iv)(F) | Buyer shall deliver to Citibank, N.A. (the "<u>Escrow Agent</u>") a deposit in the sum of US$6,000,000 (the "<u>Deposit Amount</u>") on the terms contemplated herein. |
| **Tax Exemption** Local Rule 6004-1(b)(iv)(I) | None. |
| **Record Retention** Local Rule 6004-1(b)(iv)(J) | <u>Maintenance of Books and Records</u>.  After the Closing Date, Buyer shall until the sixth anniversary of the Closing Date, preserve, maintain and retain all books, records, other documents and electronically stored information Related to the Business, including the Books and Records, in existence on the Closing Date and, subject to compliance with applicable Law, make the same available for inspection and copying by Sellers, any of Sellers' successors or assigns or any trustee in bankruptcy and, in each case, any of their respective Representatives for any reasonable business purpose or compliance with any obligation under any applicable Law, during normal business hours of the Business upon reasonable request and upon reasonable notice. |
| **Requested Findings as to Successor Liability** Local Rule 6004-1(b)(iv)(L) | The Stalking Horse APA requires that Debtors file a sale motion seeking entry of an order that contains findings of fact and conclusions of law that the Buyer is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code and is not a successor to Seller. |
| **Credit Bidding** | Any Qualified Bidder (defined below) who has a valid and perfected lien on any assets of the Debtors' estates and the right under applicable non-bankruptcy law to credit bid claims secured by such liens shall have the right to credit bid any portion and up to the entire amount of |

| MATERIAL TERMS OF THE STALKING HORSE PURCHASE AGREEMENT[4] | |
|---|---|
| Local Rule 6004 1(b)(iv)(N) | their outstanding secured claims pursuant to section 363(k) of the Bankruptcy Code, provided that any credit bid for a material portion of the Assets by or on behalf of any party other than Bank of Montreal under the Debtors' prepetition and debtor in possession credit facilities, shall contain a cash component sufficient to pay the aggregate amount of the Debtor's accrued, unpaid administrative expenses and any other claims requiring payment in full in cash; provided, further, that any credit bid shall contain a cash component or make other provision sufficient to pay or otherwise satisfy any applicable cure costs for any executory contracts or unexpired leases to be assumed and assigned to the credit bidding party under the credit bid; provided, further, that any credit bid submitted by a party shall include a cash component sufficient to (a) pay the amount of the Stalking Horse Protections (as defined below) and (b) pay for any Assets that are unencumbered by first priority perfected liens in favor of the credit bidder. |
| **Relief from Bankruptcy Rule 6004(h)** Local Rule 6004-1(b)(iv)(O) | The Debtors believe that any Sale should be consummated as soon as practicable to preserve and maximize value. Accordingly, the Debtors request that any Sale Order approving the sale of the Assets and the assumption and assignment of the Assigned Contracts be effective immediately upon entry of such order and that the fourteen-day stay under Bankruptcy Rules 6004(h) and 6006(d) be waived. |

## **Stalking Horse Protections**

13.     By this Motion, the Debtors request authority to, among other things, provide the Stalking Horse Purchaser, subject to the terms and conditions of the Stalking Horse Purchase Agreement, (a) reimbursement of the Stalking Horse Purchaser's expenses incurred in connection with the Stalking Horse Purchase Agreement in an amount of up to $600,000 (the "Expense Reimbursement") and (b) a break-up fee in the amount of $1,800,000 (the "Break-Up Fee") and, together with the Expense Reimbursement, the "Stalking Horse Protections").

14.     The Expense Reimbursement and the Break-Up Fee, which represent one percent and three percent, respectively, of the Purchase Price (not including substantial Assumed Liabilities, each as defined in the Stalking Horse Purchase Agreement), are well below the high

end of the range of bid protections often allowed in this District for sale processes under section 363 of the Bankruptcy Code. Further, the Stalking Horse Protections are reasonable in light of, among other things, the Stalking Horse Purchaser's considerable efforts in setting a floor for the auction of the Assets.

15.    In addition, the Debtors' estates will not be impacted by the Stalking Horse Protections because the Bidding Procedures provide that any overbid must include an amount of cash consideration equal to or exceeding the sum of the Purchase Price (as defined in the Stalking Horse Purchase Agreement), *plus* the amount of the Stalking Horse Protections, *plus* $500,000.

### The Bidding Procedures[5]

**A.    Overview of Bidding Procedures**

16.    The Bidding Procedures are designed to promote a competitive, fair, and efficient Sale process that seeks to maximize the value of the Debtors' estates. If approved, the Bidding Procedures will allow the Debtors to solicit and identify bids from potential buyers that constitute the highest or otherwise best offer for the Assets on a schedule consistent with the milestones detailed in the DIP Motion and the Debtors' chapter 11 objectives.

17.    As the Bidding Procedures are attached to the Bidding Procedures Order, they are not restated in their entirety herein. Pursuant to Local Rule 6004-1, certain of the key terms of the Bidding Procedures are highlighted in the chart below.

---

[5]    The summary of the Bidding Procedures provided herein is qualified in its entirety by reference to the provisions of the Bidding Procedures. In the event of any inconsistencies between the provisions of the Bidding Procedures and the summary set forth herein, the terms of the Bidding Procedures shall govern. Capitalized terms that are used but not defined in the following summary shall have the meanings ascribed to such terms in the Bidding Procedures or Bidding Procedures Order (as applicable).

| MATERIAL TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| **Qualification of Bidders and Qualified Bids**<br><br>Local Rule 6004-1(c)(i)(A)<br><br>Local Rule 6004-1(c)(i)(B) | To participate in the bidding process or otherwise be considered for any purpose under these Bidding Procedures, a person or entity interested in consummating a Sale (a "Potential Bidder") must deliver or have previously delivered, if determined to be necessary by the Debtor in its sole discretion after consultation with Bank of Montreal, the following documents:<br><br>1.    an executed confidentiality agreement on terms acceptable to the Debtor (a "Confidentiality Agreement"), to the extent not already executed;<br><br>2.    identification of the Potential Bidder and any of the principals, corporate officers, or other representatives that are authorized to appear for and act on behalf of the Potential Bidder with respect to the contemplated transaction; and<br><br>3.    unless publicly available in a filing under applicable securities laws or regulations, the most current audited and latest unaudited financial statements (the "Financials") of the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets (x) Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure as is acceptable to the Debtor and its advisors, and (y) a written commitment acceptable to the Debtor and its advisors of the equity holder(s) of the Potential Bidder to be responsible for the Potential Bidder's obligations in connection with the Sale).<br><br>A Bid will be considered a "Qualified Bid," and each Bidder that submits a Qualified Bid will be considered a "Qualified Bidder," if the Debtors determine in their reasonable business judgment after consultation with Bank of Montreal that such Bid (a) satisfies the Bid Requirements, and (b) is reasonably likely (based on availability of financing, regulatory issues, experience, and other considerations) to be consummated, if selected as a Winning Bid, within a time frame reasonably acceptable to the Debtors after consultation with Bank of Montreal.<br><br>All Bids must be submitted in writing and satisfy the following requirements (collectively, the "Bid Requirements"):<br><br>*Purchase Price.*<br><br>       Each Bid must clearly set forth the purchase price to be paid, specifying (a) any cash and (b) any non-cash components, in sufficient detail satisfactory to the Debtors (the "Purchase Price"). Each Bid for |

| MATERIAL TERMS OF THE BIDDING PROCEDURES |
|---|
| a combination of Assets, other than for all or substantially all of the Assets, must:  (x) provide a breakdown of the share of the Purchase Price allocable to each of the Assets included in the Bid; (y) state whether the Bid is conditioned upon the Bid being the Winning Bid (as defined below) for any of the other Assets included in the Bid (and, if so, which Assets); and (z) state whether the Bidder is willing to purchase any of the Assets included in the Bid individually, and if so, the price such Bidder would pay for each such Asset. |

*Marked Agreement.*

Each Bid must be accompanied by clean and duly executed transaction documents including, at a minimum, a draft purchase agreement, the form of which shall be in a form substantially similar to the Stalking Horse APA, pursuant to which the Bidder proposes to effectuate the Sale, along with redlines of such agreement marked to reflect any amendments and modifications from the form purchase agreement provided, which amendments and modifications may not be materially more burdensome than the Stalking Horse APA or otherwise inconsistent with these Bidding Procedures.  The Debtors, in their reasonable business judgment after consultation with Bank of Montreal, will determine whether any such amendments and modifications are materially more burdensome.

*Deposit.*

Each Bid, other than a credit bid, must be accompanied by a cash deposit in an amount equal to ten percent (10%) of the aggregate value of the cash and non-cash consideration of such Bid (the "Deposit"), to be submitted by wire transfer to an escrow account to be identified and established by the Debtors.  The Deposit shall not bear interest and shall be conclusively deemed subject to the exclusive jurisdiction of the Bankruptcy Court upon receipt.

*Committed Financing.*

Each Bid must contain evidence of the Bidder's ability to consummate a Sale by June 5, 2023. To the extent that a Bid is not accompanied by evidence of such party's capacity to consummate the Sale set forth in its Bid with cash on hand, each Bid must include committed financing, documented to the Debtors' satisfaction after consultation with Bank of Montreal, that demonstrates that such party has received sufficient debt and/or equity funding commitments to satisfy the Bid's Purchase Price and other obligations thereunder. Such funding commitments or other financing must be unconditional

| MATERIAL TERMS OF THE BIDDING PROCEDURES |
|---|

and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors after consultation with Bank of Montreal.

*No Financing or Diligence Outs.*

A Bid shall not be conditioned on the obtaining or the sufficiency of financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy at the closing of specified representations and warranties or the satisfaction at the closing of specified conditions.

*Identity.*

Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Bidder if such Bidder is an entity formed for the purpose of consummating the proposed Sale contemplated by such Bid), and the complete terms of any such participation. Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any Bid. Each Bid must also include contact information for the specific person(s) and counsel whom the Debtors' advisors should contact regarding such Bid.

*Authorization.*

Each Bid must contain evidence that the Bidder has obtained authorization or approval from its board of directors (or comparable governing body) with respect to the submission of its Bid and the consummation of the Sale contemplated in such Bid.

*Adequate Assurance of Future Performance.*

Each Bid must (a) identify any executory contracts and unexpired leases to be assumed and assigned in connection with such Bid, (b) provide for the payment by the Bidder of all cure costs related to such executory contracts and unexpired leases, and (c) demonstrate, in the Debtors' reasonable business judgment that the Bidder can provide adequate assurance of future performance under all such executory contracts and unexpired leases.

*Government Approvals.*

| MATERIAL TERMS OF THE BIDDING PROCEDURES |
|---|

Each Bid must include a description of all governmental, licensing, regulatory, or other approvals or consents that are required to consummate the proposed Sale, together with evidence satisfactory to the Debtors of the ability to obtain such consents or approvals in a timely manner, as well as a description of any material contingencies or other conditions that will be imposed upon, or that will otherwise apply to, obtaining any such consents or approvals.

*Government Approvals Timeframe.*

Each Bid must set forth an estimated timeframe for obtaining any required governmental, licensing, regulatory, or other approvals or consents for consummating any proposed Sale.

*As-Is, Where-Is.*

Each Bid must include a written acknowledgement and representation that the Bidder (a) has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its offer, (b) has relied solely upon its own independent review, investigation, or inspection of any documents or the Assets in making its Bid, and (c) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Assets or the completeness of any information provided in connection therewith or the Auction.

*Honoring the Bid Procedures.*

Each Bid must affirmatively state the Bidder's agreement, and by submitting its Bid, each Bidder is so agreeing, to abide by and honor the terms of these Bidding Procedures (including if such Bid is declared the Winning Bidder or Backup Bidder (as defined below)) and to refrain from submitting a Bid or seeking to reopen the Auction after conclusion of the Auction. The submission of a Bid shall constitute a binding and irrevocable offer to acquire the Assets reflected in such Bid.

*Additional Diligence.*

Each Bidder shall comply with all reasonable requests for additional information and due diligence access by the Debtors or their advisors and Bank of Montreal regarding the Bid.

*Expenses.*

| MATERIAL TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| | Except as otherwise approved by the Bidding Procedure Order, each Bid shall not contemplate or request (and no Bidder shall receive) any break-up fee, transaction fee, termination fee, expense reimbursement, or any similar type of payment or reimbursement, and by submitting its Bid, each Bidder is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code. |
| **No-Shop or No-Solicitation Provision** Local Rule 6004-1(c)(i)(C)(1) | None. |
| **Break-Up Fee and Expense Reimbursement** Local Rule 6004-1(c)(i)(C)(2) | $1,800,000 Break-Up Fee and $600,000 Expense Reimbursement for the Stalking Horse Purchaser pursuant to the conditions set forth in the Stalking Horse Purchase Agreement and the Bidding Procedures. |
| **Initial Overbid and Bidding Increments** Local Rule 6004-1(c)(i)(C)(3) | Minimum Initial Overbid:  Any initial Overbid to the Stalking Horse Bid shall be no less than $62,900,000, consisting of $60,000,000 as the amount of the Stalking Horse Bid, *plus* $2,400,000 as the amount of the Stalking Horse Protections, *plus* $500,000. Minimum Overbid Increments:  Any subsequent Overbids shall be in increments of $500,000. Announcing Highest Bid:  After each Overbid, the Debtors shall announce the material terms of the Overbid, including value attributed to the Overbid. |
| **Treatment of Break-Up Fee and Expense Reimbursement at Auction** Local Rule 6004-1(c)(i)(C)(4) | The Stalking Horse Protections shall be taken into account in connection with each round of bidding and in each phase of the Auction by adding $2,400,000 (*i.e.*, the amount of the Stalking Horse Protections) to the amount of each Overbid made by the Stalking Horse Purchaser and, once triggered, the Stalking Horse Protections shall act as a credit toward any Closing by the Stalking Horse Purchaser as the Winning Bidder or as the Backup Bidder. |
| **Modification of Bidding and Auction Procedures** | The Debtors reserve their rights to modify these Bidding Procedures in their reasonable business judgment after consultation with Bank of Montreal, in a manner consistent with their fiduciary duties and applicable law, without further order from the Court, in any manner |

| **MATERIAL TERMS OF THE BIDDING PROCEDURES** | |
|---|---|
| Local Rule 6004-1(c)(i)(D) | that will best promote the goals of these Bidding Procedures, or impose, at or prior to the Auction, additional customary terms and conditions on a Sale, including, without limitation:  (a) extending or modifying any of the dates and deadlines set forth in these Bidding Procedures; (b) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (c) adjusting the applicable minimum Overbid increment, including by requesting that Qualified Bidders submit last or final bids on a "blind" basis; (d) adjourning or cancelling the Auction; and (e) rejecting any or all Bids or Qualified Bids. |
| **Closing with Alternative Back-Up Bidders**<br><br>Local Rule 6004-1(c)(i)(E) | <u>Designation of Backup Bidder</u>:  The Qualified Bidder with the next-highest or otherwise second-best Qualified Bid for the Assets or any subset thereof, as applicable, as determined by the Debtors in the exercise of their reasonable business judgment after consultation with Bank of Montreal, shall be required to serve as a Backup Bidder until such time as the applicable Sale is consummated, and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated by the Debtors.<br><br><u>Identity of Backup Bidder</u>:  The identity of the Backup Bidder and the amount and material terms of the Qualified Bid of the Backup Bidder shall be announced by the Debtors at the conclusion of the Auction at the same time the Debtors announce the identity of the Winning Bidder.  The Backup Bidder shall be required to keep its Qualified Bid (or if the Backup Bidder submits one or more Overbids at the Auction, its final Overbid) open and irrevocable until such time as the Sale is consummated.<br><br><u>Consummating a Sale with Backup Bidder</u>:  If a Winning Bidder fails to consummate the Sale contemplated by its Winning Bid, then the Debtors may select the Backup Bidder as the Winning Bidder, and such Backup Bidder shall be deemed a Winning Bidder for all purposes.  The Debtors will be authorized, but not required, to consummate all transactions contemplated by the Bid of such Backup Bidder without further order of the Court or notice to any party. |

**B.      Key Proposed Dates and Deadlines**

18.      The Debtors propose the below key dates and deadlines for the Sale process, certain

of which dates and deadlines may be subject to extension in accordance with the Bidding

Procedures or to Court availability.[6]

| Event | Proposed Date |
|---|---|
| Hearing on Bidding Procedures and Entry into Stalking Horse Purchase Agreement | May 1, 2023 at 10:00 a.m. (prevailing Eastern Time), subject to Court availability. |
| Service of Cure Notices | Three (3) business days after entry of the Bidding Procedures Order. |
| Service of Auction and Sale Notice | Three (3) business days after entry of the Bidding Procedures Order |
| Sale Objection Deadline and Contract Objection Deadline (other than a Winning Bidder Adequate Assurance Objection) | May 18, 2023, at 4:00 p.m. (prevailing Eastern Time). |
| Bid Deadline | May 18, 2023, at 4:00 p.m. (prevailing Eastern Time). |
| Auction (if necessary) | May 19, 2023, at 10:00 a.m. (prevailing Eastern Time). |
| Notice of Winning Bidder and Assigned Contracts | The calendar day after the Auction is completed. |
| Winning Bidder Adequate Assurance Objection Deadline | May 24, 2023, at 4:00 p.m. (prevailing Eastern Time). |
| Reply Deadline | May 25, 2023, at 12:00 p.m. (prevailing Eastern Time). |
| Sale Hearing | May 26, 2023, at 10:00 a.m. (prevailing Eastern Time), subject to Court availability. |

**C.      Notice Procedures**

19.      Within three (3) business days of the entry of the Bidding Procedures Order, the

Debtors shall serve the Auction and Sale Notice upon:  (a) the U.S. Trustee; (b) counsel to any

official committee of unsecured creditors appointed in these Chapter 11 Cases (the "Committee");

---

[6]      The Debtors reserve the right to modify the proposed sale-related dates and deadlines.

(c) counsel to the Prepetition Lender; (d) counsel to the DIP Lender; (e) those persons who have formally appeared in these Chapter 11 Cases and requested service pursuant to Bankruptcy Rule 2002; (f) the Securities and Exchange Commission; (g) the Internal Revenue Service; (h) all other applicable government agencies to the extent required by the Bankruptcy Rules or the Local Rules; (i); all parties who have asserted a lien or security interest against any of the Assets; and (j) all state attorneys general in states where the Assets are located.

20.    The Debtors will post the Auction and Sale Notice, the Cure Notice, and the Bidding Procedures Order on the website of the Debtors' claims and noticing agent.

21.    The Debtors submit that notice of this Motion coupled with service of the Auction and Sale Notice, as provided for herein (together the "Notice"), constitutes good and adequate notice of the Auction and Sale and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002.  The Debtors propose that no other or further notice of the Auction and Sale shall be required and submit that the Notice is reasonably calculated to provide all interested parties with timely and proper notice of the proposed Sale, including the date, time, and place of the Auction (if one is held), the Bidding Procedures, and the dates and deadlines related thereto.  Accordingly, the Debtors request that the form and manner of the Auction and Sale Notice be approved and that the Court determine that no other or further notice of the Auction and Sale is required.

## Assumption and Assignment Procedures

22.    The Debtors propose the following Assumption and Assignment Procedures for notifying the counterparties (each, a "Counterparty" and, collectively, the "Counterparties") with

respect to the assumption and assignment of any executory contract or unexpired lease to which a

Debtor is a party (the "Executory Contracts"):

a. On or before the date that is three (3) business days after the entry of this Order, the Debtors shall file the Cure Notice with the Court and serve the Cure Notice on each Counterparty to an Executory Contract.

b. The Cure Notice shall include, without limitation, the cure amount, if any, that the Debtors believe is required to be paid to the applicable Counterparty under section 365(b)(1)(A) and (B) of the Bankruptcy Code for each of the Executory Contracts in the event such Executory Contracts are assumed and assigned by the Debtors (the "Cure Amount"). If a Counterparty objects to (i) the assumption and assignment of the Counterparty's Executory Contract (including, without limitation, on the basis that the Stalking Horse Purchaser cannot provide adequate assurance of future performance) or (ii) the Cure Amount for any of its Executory Contracts, the Counterparty must file with the Court and serve on the Objection Notice Parties (as defined herein) a written objection (a "Contract Objection") on or before the applicable objection deadline set forth in these Assumption and Assignment Procedures.

c. Any Contract Objection shall: (i) be in writing; (ii) comply with the Bankruptcy Rules and the Local Rules; (iii) be filed with the Clerk of the Court, 824 North Market Street, 3rd Floor, Wilmington, Delaware 19801 **on or before 4:00 p.m. (prevailing Eastern Time) on May 18, 2023** (the "Contract Objection Deadline"), and proof of service of such Contract Objection upon the Objection Notice Parties shall be filed with the Court as and when required by the Local Rules; (iv) be served upon the Objection Notice Parties; and (v) state with specificity the grounds for such objection, including, without limitation, the fully liquidated Cure Amount and the legal and factual bases for any unliquidated Cure Amount that the Counterparty believes is required to be paid under section 365(b)(1)(A) & (B) of the Bankruptcy Code for the Assigned Contract, along with the specific nature and dates of any alleged defaults, the pecuniary losses, if any, resulting therefrom, and the conditions giving rise thereto and any objection to the provision of adequate assurance of future performance by the Stalking Horse Purchaser.

d. In the event that the Stalking Horse Purchaser is not the Winning Bidder, the deadline to object to the provision of adequate assurance of future performance by a Winning Bidder or Back-Up Bidder that is not the Stalking Horse Purchaser (a "Winning Bidder Adequate Assurance Objection") shall be **12:00 p.m. (ET) on May 24, 2023**, and any Winning Bidder Adequate Assurance Objections must be filed and served in the same manner as Contract Objections.

e.      The "Objection Notice Parties" are as follows:  (i) counsel to the Debtors, Chipman Brown Cicero & Cole, LLP, Hercules Plaza, 1313 North Market Street, Suite 5400, Wilmington, Delaware 19801, Attn: William E. Chipman, Jr. (chipman@chipmanbrown.com); Robert A. Weber (weber@chipmanbrown.com); Mark L. Desgrosseilliers (desgross@chipmanbrown.com); and Mark Olivere (olivere@chipmanbrown.com); (ii) counsel to any Committee appointed in these Chapter 11 Cases; (iii) counsel to the Prepetition Lender and the DIP Lender, (a) Blake, Cassels & Graydon LLP, 855 - 2nd Street S.W., Suite 3500, Bankers Hall East Tower, Calgary, Alberta, T2P 4J8, Attn: Kelly Bourassa (kelly.bourassa@blakes.com), Christopher Keliher (christopher.keliher@blakes.com), Erik Fleming (erik.fleming@blakes.com), and Austin Beck (Austin.Beck@blakes.com) (b) Chapman and Cutler LLP, 320 South Canal Street, Chicago, Illinois 60606 (Attn: Stephen R. Tetro II and James P. Sullivan), email: stetro@chapman.com and jsulliva@chapman.com, and (c) Womble Bond Dickinson (US) LLP, 1313 North Market Street, Suite 1200, Wilmington, Delaware 19801 (Attn: Matthew P. Ward), email: matthew-ward@wbd-us.com; and (iv) the Office of the United States Trustee for the District of Delaware, 855 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Benjamin.A.Hackman (Benjamin.a.hackman@usdoj.gov).

f.      Within one (1) day after the cancellation or completion of the Auction, the Debtors shall file with the Court a notice identifying the Winning Bidder (a "Notice of Winning Bidder"), which shall set forth, among other things, (i) the Winning Bidder and Back-Up Bidder (if any) and the amount of each of the Winning Bid and the Back-Up Bid (if any), (ii) the Assigned Contracts (as defined herein), as determined at such time and subject to the provisions of subsection (i) of the Assumption and Assignment Procedures, and (iii) the proposed assignee(s) of such Assigned Contracts, and serve the Notice of Winning Bidder by overnight mail and, if available, electronic mail, upon each affected Counterparty and its counsel (if known).

g.      At the Sale Hearing, the Debtors will seek Court approval of the assumption and assignment to the Winning Bidder of only those Executory Contracts, that have been selected by the Winning Bidder to be assumed and assigned (each, an "Assigned Contract," and collectively, the "Assigned Contracts").

h.      If no Contract Objection or Winning Bidder Adequate Assurance Objection, as applicable, is timely received with respect to an Assigned Contract: (i) the Counterparty to such Assigned Contract shall be deemed to have consented to the assumption by the Debtors and assignment to the Winning Bidder of the Assigned Contract, and be forever barred from asserting any objection with regard to such assumption and assignment (including, without limitation, with respect to adequate assurance of future performance by the Winning Bidder); (ii) any and all defaults under the Assigned

Contract and any and all pecuniary losses related thereto shall be deemed cured and compensated pursuant to section 365(b)(1)(A) and (B) of the Bankruptcy Code; and (iii) the Cure Amount for such Assigned Contract shall be controlling, notwithstanding anything to the contrary in such Assigned Contract, or any other related document, and the Counterparty shall be deemed to have consented to the Cure Amount and shall be forever barred from asserting any other claims related to such Assigned Contract against the Debtors and their estates or the Winning Bidder, or the property of any of them, that existed prior to the entry of the Sale Order.

i.    To the extent that the Debtors and a Counterparty are unable to consensually resolve any such Contract Objection or Winning Bidder Adequate Assurance Objection, as applicable, prior to the commencement of the Sale Hearing, such Contract Objection or Winning Bidder Adequate Assurance Objection, as applicable, will be adjudicated at the Sale Hearing or at such other date and time as may be determined by the Debtors, in consultation with the Winning Bidder, or otherwise fixed by the Court.  To the extent that (i) the Debtors settle a Contract Objection or Winning Bidder Adequate Assurance Objection or (ii) the Court enters an order resolving the Contract Objection or Winning Bidder Adequate Assurance Objection, and such settlement or order is not acceptable to the Winning Bidder, the Winning Bidder shall have the option to designate the relevant Executory Contract as no longer an Assigned Contract, in which case such Executory Contract shall not be assumed by the Debtors or assigned to the Winning Bidder, and neither the Debtors nor the Winning Bidder shall be responsible for any Cure Amounts related to such Contract.

j.    Notwithstanding anything to the contrary herein, if, after the Sale Hearing or the entry of the Sale Order, additional executory contracts or unexpired leases of the Debtors are determined to be Assigned Contracts, as soon as practicable thereafter, the Debtors shall file with the Court and serve, by regular mail, on the Counterparties a Cure Notice, and such Counterparties shall file any Contract Objections (including, without limitation, with respect to adequate assurance of future performance of the Winning Bidder and the Cure Amount) not later than seven (7) days thereafter.  If no Contract Objection is timely received, the Debtors shall be authorized to assume and assign such Assigned Contracts to the Winning Bidder, without further notice to creditors or other parties in interest and without the need for further order of the Court, and such assumption and assignment shall be subject to the terms of the Sale Order.

### <u>Need for an Expedited Approval and Implementation of the Bidding Procedures</u>

23.    The Debtors believe that the auction process and time periods set forth herein and in the Bidding Procedures are reasonable and will provide parties with sufficient time and

information necessary to formulate a bid to purchase the Assets.  Moreover, the proposed Sale timeline is the product of consensus between the Debtors and the Prepetition Lender, reached through arms' length, good faith negotiations.  Given that the Debtors recently performed an extensive prepetition marketing process that targeted the universe of potential interested parties, the proposed timeline is more than sufficient to engage with and promote active bidding by interested parties, thereby completing a fair and open Sale process that will maximize the value received for the Assets.

24.     In addition, the proposed sale timeline is informed, among other things, by the fact that the most likely bidders are (and were, as of the Petition Date) already well-aware that the Debtors' Assets are up for sale, and most likely have already been contacted or indicated their interest in the Debtors' businesses or Assets during the prepetition Marketing Process.  In connection with the formal Marketing Process, as described herein and in the Haggard Declaration, the Debtors and Miller Buckfire undertook extensive efforts to identify and reach out to potential buyers interested in a Sale transaction with the Debtors.  Given this outreach, it was well-known in the industry—among both potential strategic and financial buyers—that the Company was open to a potential Sale of the Debtors' Assets.  These efforts continue following the Petition Date as well.  Accordingly, the Debtors and Miller Buckfire, together, have interacted with third parties that are likely to have serious interest in acquiring the Debtors' Assets.

25.     Moreover, maintaining the Sale timeline as currently proposed by the Bidding Procedures Motion is necessary to the success of the Sale process.  Any extension of the Sale process that is not in accordance with the milestones set forth in the DIP Facility without the consent of the DIP Lender will result in the Debtors' breach of the DIP Facility.  The DIP Facility was sized to balance the administrative and operational costs of maintaining the Debtors' business

in chapter 11, including funding the maintenance-level of activity at the Debtors' U.S. Facility that is currently not producing, while also allowing the Debtors to conclude their Sale process in an orderly, efficient, and value-maximizing way

**Payment of Net Sale Proceeds to DIP Lender and Prepetition Lender**

26.     The Debtors further request authority, in accordance with the terms of the DIP Facility and the Prepetition Facility, to pay the net proceeds from the Sale to (a) the DIP Lender, up to the amount of the DIP Obligations, and (b) to the Prepetition Lender, up to the amount of the Prepetition Obligations.

**Basis for Relief**

**I.     The Relief Sought in the Bidding Procedures Order Is in the Best Interests of the Debtors' Estates and Should Be Approved.**

27.     Adoption of the Bidding Procedures is a valid exercise of the Debtors' business judgment.  Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling assets from its estate.  *See*, *e.g.*, *In re Culp*, 550 B.R. 683, 697 (D. Del. 2015) ("In evaluating whether a sound business purpose justifies sale of property under Section 363, courts consider a variety of factors, which essentially represent a 'business judgment' test."); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *In re Phx. Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987).  This standard prohibits other parties from second-guessing the debtor's business judgment if the debtor has shown that the proposed use will benefit the debtor's estate.  *See In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."); *see also In re Tower Air,*

*Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) ("Overcoming the presumptions of the business judgment rule on the merits is a near Herculean task.").

28.     The paramount goal in any sale of property of a debtor's estate is to maximize the proceeds realized by the estate.  *See In re Mushroom Transp. Co., Inc.*, 382 F.3d 325, 339 (3rd Cir. 2004) (holding that debtor "had a fiduciary duty to protect and maximize the estate's assets"); *Official Comm. of Unsecured Creditors of Cybergenics Corp., v. Chinery*, 330 F.3d 548, 573 (3rd Cir. 2003) (same); *In re Adams Res. Expl. Corp.*, No. 17-10866 (KG), at 12 (Bankr. D. Del. 2017) ("The relief requested in the Sale Motion . . . is a necessary and appropriate step toward enabling the Debtor to maximize the value of its bankruptcy estate, and it is in the best interests of the Debtor, its estate, and its creditors."); *Corp. Assets, Inc. v. Paloian*, 368 F.3d 761, 765 (7th Cir. 2004) (stating that in a bankruptcy sale, the "governing principle . . . is to secure the highest price for the benefit of the estate and creditors").  Accordingly, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value realized by the estate and therefore are appropriate in the context of bankruptcy transactions.  *See, e.g.*, *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 537 (3d Cir. 1999) (noting that bidding procedures that promote competitive bidding provide a benefit to a debtor's estate); *In re Energy Future Holdings Corp.*, 593 B.R. 217, 246 (Bankr. D. Del. 2018) (recognizing the appropriateness of debtors' bidding procedures where the "objective at all times was to maximize value for their estates, consistent with their fiduciary duties"); *In re Verasun Energy Corp., No. 08-12606* (BLS), 2009 WL 7215671, at *2 (Bankr. D. Del. Feb. 19, 2009); *In re Dura Auto. Sys., Inc.,* No. 06-11202 (KJC), 2007 WL 7728109, at *90 (Bankr. D. Del. Aug. 15, 2007); *In re Integrated Res., Inc.*, 147 B.R.

650, 656–57 (Bankr. S.D.N.Y. 1992) (stating that bidding procedures "encourage bidding and . . . maximize the value to the debtor's assets").

29.     The Debtors believe that the proposed Bidding Procedures will encourage prospective bidders to put forward their best bids quickly in order to generate the highest or best recoveries for the Debtors' stakeholders and also provide for substantial flexibility with respect to the structure of any Sale.  The Bidding Procedures provide for an orderly, uniform and appropriately competitive process through which interested parties may submit offers to purchase the Assets.  Given the case timeline negotiated with the Prepetition Lender, and taking into consideration the prepetition marketing process, the Debtors have structured the Bidding Procedures to promote active bidding by interested parties and to confirm the highest or otherwise best offer reasonably available for the Assets.  Additionally, the Bidding Procedures will allow the Debtors to conduct the Auction in a fair and transparent manner that will encourage participation by financially capable bidders with demonstrated ability to consummate a timely Sale.  The Bidding Procedures also allow the Debtors to determine that a single Qualifying Bid or several Qualifying Bids in the aggregate represent the highest or otherwise best offer for the Debtors' Assets.  Accordingly, the Bidding Procedures should be approved because, under the circumstances, they are reasonable, appropriate, and in the best interests of the Debtors, their estates, and all parties in interest.

## II.     The Stalking Horse Protections Should Be Approved.

30.     The Stalking Horse Purchase Agreement provides for the Stalking Horse Protections, consisting of a Break-Up Fee of $1,800,000 and an Expense Reimbursement in an amount of up to $600,000.  The Debtors believe that the Stalking Horse Protections are an essential prerequisite for the Stalking Horse Purchaser to enter into the Stalking Horse Purchase Agreement. In addition, the Debtors believe that the presence of the Stalking Horse Purchaser will set a floor

for the value of the Assets and attract other potential buyers to bid for such assets, thereby maximizing the realizable value of the Assets for the benefit of the Debtors' estates, their creditors, and all other parties in interest.

31.    Approval of the Stalking Horse Protections is governed by standards for determining the appropriateness of bid protections in the bankruptcy context.  Courts have identified at least two instances in which bid protections may benefit the estate.  First, a break-up or expense reimbursement fee may be necessary to preserve the value of a debtor's estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *In re O'Brien Envtl. Energy, Inc.*, 181 F.3d at 533.  Second, if the availability of a break-up fee or expense reimbursement was to induce a bidder to research the value of the debtor and convert the value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth.  *See id.*; *see also In re Reliant Energy Channel View LP*, 594 F.3d 200, 206–08 (3d Cir. 2010) (reasoning that a break-up fee should be approved if it is necessary to entice a party to make the first bid or if it would induce a stalking horse purchaser to remain committed to a purchase).

32.    In *O'Brien*, the Third Circuit reviewed the following nine factors set forth by the lower court as relevant in deciding whether to award a break-up fee or expense reimbursement:

    a.    the presence of self-dealing or manipulation in negotiating the break-up fee;

    b.    whether the fee harms, rather than encourages, bidding;

    c.    the reasonableness of the break-up fee relative to the purchase price;

    d.    whether the unsuccessful bidder placed the estate property in a "sale configuration mode" to attract other bidders to the auction;

e.      the ability of the request for a break-up fee to serve to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders or attract additional bidders;

f.      the correlation of the fee to a maximum value of the debtor's estate;

g.      the support of the principal secured creditors and creditors' committees of the break-up fee;

h.      the benefits of the safeguards to the debtor's estate; and

i.      the substantial adverse impact of the break-up fee on unsecured creditors, where such creditors are in opposition to the break-up fee.

*See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d at 536.

33.      Although none of the factors is dispositive, an application of the facts to several of such factors supports the approval of the Stalking Horse Protections in this case.  In particular, the Stalking Horse Protections are necessary to preserve the value of the Debtors' estates because they will enable the Debtors to secure an adequate floor for the Assets—a clear benefit to the Debtors' estates.

34.      Moreover, there has been no showing of any self-dealing or manipulation of any kind in the negotiation of the Stalking Horse Protections.  Rather, the Stalking Horse Protections are the result of good faith, arm's-length negotiations between the Debtors and the Stalking Horse Purchaser.  In fact, the Prepetition Lender only agreed to support the Debtors' cases conditioned upon the having the Stalking Horse Purchase Agreement in place, which includes the Stalking Horse Protections.  The Debtors believe that the agreement to pay the Stalking Horse Protections is reasonable and necessary to induce the Stalking Horse Purchaser to enter into the transactions encompassed by the Stalking Horse Purchase Agreement.

35.      Further, the Stalking Horse Purchaser would not agree to act as a stalking horse without the Stalking Horse Protections, given the substantial time and expense that it incurred in connection with entering into definitive documentation and the risk that it will be outbid at the

Auction. Without the Stalking Horse Protections, the Debtors might lose the opportunity to obtain the highest or otherwise best offer for the Assets, may have lost the financing from the Prepetition Lender for these Chapter 11 Cases, and would certainly lose the downside protection that will be afforded by the existence of the Stalking Horse Purchaser. *See, e.g.*, *In re Enjoy Technology, Inc.*, Case No. 22-10580 (Bankr. D. Del. July 26, 2022) [Docket No. 199] (approving break-up fee and expense reimbursement). Additionally, without the floor established by the Stalking Horse Purchaser, the bids received at Auction for the Assets could be substantially lower than the bid offered by the Stalking Horse Purchaser.

36. Pursuant to the Bidding Procedures, any bidder that wishes to participate in the Auction must submit an offer that is higher or otherwise better than the bid of the Stalking Horse Purchaser, which would be used to fund the Stalking Horse Protections. The bid of the Stalking Horse Purchaser attracts additional bidders because, among other things, additional bidders will be able to save considerable time and expense because they can use many of the documents that the Stalking Horse Purchaser heavily negotiated, including the Stalking Horse Purchase Agreement and the schedules thereto, in making their bid. In sum, if the Assets are sold to a Winning Bidder other than the Stalking Horse Purchaser, the Sale likely will be the result of the Stalking Horse Purchaser's crucial role as an initial bidder generating interest in the Assets and establishing a minimum acceptable price and offer against which other parties can bid.

37. Finally, the Debtors believe that the amount of the Stalking Horse Protections is appropriate when compared to bid protections approved in other cases in this District.[7]

---

[7] *See, e.g.*, *In re Am. Eagle Del. Holding Co., LLC*, No. 22-10028 (JKS) [D.I. 146] (approving a breakup fee of 3% of the cash consideration of the stalking horse bid plus expense reimbursements equal to a maximum of 1.25% of the cash consideration of the stalking horse bid capped at $50,000); *In re Ector Cnty. Energy Ctr., LLC*, No. 22-10320 (JTD) (Bankr. D. Del. May 6, 2022) [D.I. 136] (approving breakup fee of 3% of cash consideration of the stalking horse bid plus expense reimbursements equal to a maximum of 0.5% of the cash consideration of the stalking horse bid); *In re BHCosmetics Holdings, LLC*, No. 22-10050 (CS) (Bankr. D. Del. Jan. 28, 2022) [D.I. 90] (approving breakup fee equal to 4% of the cash consideration of the stalking horse bid plus expense

Accordingly, the Debtors submit that the Stalking Horse Protections are reasonable under the circumstances of these Chapter 11 Cases and should be approved.

### III.    The Form and Manner of the Auction and Sale Notice Should Be Approved.

38.    Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide creditors with 21 calendar days' notice of a hearing where the Debtors will seek to use, lease, or sell property of the estate outside the ordinary course of business.  Bankruptcy Rule 2002(c) requires any such notice to include the time and place of the auction and the hearing and the deadline for filing any objections to the relief requested therein.

39.    The Debtors submit that the Auction and Sale Notice constitutes good and adequate notice of the Auction and Sale and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002.  Accordingly, no further notice is necessary and the Debtors request that this Court approve the form and manner of the the Auction and Sale Notice.

### IV.    The Assumption and Assignment Procedures Should Be Approved.

40.    To facilitate and effectuate the Sale, the Debtors are seeking approval of the Assumption and Assignment Procedures.  The Assumption and Assignment Procedures are reasonable and necessary to properly notify parties of potential assumptions and assignments and

---

reimbursements equal to a maximum of approximately 3.5% of the cash consideration of the stalking horse bid); *In re Gorham Paper & Tissue, LLC*, No. 20-12814 (KBO) (Bankr. D. Del. Nov. 19, 2020) [D.I. 112] (approving break-up fee in an amount equal to approximately 3.4% of cash purchase price and expense reimbursement up to an amount equal to approximately 1.1% of cash purchase price);*In re Brooks Bros. Grp., Inc.*, Case No. 20-11785 (CSS) Bankr. D. Del. Aug. 3, 2020) [D.I. 285] (authorizing a break-up fee of 3% and an expense reimbursement capped at $1 million, for total bid protections of up to 3.3%); *In re Lucky Brand Dungarees, LLC*, Case No. 20-11768 (CSS) (Bankr. D. Del. July 30, 2020) [D.I. 251] (authorizing an expense reimbursement capped at $1 million and a break-up fee of 3% of the sum of the purchase price, credit bid, value of standby letters of credit, and $7 million of assumed liabilities, for total bid protections of approximately 3.5%); *In re Templar Energy LLC*, Case No. 20-11441 (BLS) (Bankr. D. Del. June 29, 2020) [D.I. 130] (authorizing break-up fee of 3% of the cash component of the stalking horse purchase price and expense reimbursement up to $350,000, for total bid protections of approximately 3.5%).

provide the Counterparties with sufficient time to determine the accuracy of the proposed cure amount and whether the Debtors have provided adequate assurance of future performance.

41.     The Debtors will demonstrate at the Sale Hearing that the requirements for assumption and assignment of the Assigned Contracts to the Winning Bidder will be satisfied.  As required by the Bidding Procedures, the Debtors will evaluate the financial wherewithal of potential bidders before designating such party a Qualified Bidder or Winning Bidder.  Further, the Assumption and Assignment Procedures provide the Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of the Winning Bidder to provide adequate assurance of future performance and object to the assumption of the Assigned Contracts or proposed cure amounts.  The Court therefore will have a sufficient basis to authorize the Debtors to assume and assign or reject the Assigned Contracts.

42.     Accordingly, the Debtors submit that the Assumption and Assignment Procedures should be approved as reasonable and necessary measures to adequately notify parties in interest and conduct the proposed sale process in a fair, efficient, and proper manner.

**V.     The Proposed Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code.**

43.     The Debtors further submit that it is appropriate to sell the Assets free and clear of any liens, claims, or interests in such property pursuant to section 363(f) of the Bankruptcy Code, with any such liens attaching to the net sale proceeds of the Assets to the same extent and with the same priority as such liens held against the Assets immediately prior to the Sale.  Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of an entity's liens if: (i) such a sale is permitted under applicable non-bankruptcy law; (ii) the party asserting such a lien, claim, or interest consents to such sale; (iii) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; (iv) the interest is the

subject of a *bona fide* dispute; or (v) the party asserting the lien, claim, or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest.

44.     Section 363(f) of the Bankruptcy Code is drafted in the disjunctive, therefore, satisfaction of any one of its five requirements will suffice to permit the sale of the Assets "free and clear" of liens.  *In re Decora Indus., Inc.*, No. 00-4459 (JJF), 2002 WL 32332749, at *7 (D. Del. May 20, 2002) ("Because §363(f) is drafted in the disjunctive, the satisfaction of any of the requirements outlined is sufficient to warrant Debtors' sale of the Assets free and clear of all Liens."); *Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (Bankr. E.D. Pa. 1988) (same).

45.     The Debtors believe that one or more of the tests of section 363(f) of the Bankruptcy Code are satisfied with respect to the transfer of the Assets.  To the extent the Debtors find that any party may hold a lien on all, or a portion of, the Assets, the Debtors will provide such party with notice of, and an opportunity to object to, the Sale.  Absent objection, each such party will be deemed to have consented to the sale of the Assets.  Furthermore, courts have held that they have the equitable power to authorize sales free and clear of interests that are not specifically covered by section 363(f).  *See, e.g., In re Trans World Airlines, Inc.*, 2001 WL 1820325 at *3, 6 (Bankr. D. Del. March 27, 2001); *Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987).  Accordingly, section 363(f) of the Bankruptcy Code authorizes the sale of the Assets free and clear of any such liens, claims, interests, and encumbrances.

## VI.     The Winning Bidder Should Be Entitled to the Protections of Section 363(m) of the Bankruptcy Code.

46.     Pursuant to section 363(m) of the Bankruptcy Code, a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims.  *See, e.g., In*

*re Mark Bell Furniture Warehouse, Inc*., 992 F.2d 7, 8 (1st Cir. 1993); *In re Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985); *In re Congoleum Corp.*, No. 03-51524, 2007 WL 1428477, *2 (Bankr. D. N.J. May 11, 2007); *Abbotts Dairies of Pa.*, 788 F.2d 143, 147 (3d Cir. 1986).

47.     Any agreement consummating a Sale will be negotiated at arm's length by sophisticated parties, each represented by their own advisors.  Accordingly, the Debtors request that the Sale Order include a provision that the Winning Bidder for the Assets is a "good faith" purchaser within the meaning of Bankruptcy Code section 363(m).  The Debtors believe that providing any Winning Bidder with such protection will ensure that the maximum price will be received by the Debtors for the Assets and closing of the same will occur promptly.

## VII.    Assumption and Assignment of Executory Contracts and Unexpired Leases Should Be Authorized.

48.     Section 365(a) of the Bankruptcy Code provides that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  Courts employ the business judgment standard in determining whether to approve a debtor's decision to assume or reject an executory contract or unexpired lease.  *See, e.g.*, *In re HQ Glob. Holdings, Inc*., 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding that debtor's decision to assume or reject an executory contract is governed by a business judgment standard and may only be overturned if the decision is a product of bad faith, whim, or caprice); *In re Market Square Inn, Inc*., 978 F.2d 116, 121 (3d Cir. 1992) (stating that assumption or rejection of lease "will be a matter of business judgment by the bankruptcy court").

49.     The "business judgment" test in this context "requires only that the trustee [or debtor in possession] demonstrate that [assumption] or rejection of the contract will benefit the estate." *In re Wheeling-Pittsburgh Steel Corp*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987); *see also Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989).  Any further

requirement would slow the administration of the debtor's estate, increase costs, and interfere with the Bankruptcy Code's provision for private control of administration of the estate. Prior to assuming an executory contract, however, section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the contracts to be assumed be cured or that the Debtors provide adequate assurance that such defaults will be promptly cured.

50.     The Debtors respectfully submit that, prior to any assumption of an Assigned Contract, the Debtors and/or a Winning Bidder will cure any amounts necessary to assume the Assigned Contract. Indeed, as required by the Bankruptcy Code, the Debtors' assumption and assignment of the Assigned Contracts will be contingent upon payment or reserve of Cure Amount in connection with the Sale.

51.     Once an executory contract is assumed, the Bankruptcy Code provides that the Debtors may elect to assign such contract. *See In re Rickel Home Center, Inc.*, 209 F.3d 291, 299 (3d Cir. 2000) ("The Code generally favors free assignability as a means to maximize the value of the debtor's estate."). Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor may assign an executory contract or unexpired lease of nonresidential real property if "adequate assurance of future performance by the assignee of such contract or lease is provided."

52.     As set forth herein and in the Bidding Procedures, for a bid to qualify as a Qualifying Bid, a Potential Bidder must include with its bid information regarding its ability (and the ability of its designated assignee, if applicable) to perform under the Executory Contracts that it wishes for the Debtors to assume and assign. Each affected Counterparty will have an opportunity to object to the ability of the Winning Bidder to provide adequate assurance as provided in the Bidding Procedures Order. To the extent necessary, the Debtors will present facts at the Sale Hearing to show the financial wherewithal, willingness and ability of the Winning

Bidder to perform under the Executory Contracts that it wishes for the Debtors to assume and assign.

53.     Accordingly, the Debtors request approval under section 365 of the Bankruptcy Code of the Debtors' assumption and assignment of the Assigned Contracts in connection with the Sale.  The Debtors further request that the Sale Order provide that the Assigned Contracts will be transferred to, and remain in full force and effect for the benefit of, the Winning Bidder notwithstanding any provisions in the Assigned Contracts, including those described in sections 365(b)(2) and (f)(1) and (f)(3) of the Bankruptcy Code that prohibit such assignment.

**Waiver of Bankruptcy Rules 6004(a) and 6004(h)**

54.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

**Notice**

55.     The Debtors will provide notice of this Motion to:  (a) the Office of the United States Trustee for the District of Delaware; (b) the United States Attorney's Office for the District of Delaware; (c) the state attorneys general for all states in which the Debtors conduct business; (d) the Internal Revenue Service; (e) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (f) counsel to the Prepetition Lender; (g) counsel to the DIP Lender; (h) the Insurance Carriers; (i) the Insurance Brokers; and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002.  Additionally, notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013 1(m).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Debtors respectfully request (i) entry of the Bidding Procedures Order, substantially in the form attached hereto as **Exhibit A**, (ii) entry of the Sale Order, substantially in the form attached hereto as **Exhibit B**, and (iii) such other and further relief as is just and proper.

Dated: April 24, 2023
    Wilmington, Delaware

**CHIPMAN BROWN CICERO & COLE, LLP**

/s/ Mark L. Desgrosseilliers
William E. Chipman, Jr. (No. 3818)
Robert A. Weber (No. 4013)
Mark L. Desgrosseilliers (No. 4083)
Mark D. Olivere (No. 4291)
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Telephone:    (302) 295-0191
Email:    chipman@chipmanbrown.com
    weber@chipmanbrown.com
    desgross@chipmanbrown.com
    olivere@chipmanbrown.com

*Proposed Conflicts Counsel to Debtors and Debtors in Possession*

## **EXHIBIT A**

**Bidding Procedures Order**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| STRUCTURLAM MASS TIMBER U.S., INC., *et al.*,[1] | ) Case No. 23-10497 (CTG) |
|  | ) |
|  | ) (Jointly Administered) |
| Debtors. | ) |
|  | ) |

## ORDER (I) APPROVING BIDDING PROCEDURES, (II) APPROVING STALKING HORSE PROTECTIONS AND DEBTORS' ENTRY INTO STALKING HORSE PURCHASE AGREEMENT, (III) SCHEDULING THE BID DEADLINES AND THE AUCTION, (IV) SCHEDULING HEARINGS AND OBJECTION DEADLINES WITH RESPECT TO THE SALE, (V) APPROVING THE FORM AND MANNER OF THE NOTICE THEREOF, (VI) APPROVING CONTRACT ASSUMPTION AND ASSIGNMENT PROCEDURES, AND (VII) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of (a) an order (this "Bidding Procedures Order"): (i) authorizing and approving the proposed bidding procedures (the "Bidding Procedures") attached hereto as **Exhibit 1**, in connection with the sale (the "Sale") of all, or substantially all, or any combination of the Debtors' assets (collectively, the "Assets"), free and clear of all liens, claims, interests, and encumbrances; (ii) approving the Stalking Horse Protections and the Debtors' entry into that certain Asset Purchase Agreement dated April 21, 2023, by and between the Debtors and Mercer International Inc. (the "Stalking Horse Purchaser"), attached hereto as **Exhibit 2** (the "Stalking Horse Purchase Agreement"), subject to higher or better offers in

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number or Canadian business number, as applicable, include: Structurlam Mass Timber U.S., Inc. (6287); Natural Outcomes, LLC (n/a); Structurlam Mass Timber Corporation (5050); and SLP Holdings Ltd. (3114).  The location of the Debtors' headquarters is:  2176 Government Street, Penticton, British Columbia, Canada V2A 8B5. The address of the registered agent for Structurlam Mass Timber U.S., Inc. is: 8 The Green, Suite A, Dover, Delaware 19901.

[2]  Capitalized terms used but not otherwise defined herein have the meanings given to such terms in the Motion or the Bidding Procedures (defined herein), as applicable.

accordance with the terms of the Stalking Horse Purchase Agreement; (iii) scheduling an auction in connection with the Sale (the "Auction"), a hearing date for the approval of the Sale subject to the Court's availability (the "Sale Hearing"), and the objection deadlines for the Sale Hearing (collectively, the "Sale Schedule"); (iv) approving the form and manner of notice of the Auction and Sale, attached hereto as **Exhibit 3** (the "Auction and Sale Notice"); (v) approving procedures (the "Assumption and Assignment Procedures") for the assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale (collectively, the "Assigned Contracts"), and approving the form and manner of the Cure Notice; and (vi) granting related relief, and (b) an order (the "Sale Order"), the form of which will be filed by the Debtors prior to the Sale Hearing, (i) authorizing the Sale to the Stalking Horse Purchaser or, in the event the Stalking Horse Purchaser is not selected as the Winning Bidder in accordance with the Bidding Procedures, to the Winning Bidder free and clear of all liens, claims, interests, and encumbrances; (ii) authorizing the assumption and assignment of the Assigned Contracts; and (iii) granting related relief all as more fully set forth in the Motion; and the Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate and no other notice need be provided; and this Court having reviewed the Motion

and having heard any statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, **IT IS HEREBY FOUND AND DETERMINED THAT:**

A.    In the Motion and at the Hearing on the relief set forth herein, the Debtors demonstrated that good and sufficient notice of the relief granted by this Order has been given and no further notice is required.  A reasonable opportunity to object or be heard regarding the relief granted by this Order (including, without limitation, with respect to the Bidding Procedures and the Stalking Horse Protections) has been afforded to those parties entitled to notice pursuant to Bankruptcy Rule 2002 and all other interested parties.

B.    The Auction and Sale Notice (as defined herein), in substantially the form attached hereto as **Exhibit 3**, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of this Order, the Bidding Procedures, the auction for the Assets (the "Auction"), the Sale, and the Sale Hearing, and any and all objection deadlines related thereto, and no other or further notice is required of the foregoing.

C.    The Debtors have articulated good and sufficient business reasons for this Court to approve the Bidding Procedures, and the Bidding Procedures are: (i) fair, reasonable, and appropriate; and (ii) designed to maximize recovery with respect to the Sale.

D.    The Assumption and Assignment Procedures provided for herein and the Cure Notice (as defined herein), in substantially the form attached hereto as **Exhibit 4**, are reasonable and appropriate and consistent with the provisions of section 365 of the Bankruptcy Code and Bankruptcy Rule 6006.  The Assumption and Assignment Procedures and the Cure Notice have

been tailored to provide an adequate opportunity for all Counterparties (as defined herein) to assert any Contract Objections (as defined herein).

E.      The Debtors have articulated good and sufficient reasons and business justification for the Court to grant the relief requested in the Motion regarding the Stalking Horse Protections, consisting of the Expense Reimbursement and the Break-Up Fee.  The Stalking Horse Protections, as approved by this Order, are fair and reasonable and provide a benefit to the Debtors' estates and stakeholders.

F.      If triggered in accordance with the terms of the Stalking Horse Purchase Agreement, the payment of the Stalking Horse Protections under this Order and upon the conditions set forth in the Stalking Horse Purchase Agreement and the Bidding Procedures, is (i) an actual and necessary cost of preserving the Debtors' estates, within the meaning of sections 503(b) and 507(a) of the Bankruptcy Code, (ii) reasonably tailored to encourage, rather than hamper, bidding for the Assets, by providing a baseline of value, increasing the likelihood of competitive bidding at the Auction, and facilitating participation of other bidders in the Sale process, thereby increasing the likelihood that the Debtors will receive the best possible price and terms for the Assets, (iii) of substantial benefit to the Debtors' estates and stakeholders and all parties in interest herein because it encouraged the Stalking Horse Purchaser to submit the Stalking Horse Purchase Agreement and is a condition of the Stalking Horse Purchase Agreement, (iv) reasonable and appropriate, (v) a material inducement for, and conditions necessary to, ensure that the Stalking Horse Purchaser will continue to pursue its proposed agreement to purchase the Assets, and (vi) reasonable in relation to the Stalking Horse Purchaser's efforts and to the magnitude of the Sale and the Stalking Horse Purchaser's lost opportunities resulting from the time spent pursuing such transaction

G.     Entry of this Order is in the best interests of the Debtors, their estates and creditors, and all other parties in interest.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT**:

1.     Those portions of the Motion seeking approval of (a) the Bidding Procedures, attached hereto as **Exhibit 1**, (b) the Debtors' entry into the Stalking Horse Purchase Agreement attached hereto as **Exhibit 2** and all of its terms (subject to higher or otherwise better offers in accordance with the Stalking Horse Purchase Agreement and this Order), (b) the Assumption and Assignment Procedures, (c) the Stalking Horse Protections, (d) the date and time of the Sale Hearing, and (e) the noticing and objection procedures related to each of the foregoing, including, without limitation, the notice of the Sale and the entry of this Order, substantially in the form attached hereto as **Exhibit 3** (the "Auction and Sale Notice"), and the notice of the Debtors' potential assumption and assignment of executory contracts and unexpired leases (the "Executory Contracts") that may be Assigned Contracts, substantially in the form attached hereto as **Exhibit 4** (the "Cure Notice") (subclauses (a) – (e) above, collectively, the "Bidding and Auction Process"), are hereby GRANTED to the extent set forth herein.

2.     Any objections filed in response to the Motion as it pertains to the Bidding and Auction Process or the relief granted herein, to the extent not withdrawn, waived, or resolved as set forth herein or on the record at the Hearing, are hereby overruled and denied on the merits with prejudice.

**I.     Important Dates and Deadlines**

3.     The following dates and deadlines are hereby approved as set forth below and subject to modification in accordance with the Bidding Procedures.

(a)     Bid Deadline. May 18, 2023, at 4:00 p.m. (prevailing Eastern Time), is the deadline by which Bids for the Assets (as well as the deposit and all other

documentation required under the Bidding Procedures for Qualified Bidders) must be submitted.

(b)     Sale Objection Deadline.  May 18, 2023, at 4:00 p.m. (prevailing Eastern Time) is the deadline (the "Sale Objection Deadline") by which all objections to the Sale, other than a Contract Objection or Winning Bidder Adequate Assurance Objection, must be filed with the Court.  Replies to any such objections shall be filed with the Court by May 25, 2023, at 12:00 p.m. (prevailing Eastern Time).

(c)     Contract Objection Deadline.  May 18, 2023, at 4:00 p.m. (prevailing Eastern Time) is the deadline (the "Contract Objection Deadline") by which Counterparties to Executory Contracts must file with the Court and serve on the Objection Notice Parties an objection with respect to (i) the assumption and assignment of the Counterparty's Executory Contract (including, without limitation, on the basis that the Stalking Horse Purchaser cannot provide adequate assurance of future performance) or (ii) the Cure Amount for any of its Executory Contracts.

(d)     Auction.  May 19, 2023, at 10:00 a.m. (prevailing Eastern Time) is the date and time that the Auction, if any, will be held via videoconference, or such later date, time, and location, as selected by the Debtors.

(e)     Winning Bidder Adequate Assurance Objection Deadline.  May 24, 2023, at 4:00 p.m. (prevailing Eastern Time) is the deadline (the "Winning Bidder Adequate Assurance Objection Deadline") by which, in the event that the Stalking Horse Purchaser is not the Winning Bidder, Counterparties to Executory Contracts must file with the Court and serve on the Objection Notice Parties an objection with respect to the provision of adequate assurance of future performance by a Winning Bidder or Back-Up Bidder that is not the Stalking Horse Purchaser.

(f)     Sale Hearing.  The hearing approving the Sale to the Winning Bidder shall take place before the Court on May 26, 2023, at 10:00 a.m. (prevailing Eastern Time).

## II.     The Bidding Procedures

4.     The Bidding Procedures, substantially in the form attached hereto as **Exhibit 1**, are hereby approved in their entirety, and the Bidding Procedures shall govern the submission, receipt, and analysis of all bids relating to the proposed Sale of the Assets.  Any party desiring to bid on one or more individual Assets or all or substantially all of the Assets shall comply with the Bidding

Procedures and this Bidding Procedures Order.  The Debtors are authorized to take any and all actions necessary to implement the Bidding Procedures.

### III.    The Auction

5.      If no timely Qualifying Bids other than the Stalking Horse Purchase Agreement are submitted on or before the Bid Deadline, the Debtors shall not hold an Auction and shall request at the Sale Hearing that this Court approve the Stalking Horse Purchase Agreement and the transactions contemplated thereunder.  If the Debtors timely receive one or more Qualifying Bids other than the Stalking Horse Purchase Agreement, then the Debtors shall conduct the Auction, in accordance with the Bidding Procedures, on May 19, 2023 at 10:00 a.m. (prevailing Eastern Time), subject to any adjournment in accordance with the Bidding Procedures.

6.      Only Qualified Bidders that have submitted Qualified Bids by the Bid Deadline are eligible to participate in the Auction, *provided* that the Stalking Horse Purchaser shall be considered a Qualified Bidder and the Stalking Horse Purchase Agreement shall be considered a Qualified Bid.  If the Debtors receive two or more Qualified Bids with respect to the Assets or any combination thereof, as applicable, then the Debtors will conduct the Auction to determine the Winning Bidder (as defined below) with respect to such Assets.   The Debtors and their professionals shall direct and preside over the Auction.

7.      At the Auction, Qualified Bidders that have submitted Qualified Bids by the Bid Deadline will be entitled, but will not be obligated, to submit Overbids, and will be entitled in any such Overbids to credit bid all or a portion of the value of the secured portion of its claims within the meaning of section 363(k) of the Bankruptcy Code, subject to the limits on credit bidding set forth in the Bidding Procedures.

8.      Any initial Overbid to the Stalking Horse Bid, which shall serve as the Baseline Bid, shall be no less than $62,900,000, consisting of $60,000,000 as the amount of the Stalking Horse Bid, *plus* $2,400,000 as the amount of the Stalking Horse Protections, *plus* $500,000.

9.      Any subsequent Overbids shall be in increments of $500,000.

10.     The Auction shall continue until the Debtors select, in their reasonable business judgment, pursuant to the Bidding Procedures, the highest or otherwise best Qualified Bid(s) for the Assets or any combination thereof, as applicable.  Such Qualified Bid shall be declared the Winning Bid, and such Qualified Bidder shall be declared the Winning Bidder, and upon such declaration of the Winning Bid and the Winning Bidder, the Auction will be closed.

11.     The Debtors may reject any Bid (regardless of whether such Bid is a Qualified Bid) that, in the Debtors' business judgment, is (a) inadequate, insufficient, or not the highest or best Bid, (b) not in conformity with the requirements of the Bankruptcy Code, the Bankruptcy Rules, or the Bidding Procedures, or (c) contrary to, or otherwise not in the best interests of the Debtors' estates, affected stakeholders, or other parties in interest.

## IV.    Notice Procedures

12.     The Auction and Sale Notice substantially in the form attached hereto as **Exhibit 3** is approved.

13.     Within three (3) business days of the entry of the Bidding Procedures Order, the Debtors shall serve the Auction and Sale Notice upon:  (a) the U.S. Trustee; (b) counsel to any official committee of unsecured creditors appointed in these Chapter 11 Cases (the "Committee"); (c) counsel to the Prepetition Lender; (d) counsel to the DIP Lender; (e) those persons who have formally appeared in these Chapter 11 Cases and requested service pursuant to Bankruptcy Rule 2002; (f) the Securities and Exchange Commission; (g) the Internal Revenue Service; (h) all other applicable government agencies to the extent required by the Bankruptcy Rules or the Local Rules;

(i); all parties who have asserted a lien or security interest against any of the Assets; and (j) all state attorneys general in states where the Assets are located.

14.     The Debtors shall post the Auction and Sale Notice, the Cure Notice, and the Bidding Procedures Order on the website of the Debtors' claims and noticing agent.

15.     Notice of the Motion coupled with service of the Auction and Sale Notice (together the "Notice"), constitutes good and adequate notice of the Auction and Sale and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002.

16.     No other or further notice of the Auction and Sale shall be required.

17.     Any objections to the Sale or the relief requested in connection with the Sale (a "Sale Objection"), other than a Contract Objection or Winning Bidder Adequate Assurance Objection, which shall each be governed by the Assumption and Assignment Procedures, must: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) set forth the specific basis for the Sale Objection; (d) be filed with the Clerk of this Court, 824 North Market Street, 3rd Floor, Wilmington, Delaware 19801 **on or before 4:00 p.m. (ET) on May 18, 2023** (the "Sale Objection Deadline"), and proof of service of such Sale Objection upon the Objection Notice Parties shall be filed with the Court as and when required by the Local Rules; and (e) be served upon the Objection Notice Parties.  If a Sale Objection is not filed and served on or before the Sale Objection Deadline in accordance with the foregoing requirements, the objecting party may be barred from objecting to the Sale and being heard at the Sale Hearing, and this Court may enter the Sale Order without further notice to such party.

18.     The Debtors and any other entity shall have until **one (1) business day prior to the Sale Hearing at 12:00 p.m. (prevailing Eastern Time)** to file and serve a reply to any objection

filed in connection with the Sale, including, without limitation, any Sale Objection, Contract

Objection, or Winning Bidder Adequate Assurance Objection.

**V.      The Assumption and Assignment Procedures**

19.    The following "Assumption and Assignment Procedures" are hereby approved:

a.    On or before the date that is three (3) business day after the entry of this Order, the Debtors shall file the Cure Notice with the Court and serve the Cure Notice on each Counterparty to an Executory Contract.

b.    The Cure Notice shall include, without limitation, the cure amount, if any, that the Debtors believe is required to be paid to the applicable Counterparty under section 365(b)(1)(A) and (B) of the Bankruptcy Code for each of the Executory Contracts in the event such Executory Contracts are assumed and assigned by the Debtors (the "Cure Amount").  If a Counterparty objects to (i) the assumption and assignment of the Counterparty's Executory Contract (including, without limitation, on the basis that the Stalking Horse Purchaser cannot provide adequate assurance of future performance) or (ii) the Cure Amount for any of its Executory Contracts, the Counterparty must file with the Court and serve on the Objection Notice Parties (as defined herein) a written objection (a "Contract Objection") on or before the applicable objection deadline set forth in these Assumption and Assignment Procedures.

c.    Any Contract Objection shall: (i) be in writing; (ii) comply with the Bankruptcy Rules and the Local Rules; (iii) be filed with the Clerk of the Court, 824 North Market Street, 3rd Floor, Wilmington, Delaware 19801 **on or before 4:00 p.m. (prevailing Eastern Time) on May 18, 2023** (the "Contract Objection Deadline"), and proof of service of such Contract Objection upon the Objection Notice Parties shall be filed with the Court as and when required by the Local Rules; (iv) be served upon the Objection Notice Parties; and (v) state with specificity the grounds for such objection, including, without limitation, the fully liquidated Cure Amount and the legal and factual bases for any unliquidated Cure Amount that the Counterparty believes is required to be paid under section 365(b)(1)(A) & (B) of the Bankruptcy Code for the Assigned Contract, along with the specific nature and dates of any alleged defaults, the pecuniary losses, if any, resulting therefrom, and the conditions giving rise thereto and any objection to the provision of adequate assurance of future performance by the Stalking Horse Purchaser.

d.    In the event that the Stalking Horse Purchaser is not the Winning Bidder, the deadline to object to the provision of adequate assurance of future performance by a Winning Bidder or Back-Up Bidder that is not the Stalking Horse Purchaser (a "Winning Bidder Adequate Assurance

Objection") shall be **12:00 p.m. (prevailing Eastern Time) on May 24, 2023**, and any Winning Bidder Adequate Assurance Objections must be filed and served in the same manner as Contract Objections.

e.   The "Objection Notice Parties" are as follows: (i) proposed counsel to the Debtors, Chipman Brown Cicero & Cole, LLP, Hercules Plaza, 1313 North Market Street, Suite 5400, Wilmington, Delaware 19801, Attn: William E. Chipman, Jr. (chipman@chipmanbrown.com); Robert A. Weber (weber@chipmanbrown.com); Mark L. Desgrosseilliers (desgross@chipmanbrown.com); and Mark Olivere (olivere@chipmanbrown.com); (ii) counsel to any Committee appointed in these Chapter 11 Cases; (iii) counsel to the Prepetition Lender and the DIP Lender, (a) Blake, Cassels & Graydon LLP, 855 - 2nd Street S.W., Suite 3500, Bankers Hall East Tower, Calgary, Alberta, T2P 4J8, Attn: Kelly Bourassa (kelly.bourassa@blakes.com), Christopher Keliher (christopher.keliher@blakes.com), Erik Fleming (erik.fleming@blakes.com), and Austin Beck (Austin.Beck@blakes.com) (b) Chapman and Cutler LLP, 320 South Canal Street, Chicago, Illinois 60606 (Attn: Stephen R. Tetro II and James P. Sullivan), email: stetro@chapman.com and jsulliva@chapman.com, and (c) Womble Bond Dickinson (US) LLP, 1313 North Market Street, Suite 1200, Wilmington, Delaware 19801 (Attn: Matthew P. Ward), email: matthew-ward@wbd-us.com; and (iv) the Office of the United States Trustee for the District of Delaware, 855 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Benjamin.A.Hackman (Benjamin.a.hackman@usdoj.gov).

f.   Within one (1) day after the cancellation or completion of the Auction, the Debtors shall file with the Court a notice identifying the Winning Bidder (a "Notice of Winning Bidder"), which shall set forth, among other things, (i) the Winning Bidder and Back-Up Bidder (if any) and the amount of each of the Winning Bid and the Back-Up Bid (if any), (ii) the Assigned Contracts (as defined herein), as determined at such time and subject to the provisions of subsection (i) of these Assumption and Assignment Procedures, and (iii) the proposed assignee(s) of such Assigned Contracts, and serve the Notice of Winning Bidder by overnight mail and, if available, electronic mail, upon each affected Counterparty and its counsel (if known).

g.   At the Sale Hearing, the Debtors will seek Court approval of the assumption and assignment to the Winning Bidder of only those Executory Contracts, that have been selected by the Winning Bidder to be assumed and assigned (each, an "Assigned Contract," and collectively, the "Assigned Contracts").

h.   If no Contract Objection or Winning Bidder Adequate Assurance Objection, as applicable, is timely received with respect to an Assigned Contract: (i) the Counterparty to such Assigned Contract shall be deemed to have consented to the assumption by the Debtors and assignment to the Winning

Bidder of the Assigned Contract, and be forever barred from asserting any objection with regard to such assumption and assignment (including, without limitation, with respect to adequate assurance of future performance by the Winning Bidder); (ii) any and all defaults under the Assigned Contract and any and all pecuniary losses related thereto shall be deemed cured and compensated pursuant to section 365(b)(1)(A) and (B) of the Bankruptcy Code; and (iii) the Cure Amount for such Selected Purchased Contract shall be controlling, notwithstanding anything to the contrary in such Assigned Contract, or any other related document, and the Counterparty shall be deemed to have consented to the Cure Amount and shall be forever barred from asserting any other claims related to such Assigned Contract against the Debtors and their estates or the Winning Bidder, or the property of any of them, that existed prior to the entry of the Sale Order.

i.  To the extent that the Debtors and a Counterparty are unable to consensually resolve any such Contract Objection or Winning Bidder Adequate Assurance Objection, as applicable, prior to the commencement of the Sale Hearing, such Contract Objection Winning Bidder Adequate Assurance Objection, as applicable, will be adjudicated at the Sale Hearing or at such other date and time as may be determined by the Debtors, in consultation with the Winning Bidder, or otherwise fixed by the Court. To the extent that (i) the Debtors settle a Contract Objection or Winning Bidder Adequate Assurance Objection or (ii) the Court enters an order resolving the Contract Objection or Winning Bidder Adequate Assurance Objection, and such settlement or order is not acceptable to the Winning Bidder, the Winning Bidder shall have the option to designate the relevant Executory Contract as no longer an Assigned Contract, in which case such Contract shall not be assumed by the Debtors or assigned to the Winning Bidder, and neither the Debtors nor the Winning Bidder shall be responsible for any Cure Amounts related to such Contract.

j.  Notwithstanding anything to the contrary herein, if, after the Sale Hearing or the entry of the Sale Order, additional executory contracts or unexpired leases of the Debtors are determined to be Assigned Contracts, as soon as practicable thereafter, the Debtors shall file with the Court and serve, by regular mail, on the Counterparties a Cure Notice, and such Counterparties shall file any Contract Objections (including, without limitation, with respect to adequate assurance of future performance of the Winning Bidder and the Cure Amount) not later than seven (7) days thereafter. If no Contract Objection is timely received, the Debtors shall be authorized to assume and assign such Assigned Contracts to the Winning Bidder, without further notice to creditors or other parties in interest and without the need for further order of the Court, and such assumption and assignment shall be subject to the terms of the Sale Order.

20.     The Debtors' decision to assume and assign the Assigned Contracts to the Winning Bidder is subject to this Court's approval and the closing of the Sale.  Accordingly, absent this Court's approval and the closing of the Sale, the Assigned Contracts shall not be deemed assumed or assumed and assigned and shall in all respects be subject to further administration by the Debtors and their estates under the Bankruptcy Code in connection with these Chapter 11 Cases.

21.     The notice to be provided under the Assumption and Assignment Procedures shall constitute adequate and sufficient notice and no additional notice need be provided.

22.     Within three (3) business days of the entry of this Order, the Debtors shall file with the Court, and serve on the Counterparties, the Cure Notice, substantially in the form attached hereto as **Exhibit 3**.

23.     Service of a Cure Notice or inclusion of an Executory Contract on a Cure Notice does not constitute any admission or agreement of the Debtors that such Executory Contract is an executory contract or unexpired lease or that such Executory Contract will be assumed at any point by the Debtors or assumed and assigned pursuant to any Winning Bid.

24.     The Auction and Sale Notice, the Cure Notice, the Bidding Procedures, the Auction, the Sale Hearing, and the Assumption and Assignment Procedures and the objection periods associated with each of the foregoing are reasonably calculated to provide notice to any affected party and afford the affected party the opportunity to exercise any rights affected by the Motion as it relates to the Bidding Procedures, the Auction, the Sale, the Sale Hearing, and the assumption and assignment the Winning Bidder of the Assigned Contracts pursuant to Bankruptcy Rules 2002(a)(2), 6004 and 6006, and such notice and objection periods are hereby approved.

25.     The Assumption and Assignment Procedures are appropriate and fair to all Counterparties and comply in all respects with the Bankruptcy Code, the Bankruptcy Rules, and

the Local Rules.  The Cure Notice is: (a) reasonably calculated to (i) provide sufficient, effective notice to all Counterparties and any other affected parties of the Debtors' intent to assume and assign to the Winning Bidder some or all of the Assigned Contracts and (ii) afford the Counterparties the opportunity to exercise any rights affected by the Motion and the relief granted by this Order pursuant to Bankruptcy Rules 2002(a)(2), 6004 and 6006; and (b) hereby approved.

## VI.    Miscellaneous

26.    The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Bidding Procedures Order in accordance with the Motion.

27.    Prior to mailing the Auction and Sale Notice or the Cure Notice, as applicable, the Debtors may fill in, or cause to be filled in, any missing dates and other information, correct any typographical errors, conform the provisions thereof to the provisions of this Order, and make such other, non-material changes as the Debtors deem necessary or appropriate.

28.    The failure to include or reference a particular provision of the Bidding Procedures specifically in this Bidding Procedures Order shall not diminish or impair the effectiveness or enforceability of such provision.

29.    In the event of any inconsistency between this Order, on the one hand, and the Motion or the Bidding Procedures, on the other hand, this Order shall govern in all respects.

30.    Notwithstanding the relief granted herein and any actions taken hereunder, nothing contained in the Motion or this Bidding Procedures Order shall constitute, nor is it intended to constitute, an admission as to the validity or priority of any claim or lien against the Debtors, a waiver of the Debtors' rights to subsequently dispute such claim or lien, or the assumption or adoption of any agreement, contract, or lease under section 365 of the Bankruptcy Code.

31.    The requirements of Bankruptcy Rules 6004(h) and 6006(d) are hereby waived.

32.    The requirements of Local Rules 9006-1(c)(ii) are hereby waived.

33.     The Court retains jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Bidding Procedures Order.

## **EXHIBIT 1**

BIDDING PROCEDURES

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| STRUCTURLAM MASS TIMBER U.S., INC., *et al.*,[1] | ) Case No. 23-10497 (CTG) |
| | ) |
| | ) (Jointly Administered) |
| Debtors. | ) |
| | ) |

### BIDDING PROCEDURES FOR THE SALE OF THE DEBTORS' ASSETS

On April 21, 2023 (the "Petition Date"), the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court"). On April [ ● ], 2023, the Debtors filed the *Debtors' Motion Seeking Entry of an Order (A)(I) Approving the Debtors' Entry Into and Performance Under an Asset Purchase Agreement (II) Approving Bidding Procedures, (III) Scheduling the Bid Deadlines and the Auction, (IV) Scheduling Hearings and Objection Deadlines with Respect to the Sale, (V) Approving the Form and Manner of the Notice Thereof, (VI) Approving Contract Assumption and Assignment Procedures, and (VII) Granting Related Relief and (B)(I) Approving the Sale of the Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances, (II) Approving Assumption and Assignment of Executory Contracts and Unexpired Leases and (III) Granting Related Relief* [Docket No. [ ● ]] (the "Motion") seeking approval of, among other things, the procedures by which the Debtors are authorized to conduct an auction (the "Auction"), if any, for the sale (the "Sale") of all, substantially all, or any combination of the Debtors' assets (the "Assets") to the Winning Bidder. On [ ● ], 2023, the Court entered an order with respect to the Motion [Docket No. [ ● ]] (the "Bidding Procedures Order")[2] approving the procedures contemplated herein, (the "Bidding Procedures") and granting certain related relief.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number or Canadian business number, as applicable, include: Structurlam Mass Timber U.S., Inc. (6287); Natural Outcomes, LLC (n/a); Structurlam Mass Timber Corporation (5050); and SLP Holdings Ltd. (3114). The location of the Debtors' headquarters is: 2176 Government Street, Penticton, British Columbia, Canada V2A 8B5. The address of the registered agent for Structurlam Mass Timber U.S., Inc. is: 8 The Green, Suite A, Dover, Delaware 19901.

[2]    Capitalized terms used but not defined herein have the meaning given to such terms in the Bidding Procedures Order.

**Submissions to the Debtors.**

All submissions to the Debtors required to be made under these Bidding Procedures must be directed to each of the following persons unless otherwise provided (collectively, the "Notice Parties"):

1.  **Debtors.** Structurlam Mass Timber U.S., Inc., 2176 Government Street, Penticton, British Columbia, Canada V2A 8B5, Attn: Matthew Karmel (mkarmel@structurlam.com).

2.  **Debtor's Counsel.** Chipman Brown Cicero & Cole, LLP, Hercules Plaza, 1313 North Market Street, Suite 5400, Wilmington, Delaware 19801, Attn: William E. Chipman, Jr. (chipman@chipmanbrown.com); Robert A. Weber (weber@chipmanbrown.com); Mark L. Desgrosseilliers (desgross@chipmanbrown.com); and Mark Olivere (olivere@chipmanbrown.com).

3.  **Debtors' Investment Banker.** Stifel, Nicolaus & Company, Incorporated and Miller Buckfire & Co., LLC, Attn: Kevin Haggard (kevin.haggard@millerbuckfire.com); and Michael Sicari (michael.sicari@millerbuckfire.com).

4.  **Bank of Montreal.** Bank of Montreal, Attn: Sandy Hayer (sandy.hayer@bmo.com).

5.  **Counsel to Bank of Montreal.** (a) Blake, Cassels & Graydon LLP, 855 - 2nd Street S.W., Suite 3500, Bankers Hall East Tower, Calgary, Alberta, T2P 4J8, Attn: Kelly Bourassa (kelly.bourassa@blakes.com), Christopher Keliher (christopher.keliher@blakes.com), Erik Fleming (erik.fleming@blakes.com), and Austin Beck (Austin.Beck@blakes.com) (b) Chapman and Cutler LLP, 320 South Canal Street, Chicago, Illinois 60606 (Attn: Stephen R. Tetro II and James P. Sullivan), email: stetro@chapman.com and jsulliva@chapman.com, and (c) Womble Bond Dickinson (US) LLP, 1313 North Market Street, Suite 1200, Wilmington, Delaware 19801 (Attn: Matthew P. Ward), email: matthew-ward@wbd-us.com.

**Potential Bidders.**

To participate in the bidding process or otherwise be considered for any purpose under these Bidding Procedures, a person or entity interested in consummating a Sale (a "Potential Bidder") must deliver or have previously delivered, if determined to be necessary by the Debtor in its sole discretion after consultation with Bank of Montreal, the following documents:

1.  an executed confidentiality agreement on terms acceptable to the Debtors (a "Confidentiality Agreement"), to the extent not already executed;

2.    identification of the Potential Bidder and any of the principals, corporate officers, or other representatives that are authorized to appear for and act on behalf of the Potential Bidder with respect to the contemplated transaction; and

3.    unless publicly available in a filing under applicable securities laws or regulations, the most current audited and latest unaudited financial statements (the "Financials") of the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets (x) Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure as is acceptable to the Debtors and its advisors, and (y) a written commitment acceptable to the Debtors and its advisors of the equity holder(s) of the Potential Bidder to be responsible for the Potential Bidder's obligations in connection with the Sale).

**Electronic Data Room and Due Diligence.**

After a party delivers the executed Confidentiality Agreement in accordance with these Bidding Procedures, the Debtors shall provide such party with access to an electronic data room and due diligence information, as reasonably requested by such party, and the Debtors shall post substantially all written due diligence provided to any such party to the Debtors' electronic data room.  To the extent necessary and reasonably practicable, the Debtors will facilitate meetings between any such party and the Debtors' advisors and management team.  The Debtors and their advisors will coordinate all reasonable requests from such parties for additional information and due diligence access; *provided* that the Debtors may decline to provide such information to any party who, at such time and in the Debtors' reasonable business judgment, has not established that it intends in good faith to, or has the capacity to, consummate a Sale.  Parties which enter into a Confidentiality Agreement with the Debtors will not, directly or indirectly, contact or initiate, or engage in discussions with respect to matters relating to the Debtors or a potential transaction with any customer, supplier, or contractual counterparty of the Debtors without the prior written consent of the Debtors.  The due diligence period will end on the Bid Deadline (as defined below), and, after the Bid Deadline, the Debtors will have no obligation to furnish or update any due diligence information.

For any party that the Debtors determine to be a competitor of the Debtors or affiliated with any competitor of the Debtors, the Debtors reserve the right to withhold or modify, or to delay providing, any due diligence information that the Debtors determines is business-sensitive or otherwise inappropriate for disclosure to such party at such time.

<u>**Bidding and Auction Process**</u>

I.    **Bid Deadline.**

Any party (each, a "Bidder") that desires to make a binding proposal, solicitation, or offer (each, a "Bid") shall transmit the Bid to the Notice Parties so as to be **actually received** on or before May 18, 2023, at 4:00 p.m. (prevailing Eastern Time) (the "Bid Deadline").

## II.     Bid Requirements.

All Bids must be submitted in writing and satisfy the following requirements (collectively, the "Bid Requirements"):

*Purchase Price.*

Each Bid must clearly set forth the purchase price to be paid, specifying (a) any cash and (b) any non-cash components, in sufficient detail satisfactory to the Debtors (the "Purchase Price").  Each Bid for a combination of Assets, other than for all or substantially all of the Assets, must:  (x) provide a breakdown of the share of the Purchase Price allocable to each of the Assets included in the Bid; (y) state whether the Bid is conditioned upon the Bid being the Winning Bid (as defined below) for any of the other Assets included in the Bid (and, if so, which Assets); and (z) state whether the Bidder is willing to purchase any of the Assets included in the Bid individually, and if so, the price such Bidder would pay for each such Asset.

*Marked Agreement.*

Each Bid must be accompanied by clean and duly executed transaction documents including, at a minimum, a draft purchase agreement, the form of which shall be in a form substantially similar to the Stalking Horse Purchase Agreement, pursuant to which the Bidder proposes to effectuate the Sale, along with redlines of such agreement marked to reflect any amendments and modifications from the form purchase agreement provided, which amendments and modifications may not be materially more burdensome than the Stalking Horse Purchase Agreement or otherwise inconsistent with these Bidding Procedures.  The Debtors, in their reasonable business judgment after consultation with Bank of Montreal, will determine whether any such amendments and modifications are materially more burdensome.

*Deposit.*

Each Bid, other than a credit bid, must be accompanied by a cash deposit in an amount equal to ten percent (10%) of the aggregate value of the cash and non-cash consideration of such Bid (the "Deposit"), to be submitted by wire transfer to the escrow account established by the Debtors.  Please contact the Debtors ahead of the Bid Deadline to receive wire information.  The Deposit shall not bear interest and shall be conclusively deemed subject to the exclusive jurisdiction of the Bankruptcy Court upon receipt.

*Committed Financing.*

Each Bid must contain evidence of the Bidder's ability to consummate a Sale by June 5, 2023. To the extent that a Bid is not accompanied by evidence of such party's capacity to consummate the Sale set forth in its Bid with cash on hand, each Bid must include committed financing, documented to the Debtors' satisfaction after consultation with Bank of Montreal, that demonstrates that such party has received sufficient debt and/or equity funding commitments to satisfy the Bid's Purchase Price and other obligations thereunder.  Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors after consultation with Bank of Montreal.

*No Financing or Diligence Outs*.

A Bid shall not be conditioned on the obtaining or the sufficiency of financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy at the closing of specified representations and warranties or the satisfaction at the closing of specified conditions.

*Identity*.

Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Bidder if such Bidder is an entity formed for the purpose of consummating the proposed Sale contemplated by such Bid), and the complete terms of any such participation. Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any Bid. Each Bid must also include contact information for the specific person(s) and counsel whom the Debtors' advisors should contact regarding such Bid.

*Authorization*.

Each Bid must contain evidence that the Bidder has obtained authorization or approval from its board of directors (or comparable governing body) with respect to the submission of its Bid and the consummation of the Sale contemplated in such Bid.

*Adequate Assurance of Future Performance*.

Each Bid must (a) identify any executory contracts and unexpired leases to be assumed and assigned in connection with such Bid, (b) provide for the payment by the Bidder of all cure costs related to such executory contracts and unexpired leases, and (c) demonstrate, in the Debtors' reasonable business judgment that the Bidder can provide adequate assurance of future performance under all such executory contracts and unexpired leases.

*Government Approvals*.

Each Bid must include a description of all governmental, licensing, regulatory, or other approvals or consents that are required to consummate the proposed Sale, together with evidence satisfactory to the Debtors of the ability to obtain such consents or approvals in a timely manner, as well as a description of any material contingencies or other conditions that will be imposed upon, or that will otherwise apply to, obtaining any such consents or approvals.

*Government Approvals Timeframe*.

Each Bid must set forth an estimated timeframe for obtaining any required governmental, licensing, regulatory, or other approvals or consents for consummating any proposed Sale.

*As-Is, Where-Is*.

Each Bid must include a written acknowledgement and representation that the Bidder (a) has had an opportunity to conduct any and all due diligence regarding the Assets prior to

making its offer, (b) has relied solely upon its own independent review, investigation, or inspection of any documents or the Assets in making its Bid, and (c) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Assets or the completeness of any information provided in connection therewith or the Auction.

*Honoring the Bid Procedures.*

Each Bid must affirmatively state the Bidder's agreement, and by submitting its Bid, each Bidder is so agreeing, to abide by and honor the terms of these Bidding Procedures (including if such Bid is declared the Winning Bidder or Backup Bidder (as defined below)) and to refrain from submitting a Bid or seeking to reopen the Auction after conclusion of the Auction. The submission of a Bid shall constitute a binding and irrevocable offer to acquire the Assets reflected in such Bid.

*Additional Diligence.*

Each Bidder shall comply with all reasonable requests for additional information and due diligence access by the Debtors or their advisors and Bank of Montreal regarding the Bid.

*Expenses.*

Except as otherwise approved by the Bidding Procedure Order, each Bid shall not contemplate or request (and no Bidder shall receive) any break-up fee, transaction fee, termination fee, expense reimbursement, or any similar type of payment or reimbursement, and by submitting its Bid, each Bidder is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

## III. Designation of Qualified Bidders.

*Qualified Bidder.*

A Bid will be considered a "Qualified Bid," and each Bidder that submits a Qualified Bid will be considered a "Qualified Bidder," if the Debtors determine in their reasonable business judgment after consultation with Bank of Montreal that such Bid (a) satisfies the Bid Requirements, and (b) is reasonably likely (based on availability of financing, regulatory issues, experience, and other considerations) to be consummated, if selected as a Winning Bid, within a time frame reasonably acceptable to the Debtors after consultation with Bank of Montreal. In making the determination as to whether a Bid will be considered a Qualified Bid and a Bidder will be considered a Qualified Bidder, the Debtors may request that such Bidder provide supporting documentation or other information sufficient to demonstrate, in the Debtors' reasonable business judgment after consultation with Bank of Montreal, such Bidder's financial capacity and ability to close the proposed transaction.

Notwithstanding anything to the contrary herein, (i) the Stalking Horse Bid shall be considered a Qualified Bid, and the Stalking Horse Bidder shall be considered a Qualified Bidder and (ii) a credit bid submitted by Bank of Montreal on account of (a) the prepetition secured financing and/or (b) the debtor in possession financing provided by Bank of Montreal to the

Debtors shall be considered a Qualified Bid, and Bank of Montreal shall be considered a Qualified Bidder.

*Notification.*

Within two business days after the Bid Deadline, the Debtors will notify each Bidder whether such party is a Qualified Bidder.

*Bid Modifications.*

Between the date that the Debtors notify a Bidder that it is a Qualified Bidder and the Auction, (a) the Debtors may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder, and (b) a Qualified Bidder may not, without the prior written consent of the Debtors, modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase their Purchase Price, or otherwise improve the terms of the Qualified Bid; *provided* that any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures.

*Combination of Bids; Overlapping Bids.*

Notwithstanding anything herein to the contrary, the Debtors reserve the right to work with (a) Bidders and Qualified Bidders to aggregate two or more Bids into a single consolidated Bid prior to the Bid Deadline, (b) Qualified Bidders to aggregate two or more Qualified Bids into a single Qualified Bid prior to the conclusion of the Auction, and (c) any Bidder in advance of the Auction to cure any deficiencies in a Bid that is not initially deemed to be a Qualified Bid. The Debtors may accept a single Qualified Bid or multiple Bids for non-overlapping material portions of the Assets such that, if taken together in the aggregate, the Bids would otherwise meet the standards for a single Qualified Bid (in which event those multiple bidders shall be treated as a single Qualified Bidder for purposes of the Auction).

## IV.    **Bid Selection and Criterion.**

*Baseline Bid.*

The Stalking Horse Bid shall serve as the baseline bid (the "Baseline Bid").

*Bid Assessment Criteria.*

The determination of which Qualified Bid constitutes the Winning Bid shall take into account any factors the Debtors reasonably deem relevant to the value of the Qualified Bid to the Debtors' estates, including, among other things:  (a) the type and amount of Assets sought to be purchased; (b) the amount and nature of the Purchase Price; (c) the Qualified Bidder's ability to consummate a Sale and the timing thereof; (d) the net economic effect of any changes to the value to be received by the Debtors' estates from the Qualified Bid; and (e) the tax consequences of such Qualified Bid.

*Credit Bids*.

Any Qualified Bidder who has a valid and perfected lien on any assets of the Debtors' estates and the right under applicable non-bankruptcy law to credit bid claims secured by such liens shall have the right to credit bid any portion and up to the entire amount of their outstanding secured claims pursuant to section 363(k) of the Bankruptcy Code, *provided* that any credit bid for a material portion of the Assets by or on behalf of any party, other than Bank of Montreal under the Debtors' prepetition and debtor-in-possession credit facilities, shall contain a cash component sufficient to pay the aggregate amount of the Debtor's accrued, unpaid administrative expenses and any other claims requiring payment in full in cash; *provided*, *further*, that any credit bid shall contain a cash component or make other provision sufficient to pay or otherwise satisfy any applicable cure costs for any executory contracts or unexpired leases to be assumed and assigned to the credit bidding party under the credit bid; *provided*, *further*, that any credit bid submitted by a party shall include a cash component sufficient to (a) pay the amount of the Stalking Horse Protections and (b) pay for any Assets that are unencumbered by first priority perfected liens in favor of the credit bidder.  For the avoidance of doubt, a credit bid submitted by Bank of Montreal consistent with the foregoing clauses (a) and (b) shall be deemed a Qualified Bid.

For purposes of evaluating competing bids, every dollar of a credit bid shall be treated the same as a dollar from a cash bid, and a credit bid shall not be considered inferior to a comparable cash bid because it is a credit bid. The fact that a Bid is composed of a credit bid (whether in whole or in part) shall not be a factor considered by the Debtors in their determination of the highest or otherwise best Bid for such asset.

## V.    **Auction Procedure.**

*Time and Place*.

If the Debtors receive two or more Qualified Bids with respect to all of the Assets or any specific Asset, as applicable, then the Debtors will conduct the Auction to determine the Winning Bidder(s) (as defined below) with respect to such Assets.  The Auction shall take place at 10:00 a.m. (prevailing Eastern Time) on May 19, 2023, via videoconference (with instructions for participating in such videoconference to be provided by the Debtors in advance of the Auction), or such later date, time, and location, as selected by the Debtors after consultation with Bank of Montreal.  If the Debtors do not receive any Qualified Bids that are greater than the Stalking Horse Bid, then the Debtors may select such Stalking Horse Bid as the Winning Bid.

*Conducting the Auction*.

The Debtors and their advisors shall direct and preside over the Auction.  At the start of the Auction, the Debtors shall describe the terms of the Stalking Horse Bid as the Baseline Bid. Any Bids made at the Auction by a Qualified Bidder subsequent to the Debtors' announcement of the Baseline Bid shall be "<u>Overbids</u>" and must comply with the conditions set forth below and shall be made and received on an open basis, with all material terms of each Overbid fully disclosed to all other Qualified Bidders.  The Debtors shall maintain a written transcript of all Bids made and announced at the Auction, including the Baseline Bid, all Overbids, and the Winning Bid(s). The Debtors may (a) select, in their reasonable business judgment after consultation with Bank of

Montreal, pursuant to these Bidding Procedures, the highest or otherwise best Bid and the Winning Bidder(s) or Backup Bidder(s), and (b) reject any Bid (regardless of whether such Bid is a Qualified Bid) that, in the Debtors' reasonable business judgment after consultation with Bank of Montreal, is (x) inadequate, insufficient, or not the highest or best Bid, (y) not in conformity with the requirements of the Bankruptcy Code, the Bankruptcy Rules, or these Bidding Procedures, or (z) contrary to, or otherwise not in the best interests of the Debtors' estates, affected stakeholders, or other parties in interest.

The Auction may include individual negotiations with any of the Qualified Bidders, including in separate video conference rooms that the Debtors may establish to facilitate such discussions between the Debtors and individual Qualified Bidders, but all Bids shall be made on the record and in the presence of all of the Qualified Bidders attending the Auction.

*Terms of Overbids.*

1.   <u>Minimum Initial Overbid</u>:  Any initial Overbid to the Stalking Horse Bid shall be no less than $62,900,000, consisting of $60,000,000 as the amount of the Stalking Horse Bid, *plus* $2,400,000 as the amount of the Stalking Horse Protections, *plus* $500,000.

2.   <u>Minimum Overbid Increments</u>:  Any subsequent Overbids shall be in increments of $500,000.

3.   <u>Announcing Highest Bid</u>:  After each Overbid, the Debtors shall announce the material terms of the Overbid, including value attributed to the Overbid.

The Stalking Horse Protections shall be taken into account in connection with each round of bidding and in each phase of the Auction by adding $2,400,000 (*i.e.*, the amount of the Stalking Horse Protections) to the amount of each Overbid made by the Stalking Horse Bidder and, once triggered, the Stalking Horse Protections shall act as a credit toward any Closing by the Stalking Horse Bidder as the Winning Bidder or as the Backup Bidder.

*Eligibility.*

Only Qualified Bidders that have submitted Qualified Bids by the Bid Deadline are eligible to participate in the Auction, subject to other limitations as may be reasonably imposed by the Debtors in accordance with these Bidding Procedures; *provided* that such other limitations are (a) not inconsistent with the Bidding Procedures Order, any other order of the Court, or the Bankruptcy Code, (b) disclosed orally or in writing to all Qualified Bidders, and (c) determined by the Debtors to further the goals of these Bidding Procedures.

*Required Attendance.*

Qualified Bidders participating in the Auction must appear at the Auction, or through a duly authorized representative.

*Permitted Attendance.*

The Auction will be conducted openly and all creditors and counsel or other professional advisors may be permitted to attend, provided that the Debtors may, in their sole and exclusive discretion, establish a reasonable limit to the number of representatives and/or professional advisors that may appear on behalf of or accompany each Qualified Bidder or creditor at the Auction.

*No Collusion; Good-Faith Bona Fide Offer.*

Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that (a) it has not engaged in any collusion with respect to the bidding, and (b) its Qualified Bid is a good-faith bona fide offer and it intends to consummate the proposed Sale if selected as a Winning Bidder.

*Adjourning the Auction.*

Notwithstanding anything else herein to the contrary, the Debtors reserve the right, in their reasonable business judgment after consultation with Bank of Montreal, to adjourn the Auction one or more times to, among other things, (a) facilitate discussions between the Debtors and Qualified Bidders; (b) allow Qualified Bidders to consider how they wish to proceed; (c) alter or combine Asset groups; and (d) provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their reasonable business judgment, may require, that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed Sale at the prevailing Overbid amount.

*Closing the Auction.*

The Auction shall continue until the Debtors select, in their reasonable business judgment after consultation with Bank of Montreal, pursuant to these Bidding Procedures, the highest or otherwise best Qualified Bid for the Assets or any subset thereof, as applicable. Such Qualified Bid shall be declared the "Winning Bid," and such Qualified Bidder shall be declared the "Winning Bidder," and upon the declaration of the Winning Bid and the Winning Bidder the Auction will be closed. The Debtors may also select, in their reasonable business judgment after consultation with Bank of Montreal, pursuant to these Bidding Procedures, the next-highest or otherwise second-best Qualified Bid for the Assets or any subset thereof, as applicable, to be the "Backup Bidder." As soon as reasonably practicable after closing the Auction, the Debtors shall finalize definitive documentation to implement the terms of the Winning Bid, and, as applicable, cause such definitive documentation to be filed with the Court. The acceptance by the Debtors of the Winning Bid is conditioned upon approval by the Court of the Winning Bid.

*Backup Bidder.*

1.   Designation of Backup Bidder: The Qualified Bidder with the next-highest or otherwise second-best Qualified Bid for the Assets or any subset thereof, as applicable, as determined by the Debtors in the exercise of their reasonable business judgment after consultation with Bank of Montreal,

shall be required to serve as a Backup Bidder until such time as the applicable Sale is consummated, and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated by the Debtors.

2.  <u>Identity of Backup Bidder</u>:  The identity of the Backup Bidder and the amount and material terms of the Qualified Bid of the Backup Bidder shall be announced by the Debtors at the conclusion of the Auction at the same time the Debtors announce the identity of the Winning Bidder.  The Backup Bidder shall be required to keep its Qualified Bid (or if the Backup Bidder submits one or more Overbids at the Auction, its final Overbid) open and irrevocable until such time as the Sale is consummated.

3.  <u>Consummating a Sale with Backup Bidder</u>:  If a Winning Bidder fails to consummate the Sale contemplated by its Winning Bid, then the Debtors may select the Backup Bidder as the Winning Bidder, and such Backup Bidder shall be deemed a Winning Bidder for all purposes.  The Debtors will be authorized, but not required, to consummate all transactions contemplated by the Bid of such Backup Bidder without further order of the Court or notice to any party.

*Return of Deposit.*

The Deposits for each Qualified Bidder shall be held in one or more non-interest-bearing escrow accounts on terms acceptable to the Debtors in their sole discretion and shall be returned (other than with respect to the Winning Bidder and the Backup Bidder) within three business days after the Auction is closed, or as soon as is reasonably practicable thereafter.

The Deposit of the Winning Bidder shall be applied to the purchase price of such Sale at closing.  If a Winning Bidder (including a Backup Bidder which becomes a Winning Bidder) fails to consummate a proposed transaction because of a breach by such Winning Bidder, the Debtors will not have any obligation to return the Deposit deposited by such Winning Bidder, which may be retained by the Debtors as liquidated damages, in addition to any rights, remedies, or causes of action that may be available to the Debtors.  If a Winning Bidder consummates a proposed transaction or fails to consummate a proposed transaction but the Debtors elect to not consummate the proposed transaction with the Backup Bidder, then the Backup Bidder's Deposit shall be returned within three business days thereof, or as soon as is reasonably practicable thereafter.

*Modification of Bidding Procedures.*

The Debtors reserve their rights to modify these Bidding Procedures in their reasonable business judgment after consultation with Bank of Montreal, in a manner consistent with their fiduciary duties and applicable law, without further order from the Court, in any manner that will best promote the goals of these Bidding Procedures, or impose, at or prior to the Auction, additional customary terms and conditions on a Sale, including, without limitation:  (a) extending or modifying any of the dates and deadlines set forth in these Bidding Procedures; (b) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (c) adjusting the applicable minimum Overbid increment, including by requesting

that Qualified Bidders submit last or final bids on a "blind" basis; (d) adjourning or cancelling the Auction; and (e) rejecting any or all Bids or Qualified Bids.

*Fiduciary Out*.

Notwithstanding anything to the contrary in these Bidding Procedures, nothing in these Bidding Procedures or the Bidding Procedures Order shall require a Debtor or the board of directors, board of managers, or similar governing body of a Debtor, to take any action or to refrain from taking any action to the extent taking or failing to take such action would be inconsistent with applicable law or its fiduciary obligations under applicable law.

*Consent to Jurisdiction*.

All Qualified Bidders at the Auction shall be deemed to have consented to the jurisdiction of the Court and waived any right to a jury trial in connection with any disputes relating to the Auction or the construction and enforcement of these Bidding Procedures.

[*Remainder of Page Intentionally Left Blank*]

12

Dated: April 24, 2023
   Wilmington, Delaware

**CHIPMAN BROWN CICERO & COLE, LLP**

_/s/ Mark L. Desgrosseilliers_
William E. Chipman, Jr. (No. 3818)
Robert A. Weber (No. 4013)
Mark L. Desgrosseilliers (No. 4083)
Mark D. Olivere (No. 4291)
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Telephone: (302) 295-0191
Email:  chipman@chipmanbrown.com
    weber@chipmanbrown.com
    desgross@chipmanbrown.com
    olivere@chipmanbrown.com

_Proposed Conflicts Counsel to Debtors and Debtors
in Possession_

## **EXHIBIT 2**

STALKING HORSE PURCHASE AGREEMENT

*Execution Version*
CONFIDENTIAL

**ASSET PURCHASE AGREEMENT**

**by and among**

**MERCER INTERNATIONAL INC.**

**SLP HOLDINGS LTD.**

**STRUCTURLAM MASS TIMBER U.S., INC.**

**STRUCTURLAM MASS TIMBER CORPORATION**

**and**

**NATURAL OUTCOMES, LLC.**

**Dated as of April 21, 2023**

# TABLE OF CONTENTS

ARTICLE I PURCHASE AND SALE OF THE BUSINESS.........................................................2
  Section 1.1      Purchase and Sale of Assets ...............................................................2
  Section 1.2      Excluded Assets ..................................................................................3
  Section 1.3      Assumption of Liabilities ..................................................................5
  Section 1.4      Excluded Liabilities ...........................................................................6
  Section 1.5      Assumption and Assignment of Contracts.........................................7
  Section 1.6      Bankruptcy Proceeding Assumption and Assignment of Contracts ...........7
  Section 1.7      U.S. Bankruptcy Proceedings Assumption and Assignment of
                   Contracts.........................................................................................10
  Section 1.8      Non-Assignment of Assets...............................................................10
  Section 1.9      Wrong Pocket ...................................................................................11
  Section 1.10     Intracompany Arrangements ............................................................11
  Section 1.11     Further Conveyances and Assurances ..............................................12

ARTICLE II CONSIDERATION; CLOSING ........................................................................12
  Section 2.1      Consideration ...................................................................................12
  Section 2.2      Purchase Price Deposit.....................................................................12
  Section 2.3      Closing..............................................................................................12
  Section 2.4      Deliveries by Buyer ..........................................................................13
  Section 2.5      Deliveries by Sellers ........................................................................13
  Section 2.6      [Reserved].........................................................................................14
  Section 2.7      Escrow Mechanics ............................................................................14
  Section 2.8      Withholding ......................................................................................14

ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLERS............................15
  Section 3.1      Organization; Good Standing ...........................................................15
  Section 3.2      [Reserved].........................................................................................15
  Section 3.3      Authority; Approval..........................................................................15
  Section 3.4      Governmental Filings; No Violations ...............................................15
  Section 3.5      Financial Statements ........................................................................16
  Section 3.6      Litigation...........................................................................................16
  Section 3.7      Transferred Owned Property .............................................................16
  Section 3.8      Material Contracts ............................................................................16
  Section 3.9      Compliance with Laws; Permits .......................................................17
  Section 3.10     Brokers and Finders .........................................................................18
  Section 3.11     Employees.........................................................................................18
  Section 3.12     Employee Benefit Plans....................................................................18
  Section 3.13     Title to Transferred Assets ...............................................................19
  Section 3.14     Intellectual Property.........................................................................19
  Section 3.15     Environmental Matters......................................................................19
  Section 3.16     Taxes.................................................................................................20
  Section 3.17     Insurance...........................................................................................20
  Section 3.18     Real Property.....................................................................................21
  Section 3.19     Status of Transferred Assets.............................................................21
  Section 3.20     Full Disclosure. ................................................................................21

Section 3.21  No Other Representations or Warranties ....................................................21

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF BUYER ...............................22
Section 4.1  Organization, Good Standing ...................................................................22
Section 4.2  Authority; Approval ................................................................................22
Section 4.3  Government Filings; No Violations ..........................................................23
Section 4.4  Litigation ................................................................................................23
Section 4.5  Available Funds ......................................................................................23
Section 4.6  Condition of the Business ........................................................................23
Section 4.7  Brokers and Finders ...............................................................................24
Section 4.8  No Other Representations or Warranties ...................................................24
Section 4.9  Due Diligence by Buyer ..........................................................................24
Section 4.10  [Reserved] ............................................................................................25
Section 4.11  No Other Representations or Warranties .................................................25

ARTICLE V BANKRUPTCY MATTERS ............................................................................25
Section 5.1  Competing Transactions ..........................................................................25
Section 5.2  U.S. Bankruptcy Actions .........................................................................26
Section 5.3  CCAA and Bankruptcy Court Filings ......................................................26

ARTICLE VI COVENANTS ................................................................................................27
Section 6.1  Access and Information ...........................................................................27
Section 6.2  Interim Operations of the Business ..........................................................28
Section 6.3  Cooperation; Status Updates; Regulatory Filings .....................................28
Section 6.4  Tax Matters ............................................................................................30
Section 6.5  Employment Matters ...............................................................................32
Section 6.6  Confidentiality ........................................................................................34
Section 6.7  Personal Information ...............................................................................35
Section 6.8  Publicity ................................................................................................35
Section 6.9  Maintenance of Books and Records .........................................................35
Section 6.10  Insurance Matters ..................................................................................36
Section 6.11  Wallis Lease Extension ..........................................................................36
Section 6.12  [Reserved] ............................................................................................36
Section 6.13  Environmental .......................................................................................36
Section 6.14  Conduct of Sellers .................................................................................36
Section 6.15  Notification of Certain Matters ..............................................................37
Section 6.16  Transfer of Permits ...............................................................................38
Section 6.17  Sellers' Obligations ...............................................................................38

ARTICLE VII CONDITIONS TO CLOSING ......................................................................39
Section 7.1  Conditions Precedent to Each Party's Obligations ....................................39
Section 7.2  Conditions Precedent to Obligations of Buyer ..........................................39
Section 7.3  Conditions Precedent to Obligations of Sellers .........................................40
Section 7.4  No Frustration of Closing Conditions ......................................................40

ARTICLE VIII TERMINATION ..........................................................................................41
Section 8.1  Termination of Agreement .......................................................................41

Section 8.2    Effect of Termination...............................................................42
Section 8.3    Break-Up Fee and Expense Reimbursement Amount ............................43

ARTICLE IX MISCELLANEOUS .........................................................................44
Section 9.1    Survival.....................................................................................44
Section 9.2    Notices......................................................................................44
Section 9.3    Entire Agreement; Amendments and Waivers......................................46
Section 9.4    Assignment ................................................................................46
Section 9.5    Expenses ...................................................................................47
Section 9.6    Governing Law............................................................................47
Section 9.7    Specific Performance ...................................................................47
Section 9.8    Submission to Jurisdiction; Consent to Service of Process; Waiver
                of Jury Trial...............................................................................47
Section 9.9    Interpretation; Construction...........................................................48
Section 9.10   Severability ...............................................................................49
Section 9.11   Counterparts and Electronic Execution ..............................................49

## EXHIBITS AND SCHEDULES

### EXHIBITS

Exhibit A    -    Defined Terms
Exhibit B    -    Form of Assignment and Assumption Agreement
Exhibit C    -    Form of IP Assignment Agreement
Exhibit D    -    Form of Employment Confirmation Letter
Exhibit E    -    Form of Canadian Sale Order

### SCHEDULES

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (including the Exhibits and Schedules hereto, each as amended or restated from time to time in writing, this "Agreement"), dated as of April 21, 2023, is made by and among Mercer International Inc., a corporation organized under the Laws of the State of Washington ("Buyer"), SLP Holdings Ltd., a British Columbia company ("SLP"), Structurlam Mass Timber U.S., Inc., a Delaware corporation ("Structurlam U.S."), Structurlam Mass Timber Corporation, a British Columbia company and Natural Outcomes, LLC, a Delaware limited liability company (each a "Seller", and collectively, "Sellers"). Buyer and Sellers are collectively referred to as the "Parties" and each individually as a "Party". Exhibit A contains definitions of certain capitalized terms used in this Agreement.

## RECITALS

**WHEREAS**, Sellers and certain of their Affiliates carry on the business of offering a broad scope of timber products to builders and retailers in the U.S. and Canada, including manufacturing, distributing and selling glulam products, parallam, cross-laminated timber and related hardware and industrial matting (the "Business");

**WHEREAS**, Sellers and certain of their Affiliates will commence voluntary proceedings under Chapter 11 of the Bankruptcy Code (the "U.S. Bankruptcy Proceeding") by filing petitions for relief in the U.S. Bankruptcy Court for the District of Delaware (the "U.S. Bankruptcy Court");

**WHEREAS**, Sellers and certain of their Affiliates will seek to obtain an Order (the "Initial Order") under the Companies' Creditors Arrangement Act (Canada) ("CCAA") from the Supreme Court of British Columbia (the "CCAA Proceedings") to recognize the U.S. Bankruptcy Proceeding as a foreign proceeding pursuant to Part IV of the CCAA and to, among other things, have the orders of the U.S. Bankruptcy Court recognized for enforcement in Canada;

**WHEREAS**, Sellers will seek to obtain from the U.S. Bankruptcy Court an Order (the "Bid and Contract Procedures Order"), among other things, approving bid procedures for the sale of Sellers' assets (the "Bid Procedures"), approving stalking horse bid protections with respect to Sellers' entry into stalking horse purchase agreements, scheduling the Auction for, and Sale Hearing(s) to approve, the sale of Sellers' assets, approving the form and manner of notices of sale, the Auction and Sale Hearing(s), and approving contract procedures for the assumption and assignment of executory contracts and unexpired leases, and will subsequently seek to have the Bid and Contract Procedures Order recognized for enforcement in the CCAA Proceedings;

**WHEREAS**, Buyer and Sellers are contemplating, among other things, that following the execution of this Agreement, Buyer will act as a "stalking horse bidder" pursuant to the Bid Procedures for the Transferred Assets, meaning that, in the absence of Sellers' acceptance of a superior bid made in accordance with the Bid Procedures, Buyer will purchase Sellers' right, title and interest in and to the Transferred Assets and assume the Assumed Liabilities on the terms and subject to the conditions set forth in this Agreement, in accordance with the Bid Procedures and subject to obtaining the U.S. Sale Order and the Canadian Sale Order (the "Acquisition");

**WHEREAS**, the Parties desire to consummate the Acquisition as promptly as practicable following the satisfaction of the conditions precedent set out herein, including the issuance by the

U.S. Bankruptcy Court of the U.S. Sale Order and the issuance by the Canadian Court of the Canadian Sale Order;

**WHEREAS**, the Acquisition and the transactions contemplated by this Agreement and the agreements contemplated hereby are subject to the approval of the U.S. Bankruptcy Court and the Canadian Court and will be consummated only subject to the terms and conditions set forth herein and in accordance with the U.S. Orders and the Canadian Orders to be entered in the U.S. Bankruptcy Proceeding and the CCAA Proceedings, respectively; and

**WHEREAS**, Buyer shall deliver to Citibank, N.A. (the "Escrow Agent") a deposit in the sum of US$6,000,000 (the "Deposit Amount") on the terms contemplated herein;

**NOW, THEREFORE**, in consideration of the foregoing, and of the representations, warranties, covenants and agreements contained herein, the Parties agree as follows:

ARTICLE I

PURCHASE AND SALE OF THE BUSINESS

Section 1.1    Purchase and Sale of Assets.  On the terms and subject to the conditions set forth herein, subject to Section 1.8, at the Closing, Sellers shall Transfer to Buyer, and Buyer shall purchase and acquire from Sellers the entirety of Sellers' right, title and interest in and to all of the Sellers' assets, properties and rights of every kind and nature, whether real, personal or mixed, tangible or intangible (including goodwill), wherever located, in the physical possession of Sellers or another Person, including the following, in each case free and clear of all Liens, claims, encumbrances, and interests (other than Permitted Encumbrances) and Excluded Liabilities (the "Transferred Assets"):

(a)      [Reserved];

(b)      Inventory;

(c)      Transferred Leased Property;

(d)      Transferred Owned Property;

(e)      Fixtures and Equipment, including, for greater certainty, all of those assets listed on Schedule 1.1(e) of the Seller Disclosure Schedule;

(f)      Transferred Intellectual Property and all the goodwill of the Business and/or associated with or related to such Transferred Intellectual Property;

(g)      each Seller Contract listed on Schedule 1.1(g) of the Seller Disclosure Schedule and each Transferred Lease with respect to which an Order has been entered by the U.S. Bankruptcy Court (which may be the U.S. Sale Order) or the Canadian Court (which may be the Canadian Sale Order) authorizing the assumption and assignment of such Contract (such Contracts collectively, the "Closing Assumed Contracts");

2

(h)     each non-executory Seller Contract;

(i)     pursuant to Section 1.6(c), each Additional Assumed Contract with respect to which an Order has been entered by the U.S. Bankruptcy Court or the Canadian Court authorizing the assumption and assignment of such Contract;

(j)     the Books and Records, subject to Section 6.9;

(k)     to the extent their transfer is permitted by Law, all Permits that are held by Sellers and applications therefor or related thereto;

(l)     all rights under the Seller Plans and any trusts, funding vehicles and other assets related thereto, Unionized Employees or Continuing Employees as set forth in Schedule 1.1(l) of the Seller Disclosure Schedule (collectively, the "Transferred Seller Plans");

(m)     all credits, prepaid expenses, deferred charges, advance payments, refunds, security deposits, prepaid items and duties to the extent related to a Transferred Asset, but excluding any refunds of Taxes to the extent included in Section 1.2(h) and any prepayments or deposits of any Asset Taxes prior to the date hereof for which Sellers shall receive credit to the extent provided in Section 6.4(b); and

(n)     any claim, right, award, recovery, indemnity, warranty, right to insurance proceeds, refund, reimbursement, audit right, duty, obligation, liability or other intangible right in favor of or owed to any Seller (other than rights arising under or relating to this Agreement, the Transaction Documents or Sellers' or any of their Affiliates' directors' and officers' insurance policies (the "D&O Insurance Claims")), to the extent (i) related to any Transferred Seller Plan, (ii) related to any other Transferred Asset and arising or attributable to the period of time on or after the Closing or (iii) related to any insurance proceeds as set forth in Section 6.10(a) other than the Excluded Insurance Proceeds.

Section 1.2     Excluded Assets. Notwithstanding anything to the contrary set forth in this Agreement or in any of the other Transaction Documents, the Parties expressly acknowledge and agree that nothing in this Agreement shall be construed to obligate any Seller to Transfer to Buyer any of the assets, properties or rights of any Seller other than the Transferred Assets specifically listed in Section 1.1, and all such assets, properties or rights of any Seller (the "Excluded Assets") shall be excluded from the Transferred Assets. Each Seller shall retain all of its respective right, title and interest in and to the Excluded Assets and Buyer shall not acquire and shall have no rights or Liabilities with respect to the right, title and interest of each Seller in and to the Excluded Assets, including, the following:

(a)     any claim, right, award, recovery, indemnity, warranty, refund, reimbursement, audit right, duty, obligation, liability or other intangible right in favor of or owed to any Seller (i) to the extent arising under or related to the D&O Insurance Claims, (ii) to the extent related to a Transferred Asset (other than a Transferred Seller Plan) and arising or attributable to the period of time prior to the date hereof, (ii) to the extent related to any of the Excluded Liabilities, (iii) related to any insurance proceeds from Sellers' or any of their Affiliates' third party insurance policies to the extent such proceeds arise on account of acts or omissions that occurred prior to the date of this Agreement (together with the D&O Insurance Claims, the "Excluded Insurance Proceeds");

(b)      all trade credits or refunds of costs or expenses borne by any Seller, in each case, attributable to the Transferred Assets and attributable to any period of time prior to the Closing Date;

(c)      any shares or other interests in any Person or any securities of any Person;

(d)      the articles and notice of articles, corporate charter, seal, minute books, stock record books and other similar documents relating to the organization, maintenance and existence of any Seller or any Affiliate of any Seller;

(e)      all invoices, shipping documents, purchase orders and other preprinted business forms that have any Trademark thereon other than those included in the Transferred Intellectual Property;

(f)      all Intellectual Property owned by any Seller or any of their Affiliates, other than the Transferred Intellectual Property;

(g)      all personnel records (including all human resources and other records) of any Seller or any of their Affiliates relating to employees of any Seller or any of their Affiliates, in either case, other than the personnel records of the Unionized Employees and Continuing Employees;

(h)      any refund of any Taxes paid by or on behalf of any Seller, other than refunds of Asset Taxes allocable to Buyer pursuant to Section 6.4(b);

(i)      all deposits, cash and cash equivalents, checks and funds, bank accounts and other similar cash items;

(j)      all consideration received by any Seller or their Affiliates pursuant to, and all rights of any Seller and their Affiliates under, this Agreement or any Transaction Document, subject to the terms hereof and thereof;

(k)      all of the following documents prepared or received by Sellers, their Affiliates or any of their respective Representatives, in each case, with respect to the Transferred Assets: (i) lists of prospective buyers; (ii) offers, bids or proposals submitted by any prospective buyer; (iii) analyses by Sellers of any offers, bids or proposals submitted by any prospective buyer; (iv) correspondence between or among Sellers, their Representatives and any prospective buyer; and (v) correspondence between Sellers, their Affiliates or any of their respective Representatives with respect to any offers, bids or prospective buyers, the transactions contemplated hereby or otherwise contemplated by the Bid Procedures;

(l)      all Retained Accounts Receivable (which, for the avoidance of doubt, shall not include the Buyer Accounts Receivable, to which Sellers shall have no entitlement under this Agreement);

(m)      all Seller Contracts that are not Closing Assumed Contracts or Additional Assumed Contracts (the "Excluded Contracts");

4

(n)    all Intracompany Receivables;

(o)    all Tax Returns;

(p)    all Actions owned by or available to any Seller, whether in Law or equity and under any forum (including, purely by way of example and without limitation, Canadian or United States federal courts, any provincial court or state court, any foreign court and any extrajudicial dispute resolution mechanism), including any (i) Action set forth on Schedule 1.2(p)(i) and (ii) Avoidance Action, attributable to any period of time prior to the Closing Date including, in each case, without limitation any Action (w) related to the acquisition, ownership, management, operation, use, function or value of any Transferred Asset or Excluded Asset, (x) against any counterparty to a Closing Assumed Contract, or any Affiliate of such counterparty or (y) against any director, officer, manager, employee, contractor, consultant or advisor employed by or providing services to any Seller (such Actions, the "Excluded Actions") unless (1) related to any Transferred Assets and (2) is attributable to any period of time following the Closing Date;

(q)    any prepayments and good faith and other bid deposits submitted by any third party under the terms of the Bid and Contract Procedures Order; and

(r)    any claim, right, award, recovery, reimbursement, or other benefit arising prior to the Closing Date from the Rebate Program and any federal matching program related thereto.

Section 1.3    Assumption of Liabilities.    On the terms and subject to the conditions set forth herein, at the Closing, Buyer will assume, without duplication, and will otherwise in a timely manner pay, perform and discharge and be responsible for, in accordance with their respective terms, all of the following Liabilities arising from and after the Closing (collectively, the "Assumed Liabilities"):

(a)    all Liabilities with respect to the ownership, possession, use and operation of the Transferred Assets accruing on or after the Closing;

(b)    [Reserved];

(c)    all Liabilities for, or related to any obligation for, any Tax that Buyer bears under Section 6.4;

(d)    all Liabilities under the Closing Assumed Contracts and the Additional Assumed Contracts, including all Cure Costs;

(e)    all Liabilities under any Permitted Encumbrance to the extent related to any Transferred Asset;

(f)    all Liabilities under the Transferred Seller Plans and all Liabilities assumed by Buyer pursuant to Section 6.5; and

(g)    all other Liabilities that Buyer has expressly assumed or agreed to assume or be responsible for under this Agreement and the other Transaction Documents.

Section 1.4    Excluded Liabilities.    Notwithstanding anything to the contrary set forth in this Agreement or in any of the other Transaction Documents, the Parties expressly acknowledge and agree that, except as set forth in Section 1.3, Buyer will not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of Sellers (or any of them), including those arising from or in connection with the Transferred Assets or the Business, or for any Action against Sellers (or any of them) or relating to the Transferred Assets or the Business, whether existing on the Closing or arising thereafter as a result of any act, omission, event, thing or circumstances taking place or not taking place prior to the Closing, including the following (all such Liabilities that Buyer is not assuming being referred to collectively, as the "Excluded Liabilities"):

(a)    all Income Taxes of Sellers;

(b)    all Liabilities relating to or arising out of the Excluded Assets;

(c)    all Liabilities in respect of any pending or threatened Action arising out of, relating to or otherwise in respect of the Business or the Transferred Assets to the extent such Action relates to the Business or the Transferred Assets for any period on or prior to the Closing Date;

(d)    all product Liability or similar claim for injury to a Person or property which arises out of or is based upon any express or implied representation, warranty, agreement or guaranty made by any Seller or based on any tort claim, or by reason of the improper performance or malfunctioning of a product, improper design or manufacture, failure to adequately package, label or warn of hazards or other related product defects of any products at any time manufactured or sold or any service performed by Seller prior to the Closing Date;

(e)    all recall, design defect, improper installation, manufacturing defect or similar or related claims of any products manufactured or sold or any service performed by any Seller prior to the Closing Date;

(f)    all Liabilities arising under or in connection with any present or former employee benefit plan providing benefits to any present or former employee of any Seller, other than as set forth in Section 1.3(f), provided, that all such Liabilities with respect to the Continuing Employees shall only be Excluded Liabilities to the extent arising or related to any period prior to the Closing;

(g)    except as provided in Section 6.5, including the Liabilities assumed by Buyer in relation to the Continuing Employees and the Unionized Employees as set out in Section 6.5(l), all Liabilities with respect to any present or former employees, officers, directors, independent contractors or consultants of Seller, including for wages or other work-related benefits, bonuses, fees, accrued vacation, workers' compensation, employee deferred compensation including stock option plans, equity grants, other grants and agreements, severance, retention, termination or other payments;

(h)    all Accounts Payable;

(i)    all Liabilities of the Business relating or arising from unfulfilled commitments, quotations, purchase orders, customer orders or work orders that do not constitute part of the Transferred Assets or Assumed Liabilities;

(j)      all Liabilities to indemnify, reimburse, or advance amounts to any present or former officer, director, employee, agent or independent contractors of any Seller (including with respect to any breach of fiduciary obligations by same);

(k)      all Liabilities under the Excluded Contracts, Intracompany Payables and/or resulting from the termination of obligations provided for in Section 1.10(b);

(l)      all Liabilities associated with debt, loans, notes, bonds, guarantees, indemnifications or credit facilities of any Seller and/or the Business or the Transferred Assets;

(m)      all Liabilities arising out of, in respect of or in connection with the failure by any Seller to comply with any Law; and

(n)      all Liabilities associated with, or arising from or in connection with the redemption and cancellation of the Conway Material Bond Agreements as contemplated by Section 6.3(b).

Section 1.5      Assumption and Assignment of Contracts.

(a)      Sellers shall assign to Buyer, and Buyer shall assume, the Closing Assumed Contracts at the Closing pursuant to the U.S. Sale Order or Canadian Sale Order, as applicable, subject to the other provisions of this Section 1.5. Buyer shall pay all Cure Costs in respect of the Closing Assumed Contracts and the Additional Assumed Contracts, which shall not be the obligation, liability or responsibility of Sellers.

(b)      The U.S. Sale Order and Canadian Sale Order, as applicable, shall provide for the assumption by the applicable Seller party thereto, and the assignment to the extent legally capable of being assigned by such Seller to Buyer, of (i) each Closing Assumed Contract on the terms and conditions set forth in Section 1.6 and Section 1.7 and (ii) each Additional Assumed Contract on the terms and conditions set forth in Section 1.6 and Section 1.7.

Section 1.6      Bankruptcy Proceeding Assumption and Assignment of Contracts.

(a)      Sellers may file with the U.S. Bankruptcy Court on the later of (i) May 4, 2023 or (ii) the date that is three (3) Business Days after the entry of the Bid and Contract Procedures Order, a notice (a "Notice of Potential Assignment") in the form approved by the Bid and Contract Procedures Order and serve such Notice of Potential Assignment by first-class mail on all non-Seller counterparties to those certain executory contracts and unexpired leases Related to the Business that Sellers may wish to assume and assign to Buyer in connection with the transactions contemplated hereby (each, an "Identified Contract"). Within one day after the conclusion of the Auction, or as soon as reasonably practicable thereafter, Sellers may file with the U.S. Bankruptcy Court a notice in the form approved by the Bid and Contract Procedures Order reflecting Sellers' proposed assumption and assignment of the Closing Assumed Contracts. At the Closing, Sellers shall assume and assign to Buyer the Closing Assumed Contracts, in each case, pursuant to Section 365 of the Bankruptcy Code or the U.S. Sale Order, subject to provision by Buyer of adequate assurance as may be required under Section 365 of the Bankruptcy Code. Pursuant to the terms of the Bid and Contract Procedures Order or the U.S. Sale Order, as the case may be, Sellers shall assume and assign to Buyer the Additional Assumed Contracts, in each case, pursuant

to Section 365 of the Bankruptcy Code and the U.S. Sale Order, subject to provision by Buyer of adequate assurance as may be required under Section 365 of the Bankruptcy Code.

(b)    From time to time following the date hereof (and not later than five days prior to the expected Closing Date (or such later date as may be approved by the U.S. Bankruptcy Court) (the "Designation Deadline")), Buyer may, in its sole discretion, (i) designate additional Identified Contracts or any other executory contracts or unexpired leases that Buyer wishes to assume in connection with the transactions contemplated hereby as "Additional Assumed Contracts" by providing written notice to Sellers in the form of an updated Additional Assumed Contracts Schedule and (ii) notify Sellers in writing of any Closing Assumed Contract or Additional Assumed Contract that it does not any longer wish to assume and any such previously considered Closing Assumed Contract or Additional Assumed Contract that Buyer no longer wishes to assume shall be automatically deemed removed from the Schedules related to Closing Assumed Contracts or Additional Assumed Contracts and shall be automatically deemed an Excluded Contract without any adjustment to the Purchase Price.

(c)    Within three Business Days following the Designation Deadline, Sellers may file with the U.S. Bankruptcy Court a further assumption notice (a "Further Assignment Notice") by first-class mail in the form approved by the Bid and Contract Procedures Order on all non-Seller counterparties to all Additional Assumed Contracts not previously noticed by Sellers in accordance with Section 1.6(a), and provide a copy of the same to Buyer. Following filing of the Further Assignment Notice, Sellers shall assume and assign to Buyer the Additional Assumed Contracts on such date as specified in such Further Assignment Notice, in each case, pursuant to Section 365 of the Bankruptcy Code and an Order providing for the assumption by the applicable Seller party thereto, and the assignment to the extent legally capable of being assigned by such Seller to Buyer, of each of the Additional Assumed Contracts pursuant to Section 365 of the Bankruptcy Code on the terms and conditions set forth in this Section 1.6, subject to provision by Buyer of adequate assurance as may be required under Section 365 of the Bankruptcy Code. For the avoidance of doubt, (x) if Buyer has not provided Sellers an updated Additional Assumed Contract Schedule to assume any additional Identified Contracts or other executory contracts or unexpired leases in accordance with the foregoing, then such Identified Contract or other executory contract or unexpired lease shall be deemed to be an Excluded Contract and may be rejected by any Seller party thereto after the expiration of the Designation Deadline, (y) no prepetition Cure Cost shall be due or payable with respect to any executory contract or unexpired lease until the permanent assumption thereof and (z) each Identified Contract or other executory contract or unexpired lease that becomes an Additional Assumed Contract pursuant to this Section 1.6(c) shall concurrently be deemed to have become a Transferred Asset.

(d)    With respect to any Identified Contracts that are not Closing Assumed Contracts, if following the Closing Date, Sellers incur any direct incremental administrative expenses allowed pursuant to section 503(b) of the Bankruptcy Code associated with its continuance of such Identified Contract during the period between the Closing Date and the earlier of (x) the date such Identified Contract is either assumed and assigned to Buyer or rejected and (y) the Designation Deadline, then Buyer shall, within 15 days following the Closing Date, reimburse Sellers for such incremental expenses (other than expenses caused as a result of the relevant Seller's breach of such executory contract or unexpired lease).

(e)     As part of any motion with respect to the Bid and Contract Procedures Order (or as necessary in one or more separate motions), Sellers shall request that, by virtue of any Seller providing seven days' prior notice of its intent to assume and assign any Closing Assumed Contract or Additional Assumed Contract, the U.S. Bankruptcy Court deem any non-debtor party to such Closing Assumed Contract or Additional Assumed Contract that does not file an objection with the U.S. Bankruptcy Court during such notice period to have given any Necessary Consent to the assumption of the Closing Assumed Contract or Additional Assumed Contract by the relevant Seller and assignment to Buyer.

(f)     At Buyer's reasonable request, and at Buyer's sole cost and expense, Sellers shall reasonably cooperate with Buyer for a period of 90 days following the Closing Date to allow Buyer to enter into an amendment of any Closing Assumed Contract or Additional Assumed Contract upon assumption of such Closing Assumed Contract or Additional Assumed Contract by Buyer (and Sellers shall reasonably cooperate with Buyer to the extent reasonably requested by Buyer in negotiations with the counterparties thereof for a period of 90 days following the Closing Date); provided that (i) in no event shall any such amendments be effective prior to the Closing and (ii) Sellers shall not be required to enter into any such amendment if such amendment would result in the incurrence of any Liability by Sellers that is not otherwise paid by Buyer at the time of the assumption by Sellers of such Closing Assumed Contract or Additional Assumed Contract.

(g)     Sellers shall use their respective commercially reasonable efforts to obtain one or more Orders of the U.S. Bankruptcy Court, which Order(s) shall be in form and substance reasonably acceptable to Buyer, and shall reflect the terms and conditions set forth herein, to assume and assign the Closing Assumed Contracts and the Additional Assumed Contracts to Buyer on the terms set forth in this Section 1.6.

(h)     Subject to Section 1.6(i), to the extent that there is (i) an objection to the assignment and assumption of any Closing Assumed Contract outstanding at the Closing Date, (ii) an objection to the assignment and assumption of any Additional Assumed Contract on or prior to the seventh day after the Further Assignment Notice is served or (iii) any Necessary Consent that is required to assume and assign to Buyer any Closing Assumed Contract or Additional Assumed Contract is not obtained by the Closing Date, each Seller shall, with respect to each such Seller Contract, from and after the Closing and until the earliest to occur of (A) the date on which such objection is resolved or such applicable Necessary Consent is obtained, and (B) the date on which such Seller Contract is deemed rejected under Section 365 of the Bankruptcy Code, use commercially reasonable efforts during the term of such Seller Contract (and to the extent the term of such Seller Contract ends prior to the earlier of clause (A) or (B)) to (1) provide to Buyer the benefits under such Seller Contract (it being understood that Buyer shall be solely responsible for the obligations under such Seller Contract), (2) cooperate in any reasonable and lawful arrangement, including holding such Seller Contract in trust for Buyer pending resolution of such objection or receipt of the Necessary Consent, designed to provide such benefits to Buyer, and (3) use its commercially reasonable efforts to enforce for the account of Buyer any rights of such Seller under such Seller Contract, including the right to elect to terminate such Seller Contract in accordance with the terms thereof upon the written direction of Buyer; provided, however, that notwithstanding the foregoing, Sellers shall not be obligated to take any action that breaches, violates or results in default under the terms of any Seller Contract. Buyer shall reasonably cooperate with Sellers in order to enable Sellers to provide to Buyer the benefits contemplated by this Section 1.6(h).

9

(i)      Notwithstanding the foregoing, a Seller Contract shall not be a Closing Assumed Contract or Additional Assumed Contract hereunder and shall not be assigned to, or assumed by, Buyer to the extent that such Seller Contract is (i) deemed rejected under Section 365 of the Bankruptcy Code or (ii) the subject of an objection to assignment or assumption or requires a Necessary Consent of any Governmental Entity or other third party (other than, and in addition to, that of the U.S. Bankruptcy Court) in order to permit the assumption and assignment by the applicable Seller to Buyer of such Seller Contract pursuant to Section 365 of the Bankruptcy Code, and such objection has not been resolved or such Necessary Consent has not been obtained prior to the 60th day following the Closing (as such 60-day period may be extended by mutual agreement of Buyer and Sellers) or (iii) is terminated by any party thereto other than Sellers, or terminates or expires by its terms, on or prior to such time as it is to be assumed by Buyer as a Closing Assumed Contract or Additional Assumed Contract hereunder and is not continued or otherwise extended upon assumption. For the avoidance of doubt, in no event shall the failure to assign to Buyer any Seller Contract due to the termination of such Seller Contract in accordance with subsection (iii) above, (x) reduce the Purchase Price or the Deposit Amount payable to Sellers (if applicable) or (y) constitute a failure to satisfy the conditions to the obligations of Buyer under Section 7.2.

Section 1.7      U.S. Bankruptcy Proceedings Assumption and Assignment of Contracts.

(a)      In the period between the execution of this Agreement and the hearing of the application for the U.S. Sale Order (the "Interim Period"), Sellers shall use reasonable commercial efforts to obtain any consents or approvals required in respect of the Acquisition including:

(i)      any consents of any non-Seller counterparties to any Identified Contracts for the transfer or assignment of Identified Contracts; and

(ii)      any consents or approvals required of applicable Governmental Entity for the transfer or assignment of Permits to Buyer or the reissuance of Permits in favor of Buyer;

and Buyer shall provide such assistance to Sellers as is reasonably required by Sellers in respect thereof.

(b)      If a non-Seller counterparty to an Identified Contract is unwilling to consent to the assignment of an Identified Contract or is unwilling to consent on terms acceptable to Buyer, acting reasonably, and such consent is required in order to assign such Identified Contract, the application to the U.S. Bankruptcy Court or the Canadian Court for the U.S. Sale Order or Assignment Order, as applicable, shall include a request that the U.S. Bankruptcy Court order that such Identified Contract be assigned pursuant to and in accordance with the terms of the Bid and Contract Procedures Order or the CCAA.

Section 1.8      Non-Assignment of Assets. Notwithstanding any other provision of this Agreement to the contrary, this Agreement will not constitute an agreement to assign or Transfer and will not effect the assignment or Transfer of any Transferred Asset (including any Closing Assumed Contract or Additional Assumed Contract) if (i) (A) prohibited by applicable Law, (B) an attempted assignment or transfer thereof would be reasonably likely to subject Buyer, its Affiliates or any of its or their respective Representatives to civil or criminal Liability or (C) an attempted

10

assignment or transfer thereof, without the approval, authorization, consent or waiver of, or granting or issuance of any license or permit by, any third party thereto (each such action, a "Necessary Consent"), would constitute a breach, default or violation thereof or of any Law or Order or in any way adversely affect the rights of Buyer thereunder or (ii) the U.S. Bankruptcy Court or the Canadian Court, as applicable, has not entered an Order approving such assignment or Transfer. In such event, such assignment or transfer is subject to such Necessary Consent being obtained and Sellers and Buyer will use their commercially reasonable efforts to obtain the Necessary Consents with respect to any such Transferred Asset (including any Closing Assumed Contract or Additional Assumed Contract) or any claim or right or any benefit arising thereunder for the assignment or transfer thereof to Buyer as Buyer may reasonably request; provided, however, that Sellers will not be obligated to pay any consideration therefor to any third party from whom approval, authorization, consent or waiver is requested or to initiate any litigation or legal proceedings to obtain any such approval, authorization, consent or waiver. If such Necessary Consent is not obtained, or if an attempted assignment or transfer thereof would give rise to any of the circumstances described in clauses (i) or (ii) of the first sentence of this Section 1.8, be ineffective or adversely affect the rights of Buyer to such Transferred Asset following the Closing, (x) Sellers and Buyer will, and will cause their respective Affiliates to, (1) use commercially reasonable efforts (including cooperating with one another to obtain such Necessary Consents, to the extent feasible) as may be necessary so that Buyer would obtain the benefits and assume the obligations thereunder in accordance with this Agreement, (2) complete any such assignments or Transfers as soon as reasonably practicable and (3) upon receipt of any applicable Necessary Consents, Transfer or assign the applicable Transferred Asset to Buyer, and (y) Sellers will, and will cause their respective Affiliates to, reasonably cooperate with Buyer in good faith without further consideration in any arrangement reasonably acceptable to Buyer and Sellers intended to provide Buyer with the benefit of any such Transferred Assets at Buyer's sole cost and expense, in each case, for a period of 60 days following the Closing Date.

Section 1.9    Wrong Pocket. Subject to Section 1.8, if at any time after the Closing (i) Buyer or its designee holds any Excluded Assets or Excluded Liabilities or (ii) any Seller holds any Transferred Assets or Assumed Liabilities, Buyer or the applicable Seller, as applicable, will promptly Transfer (or cause to be Transferred) such assets or assume (or cause to be assumed) such Liabilities to or from (as the case may be) the other Party, without further consideration from the other Party. Prior to any such Transfer, the Party receiving or possessing any such asset will hold it in trust for such other Party.

Section 1.10    Intracompany Arrangements.

(a)    Each of Buyer and Sellers agree that any Intracompany Payables between any Seller, on the one hand, and any other Seller or Affiliate thereof, on the other hand, shall be fully settled or otherwise deemed cancelled effective as of immediately prior to the Closing.

(b)    Each of Buyer and Sellers agree that, any contract, commitment or arrangement between any Seller, on the one hand, and any other Seller or Affiliate thereof, on the other hand, shall be terminated and be of no further force or effect and all obligations thereunder shall be fully satisfied and extinguished, notwithstanding any terms thereof to the contrary, effective as of immediately prior to the Acquisition.

11

(c)    No additional  consideration  shall be payable by, and no additional  amounts  shall be owed by, Buyer or any of its Affiliates to Sellers or any of their Affiliates in connection with the transactions effected pursuant to this Section 1.10.

Section 1.11    Further Conveyances and Assurances.  From time to time following  the Closing,  Sellers and Buyer will, and will cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions, assignments, releases and other instruments,  and will take such further actions,  as may be reasonably necessary or appropriate to assure to Buyer and its successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges  intended  to be conveyed  to Buyer under this Agreement and to assure fully to each Seller and its respective Affiliates and their respective successors and assigns, the assumption  of the Liabilities  and obligations  intended  to be assumed  by Buyer under this Agreement, and to otherwise make effective the transactions contemplated hereby.

ARTICLE II

CONSIDERATION; CLOSING

Section 2.1    Consideration.  At the Closing, Buyer will pay to Sellers, by wire transfer in immediately  available  funds to the account or accounts designated by Sellers, an amount equal to US$60,000,000,  less the Deposit Amount and, if applicable  in accordance with Section 8.3, the Break-Up Fee and the Expense Reimbursement  Amount (the "Purchase Price").

Section 2.2    Purchase Price Deposit.  Buyer shall deliver to Escrow Agent, within one (1) Business Day of the later of the date hereof and the execution of the Escrow Agreement, the Deposit Amount.  Buyer's deposit of the Deposit Amount with the Escrow Agent will be either returned to Buyer or paid to Sellers as follows,  in each case, in accordance with the Escrow Agreement: (a) if the Closing  occurs, the Deposit Amount shall be paid to Sellers in accordance with Section 2.7, (b) if this Agreement is terminated by Sellers pursuant to Section 8.1(e), then the Deposit  Amount shall be paid to Sellers (which will be deemed fully  earned by Sellers as compensation and consideration for entering into this Agreement), and Sellers shall have no further recourse against Buyer, or (c) if this Agreement is terminated for any reason other than by Sellers pursuant to Section 8.1(e), then the Deposit Amount shall be returned to Buyer without any set-off or deduction within three Business Days after such termination  and Buyer shall have no further recourse against Sellers other than as set forth in Section 8.3; provided that if the Deposit Amount is payable to Buyer upon termination  due to the U.S. Bankruptcy Court approving a Competing Transaction, the Deposit  Amount  shall not be payable until  three Business  days after such Competing Transaction is consummated.  The Deposit Amount shall only constitute property of Sellers in the event that the Deposit Amount is released to Sellers by the Escrow Agent in accordance with the terms of this Agreement and the Escrow Agreement.  The Deposit Amount shall not be subject to any lien, attachment, trustee process, or any other judicial  process of any creditor of any of Sellers  or Buyer.

Section 2.3    Closing.  The closing of the purchase and sale of the Acquisition  (the "Closing")  shall take place remotely,  via electronic  exchange  of documents,  at 10:00 a.m., prevailing  Eastern time, on the third Business Day following  the date on which the last of the conditions  set forth in Article VII (other than those conditions  that by their nature are to be satisfied

at the Closing but subject to the fulfillment or waiver of those conditions) has been satisfied or waived, or at such other date, time and place as the Parties may mutually agree. The date on which the Closing occurs is called the "Closing Date."

Section 2.4    Deliveries by Buyer.  At the Closing, Buyer shall deliver, or cause to be delivered, to Sellers, the following:

(a)    the payment required to be made pursuant to Section 2.1;

(b)    the certificates to be delivered pursuant to Section 7.3(c);

(c)    pursuant to Section 2.7, a counterpart to a joint instruction to the Escrow Agent, instructing the Escrow Agent to release the Deposit Amount to Sellers;

(d)    a duly executed counterpart to each of the Transaction Documents;

(e)    duly executed counterparts to one or more assignment and assumption agreements with respect to the Transferred Leases, Closing Assumed Contracts and any Additional Assumed Contracts, substantially in the form of Exhibit B attached hereto (the "Assignment and Assumption Agreements"); and

(f)    such other instruments of assumption and other instruments or documents, including bills of sale and/or assignment and assumption agreements, in form and substance reasonably acceptable to Sellers, as may be necessary to effect Buyer's assumption of the Assumed Liabilities and the assignment of any Transferred Assets in accordance with the requirements of applicable Law and this Agreement, in each case duly executed by Buyer.

Section 2.5    Deliveries by Sellers.  At the Closing, Sellers shall deliver, or cause to be delivered, to Buyer, the following:

(a)    the certificate to be delivered pursuant to Section 7.2(c);

(b)    pursuant to Section 2.7, a counterpart to a joint instruction to the Escrow Agent, instructing the Escrow Agent to release the Deposit Amount to Sellers;

(c)    a duly executed counterpart to each of the Transaction Documents;

(d)    an IRS Form W-9 with respect to each Seller that is a United States person within the meaning of Section 7701 of the Code, duly completed and executed;

(e)    the Books and Records; provided that the delivery obligations of Sellers hereunder shall be deemed satisfied if such Books and Records remain at the Transferred Owned Property or Transferred Leased Property;

(f)    a copy of the U.S. Sale Order as entered by the U.S. Bankruptcy Court, vesting the Transferred Assets in Buyer free and clear of any Liens (other than Permitted Encumbrances);

(g)      a copy of the Canadian Sale Order as entered by the Canadian Court, vesting the Transferred Assets in Buyer free and clear of any Liens (other than Permitted Encumbrances);

(h)      duly executed counterparts to the Assignment and Assumption Agreements;

(i)      an instrument of assignment substantially in the form of <u>Exhibit C</u> attached hereto with respect to the transfer of the Transferred Intellectual Property (the "<u>IP Assignment Agreement</u>");

(j)      a Joint Election;

(k)      an instrument of conveyance (including a quit claim deed, real property transfers or similar documents as customary in the applicable jurisdiction and as may be necessary in accordance with the requirements of applicable Law) conveying to Buyer fee simple title to the Transferred Owned Property, subject to Permitted Encumbrances; and

(l)      such other instruments of assumption and other instruments or documents, including bills of sale and/or assignment and assumption agreements, in form and substance reasonably acceptable to Buyer, as may be necessary to effect Buyer's assumption of the Assumed Liabilities and the effective assignment of any Transferred Assets in accordance with the requirements of applicable Law and this Agreement, in each case duly executed by the applicable Seller.

Section 2.6      [Reserved].

Section 2.7      <u>Escrow Mechanics</u>.  At the Closing, SLP shall deliver a written instruction to the Escrow Agent, in accordance with the Escrow Agreement, instructing the Escrow Agent to disburse an amount equal to the Deposit Amount to SLP.  Any disbursement of any amounts by the Escrow Agent pursuant to this <u>Section 2.7</u> and the Escrow Agreement shall be made by wire transfer of immediately available funds to such account or accounts as may be designated in such joint written instruction by Sellers, pursuant to the terms and subject to the conditions set forth in this Agreement and the Escrow Agreement.

Section 2.8      <u>Withholding</u>.    Buyer shall be entitled to deduct or withhold from consideration otherwise payable pursuant to this Agreement such amounts as it is required to deduct or withhold with respect to the making of such payment under any provision of Canadian or U.S. federal, state, provincial or local Law related to Taxes, <u>provided,</u> <u>however</u> that Buyer shall use commercially reasonable efforts to provide Sellers with at least ten Business Days' notice of the applicability of any such deduction or withholding prior to making such deduction or withholding, and shall afford Sellers a reasonable opportunity to provide any applicable certificates, forms or documentation that would reduce or eliminate the requirement to deduct or withhold Tax under applicable Law. To the extent that amounts are so deducted and withheld, such deducted and withheld amounts shall be timely paid by Buyer to the applicable Tax Governmental Entity and shall be treated for all purposes of this Agreement as having been paid to Sellers.  The Parties shall reasonably cooperate to determine whether any such deduction or withholding applies to the payment, and, if so, shall further cooperate to minimize applicable withholding Taxes and to obtain any available refund or credit of withheld amounts.

# ARTICLE III

# REPRESENTATIONS AND WARRANTIES OF SELLERS

Except (x) as set forth in the corresponding numbered section or subsection of a Schedule (it being agreed that for the purposes of the representations and warranties made by Sellers in this Agreement, disclosure of any item in any Schedule of the Seller Disclosure Schedule shall be deemed disclosure with respect to any other section or sub-section of the Agreement to which the relevance of such item is reasonably apparent) or (y) to the extent relating to the Excluded Assets or the Excluded Liabilities, Sellers represent and warrant to Buyer as of the date of this Agreement and as of the Closing as follows:

Section 3.1    <u>Organization; Good Standing</u>.  Each Seller is duly incorporated, formed or organized, validly existing and in good standing under the Laws of its jurisdiction of incorporation, formation or organization.  Each Seller has all requisite corporate or similar power and authority to own, lease and operate its properties and assets and to carry on its business as presently conducted and is qualified to do business in each jurisdiction where the ownership, leasing or operation of its assets or properties or conduct of the Business requires such qualification, except where the failure to be so qualified or in good standing, or to have such power or authority, would not, in the aggregate, have a Material Adverse Effect.

Section 3.2    <u>[Reserved]</u>.

Section 3.3    <u>Authority; Approval</u>.  Subject to (a) the issuance of the U.S. Sale Order and any other Order required by the U.S. Bankruptcy Court and (b) the issuance of the Canadian Sale Order and any other Order required by the Canadian Court, in connection with the transactions contemplated hereby:

(a)    each Seller has all right, power and authority to enter into and perform its obligations under the Transaction Documents to which it is or will become a party and has all requisite corporate or similar power and authority and has taken all organizational action necessary in order to execute, deliver and perform its obligations under the Transaction Documents to which it is or will become a party; and

(b)    this Agreement has been duly executed and delivered by each Seller and, assuming due execution and delivery by Buyer, will constitute a valid and binding agreement of each Seller, enforceable against each Seller in accordance with its terms, subject to bankruptcy, insolvency, fraudulent conveyance, preferential transfer, reorganization, moratorium and similar Laws relating to or affecting creditors' rights generally and subject, as to enforceability, to the effect of general principles of equity (the "<u>Equitable Exception</u>").

Section 3.4    <u>Governmental Filings; No Violations</u>.

(a)    Other than the filings, notices, reports, consents, registrations, approvals, permits and authorization set forth on <u>Schedule 3.4(a)</u> of the Seller Disclosure Schedule, and subject to the issuance of the U.S. Sale Order, the Canadian Sale Order, and any other Order required by the U.S. Bankruptcy Court or the Canadian Court in connection with the transactions contemplated hereby, no filing, notice, report, consent, registration, approval, permit or authorization is required to be

15

given, filed or obtained by any Seller to or from any Governmental Entity in connection with the execution, delivery and performance by any Seller of this Agreement or the transactions contemplated hereby, except those that the failure to make or obtain would not, in the aggregate, have a Material Adverse Effect.

(b)     Other than the filings, notices, reports, consents, registrations, approvals, permits and authorization set forth on <u>Schedule 3.4(b)</u> of the Seller Disclosure Schedule, the execution, delivery and performance by Sellers of this Agreement does not, and the consummation of the transactions contemplated hereby will not, conflict with, or result in any violation of or default (with or without notice, lapse of time or both) under, or give rise to a right of termination or acceleration of any obligation under, or result in the creation of any Lien upon any of the Transferred Assets (i) under any provision of the articles, by-laws or comparable governing documents of any Seller, (ii) subject to the U.S. Sale Order, the Canadian Sale Order, or any other Order required by the U.S. Bankruptcy Court or the Canadian Court in connection with the transactions contemplated hereby, any Law or Order to which any Seller, the Business and the Transferred Assets are subject, or (iii) subject to the U.S. Sale Order, Canadian Sale Order, or any other Order required by the U.S. Bankruptcy Court or the Canadian Court in connection with the transactions contemplated hereby, any Material Contract, except, in the case of clauses (<u>ii</u>) and (<u>iii</u>) above, for any such breach, violation, termination, default, creation or acceleration that would not, in the aggregate, have a Material Adverse Effect.

Section 3.5     <u>Financial Statements</u>.  The financial statements set forth in <u>Schedule 3.5</u> of the Seller Disclosure Schedule (the "<u>Financial Statements</u>") present fairly, in all material respects the consolidated financial position of SLP and its Subsidiaries in respect of the Business as of the dates thereof and the consolidated results of operations and cash flows for the periods then ended.

Section 3.6     <u>Litigation</u>.  Except as set forth in <u>Schedule 3.6</u> of the Seller Disclosure Schedule and except for the general pendency of the Bankruptcy Proceeding, the CCAA Proceedings, and Actions arising in the Ordinary Course and that would not have, in the aggregate, a Material Adverse Effect, as of the date hereof, there are no Actions pending or, to the Knowledge of Sellers, threatened against any Seller that are attributable to any of the Transferred Assets or the ownership or operation thereof or the Business.

Section 3.7     <u>Transferred Owned Property</u>.  There are no pending, or, to the Knowledge of Sellers, threatened, appropriation, condemnation, eminent domain or like proceedings relating to any Transferred Owned Property.

Section 3.8     <u>Material Contracts</u>.

(a)     Other than this Agreement, the other Transaction Documents and the DIP Financing, <u>Schedule 3.8</u> of the Seller Disclosure Schedule sets forth a true and correct list of the following Seller Contracts relating to the Transferred Assets (together, the "<u>Material Contracts</u>"):

(i)     any joint venture agreements, partnership agreements, purchase and sale agreements or similar agreements that are material to the Business;

(ii)     any Seller Contract which is reasonably expected by Sellers as of the date hereof to either (i) involve any future aggregate receipts of revenues by any Seller or Sellers

16

in excess of US$2,000,000 in the aggregate during the 2023 calendar year or (ii) involve any future aggregate payments or obligations by any Seller or Sellers in excess of US$2,000,000 in the aggregate during the 2023 calendar year (other than purchase orders in the Ordinary Course);

       (iii)     any non-competition agreement or any agreement that purports to restrict, limit or prohibit the manner in which, or the locations in which, any Seller conducts the Business;

       (iv)     [Reserved];

       (v)     any Seller Contract pursuant to which any Seller grants or receives any license with respect to Intellectual Property that is material to the Business, taken as a whole, that (i) is exclusive or (ii) requires aggregate payments to or from any of Sellers in excess of US$200,000 per annum, in each case of clauses (i) and (ii), other than (x) agreements granted on standardized terms for commercially available software or information technology services, or (y) outbound licenses granted in the Ordinary Course;

       (vi)     any Seller Contract with a Governmental Entity;

       (vii)     any Transferred Lease;

       (viii)     any Seller Contract pursuant to which any Seller currently leases personal property to or from any Person providing for lease payments in excess of US$200,000 per annum; and

       (ix)     any collective bargaining agreement with any union, staff association, works council or other agency or representative body certified or otherwise recognized for the purposes of bargaining collectively.

       (b)     Except as disclosed on Schedule 3.8(b) of the Seller Disclosure Schedule and except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, no Seller is in breach or default under any Material Contract and no Seller has received a written notice of a breach or default of the terms of any Material Contract. The Material Contracts are in full force and effect in accordance with their terms, except as may be limited by the Equitable Exception, and no event has occurred which constitutes, or which with notice or lapse of time or both would be reasonably be likely to constitute, a breach or default by any Seller (or to Sellers' Knowledge, any other party thereto) of its obligations under any of the Material Contracts (for the avoidance of doubt, not including with respect to the Bankruptcy Proceeding or the CCAA Proceedings), except in each case for those breaches or defaults which would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 3.9     Compliance with Laws; Permits.

       (a)     The Business is being conducted in all material respects pursuant to the Laws applicable to the Business or the Transferred Assets. No Seller has received any written notice of (i) any material investigation or review by any Governmental Entity with respect to the Business or the Transferred Assets or (ii) any material noncompliance with any applicable Laws which

noncompliance has not been cured as of the date hereof. Each Seller has obtained and is in material compliance with all Permits and Orders issued or granted by a Governmental Entity necessary to conduct its Business as presently conducted, except those the absence of which to have or be in compliance with would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)    Each of Sellers is in compliance with the Foreign Corrupt Practices Act of 1977, as amended (the "FCPA"), and any other U.S. or foreign Law concerning anti-corruption or anti-bribery applicable to the Business, and no Seller is, to Sellers' Knowledge, being investigated by any Governmental Entity with respect to, or been given notice in writing by a Governmental Entity of, any violation by any of Sellers of the FCPA or any other U.S. or foreign Law concerning anti-corruption or anti-bribery applicable to the Business.

Section 3.10    Brokers and Finders.    Except for fees and expenses payable to Stifel, Nicolaus & Company, Incorporated and Miller Buckfire & Co., LLC all of which shall be paid by, and be the responsibility of Sellers, there are no fees or expenses payable by any Seller to any investment banker, broker, finder or other intermediary that has been retained by or is authorized to act on behalf of Sellers in connection with the transactions contemplated hereby.

Section 3.11    Employees.    Except for the Collective Agreement disclosed in Schedule 3.11 of the Seller Disclosure Schedules and the applicable certification and bargaining rights related thereto, no Seller is a party to any collective bargaining agreement or other agreement with a labor union or like organization covering any of the Scheduled Employees. As of the date hereof, there is no pending or, to the Knowledge of Sellers, threatened strike, lockout, slowdown or work stoppage involving the Scheduled Employees.

Section 3.12    Employee Benefit Plans. (a) each Seller Plan (including any related trusts) has been established, operated and administered in compliance with its terms and all applicable Laws in all material respects, including, without limitation and as applicable in the circumstances, ERISA, the Code and the ITA, (b) other than as set forth on Schedule 3.12 of the Seller Disclosure Schedule, all contributions or other amounts payable by Sellers with respect to each Seller Plan in respect of current or prior plan years have been paid or accrued in accordance with GAAP, (c) each Seller Plan that is subject to ERISA and that is intended to be qualified under Section 401(a) of the Code has been determined by the Internal Revenue Service ("IRS"), to be qualified under Section 401(a) of the Code and, to the Knowledge of Sellers, nothing has occurred that would adversely affect the qualification or tax exemption of any such Seller Plan, (d) with respect to any Seller Plan that is subject to ERISA, none of Sellers has engaged in a transaction in connection with which any of Sellers reasonably could be subject to either a civil penalty assessed pursuant to Section 409 or 502(i) of ERISA or a tax imposed pursuant to Section 4975 or 4976 of the Code, (e) no Seller maintains or contributes to (i) a plan that is subject to Section 412 of the Code or Section 302 or Title IV of ERISA or, in the case of Canadian Plans, provides benefits under a "Defined benefit provision" of a "pension plan" within the meaning of those terms as set out in the Pension Benefits Standards Act (British Columbia) (ii) any "multiemployer plans" within the meaning of Section 3(37) of ERISA, whether or not subject to ERISA and (f) as of the date hereof, there are no Actions pending or, to the Knowledge of Sellers, threatened against any Seller that involve or relate to any Seller Plan, other than routine claims for benefits in the Ordinary Course.

Section 3.13 <u>Title to Transferred Assets</u>. Sellers, as applicable, have good and valid title to, or in the case of leased assets, have or will have on the Closing Date good and valid leasehold interests in, all material Transferred Assets, free and clear of all Liens (other than Permitted Encumbrances) and, at the Closing, Buyer will be vested with good and valid title to, or in the case of leased assets, good and valid leasehold interest in, such material Transferred Assets, free and clear of all Liens (other than Permitted Encumbrances) and Excluded Liabilities, to the fullest extent permissible under Law, including Section 363(f) of the Bankruptcy Code and the CCAA.

Section 3.14 <u>Intellectual Property</u>.

(a)    Sellers own, as applicable, all material Transferred Intellectual Property, free and clear of all Liens other than Permitted Encumbrances. To the Knowledge of Sellers, all material Transferred Intellectual Property is valid, subsisting and enforceable, and is not subject to any outstanding Order, judgment, decree or agreement materially and adversely affecting Sellers' use thereof or rights thereto.

(b)    (i) To the Knowledge of Sellers' (i) Sellers' conduct of the Business as currently conducted does not infringe, misappropriate or otherwise violate the Intellectual Property of any other Person, (ii) since January 1, 2020, Sellers have not received any written notice alleging any such infringement, misappropriation of violation by any of Sellers of Intellectual Property owned by any other Person, and (iii) none of the Transferred Intellectual Property is being infringed upon, misappropriated or otherwise violated by any other Person.

(c)    There is no Action pending before any Governmental Entity (other than the Bankruptcy Proceeding and the CCAA Proceedings) concerning the ownership, validity, registrability, enforceability, infringement, misappropriation or violation of any material Transferred Intellectual Property. None of the Transferred Intellectual Property is subject to any outstanding injunction, directive, Order, decree, award, settlement or judgment restricting the use or validity thereof.

(d)    Since January 1, 2020, there have been no security breaches of or unauthorized access to the technology and computer systems and infrastructure, owned by Sellers and used in connection with the Business, in each case, except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 3.15 <u>Environmental Matters</u>. Except for matters that relate to an Excluded Liability or as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, to Sellers' Knowledge:

(a)    the Business and the Transferred Assets are in compliance in all material respects with all applicable Environmental Laws and there are no facts that could give rise to a notice of non-compliance with any Environmental Law with respect to the Business or the Transferred Assets;

(b)    there are no writs, injunctions, decrees, Orders or judgments outstanding, or any actions, suits, proceedings or investigations pending or threatened, relating to compliance with or Liability under any Environmental Law affecting the Business, the Transferred Owned Property or the Transferred Leased Property;

(c)       there has been no waste generated by Seller or any of its Affiliates or any legally responsible predecessor corporation of Seller, that has given or could reasonably be expected to give rise to any Liability under any Environmental Law for which the Business would incur Liability; and

(d)       Notwithstanding anything in this Agreement to the contrary, the representations and warranties made by Sellers in this Section 3.15 are the sole and exclusive representations and warranties made regarding environmental matters, including those related to Environmental Laws.

Section 3.16    Taxes. Other than as set forth in Schedule 3.16 of the Seller Disclosure Schedule:

(a)       Sellers have filed all material Tax Returns with respect to the Transferred Assets required under applicable Law to be filed by Sellers with the appropriate Governmental Entities in all jurisdictions in which such Tax Returns are required to be filed prior to the Closing Date (taking into account any extension of time to file); and (ii) all material Taxes shown as due from Sellers on such Tax Returns with respect to such assets have been paid or arrangements for the payment thereof have been made, except to the extent nonpayment of which is permitted or required by the Bankruptcy Code or the CCAA.

(b)       Each Seller has filed all material Tax Returns required under applicable Law to be filed by such Seller with the appropriate Governmental Entities in all jurisdictions in which such Tax Returns are required to be filed prior to the Closing Date (taking into account any extension of time to file); and (ii) all material Taxes shown as due on such Tax Returns have been paid or arrangements for the payment thereof have been made, except to the extent nonpayment of which is permitted or required by the Bankruptcy Code or the CCAA, and only to the extent that failure to file such Tax Return or to pay such Taxes would give rise to a Lien (other than a Permitted Encumbrance) on the Transferred Assets.

(c)       No audit or other proceeding with respect to any Taxes or Tax Returns with respect to the Transferred Assets is currently in progress, or has been proposed or threatened in writing.

(d)       No Seller has received written notice of any material outstanding, proposed or assessed Tax deficiency that has not been paid or accrued for and in accordance with applicable Law, nor has any Seller executed any waiver of any statute of limitations in respect of material Taxes nor agreed to any extension of time with respect to a material Tax assessment, collection or deficiency, which notice, waiver, or extension of time could give rise to a Lien (other than a Permitted Encumbrance) on the Transferred Assets.

(e)       There are no liens for Taxes other than Permitted Encumbrances upon any of the Transferred Assets.

(f)       There are not any outstanding ruling requests, and no rulings have been received, by any Seller relating to Taxes which ruling requests or rulings relate to Taxes which could be a Lien (other than a Permitted Encumbrance) on the Transferred Assets.

Section 3.17    Insurance. Schedule 3.17 of the Seller Disclosure Schedule sets forth a true and complete list of all insurance policies (the "Existing Insurance Policies") maintained by Sellers

applicable to the Transferred Assets, together with the insurer, the amount of the coverage, the type of insurance, the policy number and any pending claims thereunder. Except as set forth on Schedule 3.17 of the Seller Disclosure Schedule, Sellers are up-to-date in the payment of all premiums and other amounts payable under the Existing Insurance Policies to maintain the Existing Insurance Policies in full force and effect, and Sellers shall continue to make all such payments until the Closing. As of the date hereof all such policies are in full force and effect in all material respects and are sufficient for compliance by Sellers with all applicable Laws.

Section 3.18    Real Property. On the Closing Date, Sellers shall convey to Buyer pursuant to Section 363 of the Bankruptcy Code good and marketable fee simple title and the deed to the Transferred Owned Property, free and clear of all Liens other than Permitted Encumbrances. Except as set forth on Schedule 3.18 of the Seller Disclosure Schedule, Sellers have not leased or otherwise granted to any Person the right to use or occupy the Transferred Owned Property or any portion thereof, and there are no Persons in possession or Person having the right to occupy or use any of the Transferred Owned Property. Sellers have no leases of any real property other than as set forth on Schedule 3.18 of the Seller Disclosure Schedule. The civic addresses of the parcels comprising the Transferred Owned Property are set out in Schedule 3.18 of the Seller Disclosure Schedule.

Section 3.19    Status of Transferred Assets. To the Knowledge of Sellers, since the commencement of the Bankruptcy Proceeding and CCAA Proceedings, no Fixtures and Equipment or other tangible personal property has been removed or transferred from the Business or otherwise sold, leased, assigned or transferred, other than as would not materially adversely affect the operation of the Transferred Assets or the Business. The Transferred Assets constitute all of the assets of every nature and kind whatsoever necessary for Buyer to conduct and operate the Business immediately after the Closing in the manner previously conducted by Sellers.

Section 3.20    Full Disclosure. There has been no event, transaction or information regarding the Business or the Transferred Assets that has come to the Sellers' Knowledge that has not been disclosed to Buyer in writing that could reasonably be expected to have a Material Adverse Effect.

Section 3.21    No Other Representations or Warranties.

(a)    Except for the representations and warranties contained in this Article III, no Seller nor any other Person on Sellers' behalf makes any other express or implied representation or warranty with respect to Sellers, the Business, the Transferred Assets, the Assumed Liabilities or the transactions contemplated hereby, and each Seller expressly disclaims any other representations or warranties, whether made by Sellers, any Affiliate of Sellers or any of Sellers' or their Affiliates' respective Representatives. Except for the representations and warranties contained in this Article III, each Seller (i) expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute or otherwise, relating to the condition of the Transferred Assets (including any express or implied warranty of merchantability or fitness for a particular purpose) and (ii) disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement or information made, communicated or furnished (orally or in writing) to Buyer or its Affiliates or Representatives (including any opinion, information, projection or advice that may have been or may be provided to Buyer by any Representative of

21

Sellers or any of its Affiliates). Sellers make no representations or warranties to Buyer regarding the probable success or profitability of the Transferred Assets or the use thereof. The disclosure of any matter or item in any Schedule hereto will not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter could result in a Material Adverse Effect.

(b)    Each Seller acknowledges and agrees that, except for the representations and warranties expressly set forth in <u>Article IV</u>, neither Buyer nor any other Person has made any express or implied representation or warranty with respect to the transactions contemplated hereby or with respect to the accuracy or completeness of any other information provided, or made available, to Sellers in connection with the transactions contemplated hereby and none of Sellers have relied on any representation or warranty other than those expressly set forth in <u>Article IV</u>.

ARTICLE IV

REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Sellers as of the date hereof and as of the Closing as follows:

Section 4.1    <u>Organization, Good Standing</u>.    Buyer is a corporation duly organized, validly existing and in good standing under the Laws of the State of Washington. Buyer has all requisite corporate or similar power and authority to own, lease and operate its properties and assets and to carry on its business as presently conducted and is qualified to do business and, to the extent such concept applies, is in good standing as a foreign legal entity in each jurisdiction where the ownership, leasing or operation of its assets or properties or conduct of its business requires such qualification, in each case, except where the failure to be so qualified or in good standing or to have such power or authority, would not, individually or in the aggregate, reasonably be likely to prevent, materially delay or materially impair the consummation of the transactions contemplated by this Agreement.

Section 4.2    <u>Authority; Approval</u>.

(a)    Buyer has all right, power and authority to enter into and perform its obligations under this Agreement and the other Transaction Documents to which it is or will become a party and has all requisite corporate or similar power and authority and has taken all organizational action necessary in order to execute, deliver and perform its obligations under this Agreement and the other Transaction Documents to which it is or will become a party and to consummate the transactions contemplated hereby. No additional corporate or shareholder authorization or consent is required in connection with the execution, delivery and performance by Buyer of this Agreement or any of the Transaction Documents to which it is or will become party.

(b)    This Agreement has been duly executed and delivered by Buyer and, when executed and delivered by Sellers, will constitute a valid and binding agreement of Buyer enforceable against Buyer in accordance with its terms, subject to the Equitable Exception.

Section 4.3    <u>Government Filings; No Violations</u>.

(a)    Subject to the issuance of the U.S. Sale Order, the Canadian Sale Order and any other Order required by the U.S. Bankruptcy Court or the Canadian Court in connection with the transactions contemplated hereby, no filing, notice, report, consent, registration, approval, permit or authorization is required to be given, filed or obtained by Buyer to or from any Governmental Entity in connection with the execution, delivery and performance by Buyer of this Agreement or the transactions contemplated hereby.

(b)    The execution, delivery and performance by Buyer of this Agreement does not, and the consummation of the transactions contemplated hereby will not, conflict with, or result in any violation of or default (with or without notice, lapse of time or both) under, or give rise to a right of termination, loss of rights, adverse modification of provisions, cancellation or acceleration of any obligation under (i) any provision of the articles, by-laws or comparable governing documents of Buyer, (ii) subject to the U.S. Sale Order, the Canadian Sale Order, any Law or Order to which Buyer is subject or (iii) subject to the U.S. Sale Order, the Canadian Sale Order, any Contracts to which Buyer is a party, except, in the case of clauses <u>(i)</u> and <u>(ii)</u> above, for any such breach, violation, termination, default, creation or acceleration that would not, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair the consummation of the transactions contemplated by this Agreement.

Section 4.4    <u>Litigation</u>.    There are no Actions pending, or, to the Knowledge of Buyer, threatened against Buyer, and Buyer is not subject to any Order, in each case, that would, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair the consummation of the transactions contemplated by this Agreement.

Section 4.5    <u>Available Funds</u>.    Buyer has sufficient funds available to it in cash to pay or cause to be paid the Purchase Price, all Cure Costs and the other fees and expenses required to be paid by Buyer in connection with the transactions contemplated hereby, and to effect the transactions contemplated hereby.  Upon the consummation of the transactions contemplated hereby, (a) Buyer will not be insolvent as defined in Section 101 of the Bankruptcy Code or under the CCAA, (b) Buyer will not be left with unreasonably small capital, (c) Buyer will not have incurred debts beyond its ability to pay such debts as they mature and (d) the capital of Buyer will not be impaired.

Section 4.6    <u>Condition of the Business</u>.    Notwithstanding anything contained in this Agreement to the contrary, Buyer acknowledges and agrees (a) that it has conducted its own independent review and analysis of the Business and the Transferred Assets, Assumed Liabilities and other rights and obligations it is acquiring and assuming under this Agreement and the other Transaction Documents, as it deems necessary and appropriate in connection with the execution and delivery of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby and (b) that Buyer will acquire the Transferred Assets (i) without any representation or warranty, express or implied, as to the fitness for purpose, merchantability, condition, quantity or quality of the Transferred Assets or any part thereof and (ii) in an "as is" condition and on a "where is" and "with all faults" basis without any warranty whatsoever, legal or conventional, at Buyer's own risk as more fully set out

23

in Section 3.21, except, in each case, for the representations and warranties expressly set forth in Article III of this Agreement.

Section 4.7    Brokers and Finders.  Except for fees and expenses payable by Buyer, there are no fees or expenses payable to any investment banker, broker, finder or other intermediary that has been retained by or is authorized to act on behalf of Buyer in connection with the transactions contemplated hereby.

Section 4.8    No Other Representations or Warranties.

(a)    Except for the representations and warranties contained in this Article IV, neither Buyer nor any other Person makes any other express or implied representation or warranty with respect to the transactions contemplated hereby, and Buyer disclaims any other representations or warranties, whether made by Buyer, any Affiliate of Buyer or any of Buyer's or its Affiliates' respective Representatives.

(b)    Buyer acknowledges and agrees that, except for the representations and warranties expressly set forth in Article III, no Seller nor any other Person has made any express or implied representation or warranty with respect to the transactions contemplated hereby or with respect to the accuracy or completeness of any other information provided, or made available, to Buyer in connection with the transactions contemplated hereby and Buyer has not relied on any representation or warranty other than those expressly set forth in Article III.

(c)    Buyer acknowledges and agrees that the enforceability of this Agreement against Sellers is subject to receipt of the U.S. Sale Order and the Canadian Sale Order.

Section 4.9    Due Diligence by Buyer.  Buyer (on behalf of itself and each of its Affiliates) acknowledges and agrees that:

(a)    the representations and warranties of Sellers set forth in Article III, any other Transaction Document or in any certificate delivered with respect to this Agreement (the "Covered Representations") are the only representations and warranties of any kind given by or on behalf of Sellers, and all other representations and warranties of any kind or nature expressed or implied (including, any relating to the future or historical financial condition, results of operations, revenues, expenses, assets, liabilities or other financial information included in the Business or the Transferred Assets or the quality, quantity or condition of the assets of the Business or the Transferred Assets) are specifically disclaimed by Sellers, and none of Sellers, their respective Affiliates or their respective Representatives make or provide any other warranty or representation, and Buyer hereby waives (on behalf of itself and each of its Affiliates) any other warranty or representation, in each case, express or implied, as to the quality, merchantability, fitness for a particular purpose or condition of the Business or the Transferred Assets or any part thereof;

(b)    to the extent that Buyer has received any forecasts, estimates and projections, statements of intent or statements of opinion, including projected financial statements, cash flow items, other financial information, market intelligence and predictions and certain business plan information, including in any information memorandum, any management presentations or any other information, Buyer acknowledges and agrees that, except for the Covered Representations, (i) there are uncertainties inherent in attempting to make such projections and forecasts and,

accordingly, Buyer is not relying on any of them, (ii) Buyer is familiar with such uncertainties and is taking full responsibility for making its own evaluation of the adequacy and accuracy of all such projections and forecasts, (iii) Buyer has no claim under or in connection with this Agreement against anyone with respect to the accuracy of such projections and forecasts, and (iv) none of Sellers, their respective Affiliates or any of their respective Representatives have made any representation, warranty or indemnity with respect to such projections and forecasts; and

(c)        (i) Buyer has engaged expert advisors experienced in the evaluation and acquisition of businesses such as the Business, as contemplated hereby, (ii) it has conducted a due diligence exercise in relation to the Business and the Transferred Assets, it has received the Seller Disclosure Schedule, it has been provided with, among other things, access to the Virtual Data Room, including all materials regarding the Business and the Transferred Assets contained therein (and not removed), from February 24, 2023 to the first Business Day prior to the Closing Date, (iii) it has been afforded the opportunity to request additional information to evaluate the merits of the transactions contemplated herein, and (iv) in making its decision to enter into this Agreement and consummate the transactions contemplated herein, Buyer has relied exclusively upon the Covered Representations and its own efforts and opinions and those of its Representatives, including its own professional, legal, financial, tax and other advisors.

Section 4.10    [Reserved].

Section 4.11    No Other Representations or Warranties. Except for the representations and warranties contained in this Article IV, any other Transaction Document or in any certificate delivered with respect to this Agreement, neither Buyer nor any other Person makes any other express or implied representation or warranty on behalf of Buyer.

ARTICLE V

BANKRUPTCY MATTERS

Section 5.1    Competing Transactions.

(a)        Consummation of the transactions contemplated hereby is subject to approval by the U.S. Bankruptcy Court and the Canadian Court and the consideration by Debtors, the U.S. Bankruptcy Court and the Canadian Court of higher or better competing bids. From and after the date hereof until the Auction is declared closed by Debtors in accordance with the Bid and Contract Procedures Order, Sellers shall be permitted to cause their respective Representatives and Affiliates to (i) initiate contact with, or solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Buyer and its Affiliates, agents and Representatives) with respect to any transaction (or series of transactions) involving the direct or indirect sale, transfer or other disposition of all, or a material portion of, the Transferred Assets to a purchaser or purchasers other than Buyer or effecting any other transaction the consummation of which would be substantially inconsistent with or in lieu of the transactions contemplated hereby, including by way of any merger, share purchase or exchange, asset purchase, tender offer, business combination, consolidation, joint venture, license, restructuring, reorganization, recapitalization, spin-off, split-off, or other transaction (a "Competing Transaction"), and (ii) respond to any inquiries or offers with respect to a Competing Transaction, including the purchase of all or any

25

part of the Transferred Assets (whether in combination with other assets of Sellers and the other Debtors or otherwise) and perform any and all other acts related thereto which are required or permitted under the Bankruptcy Code, the CCAA, the Bid and Contract Procedures Order, or other applicable Law, including supplying information relating to the Business and the assets of Sellers to prospective purchasers.

(b)    If, upon completion of the Auction, Sellers have agreed to sell their assets under a Competing Transaction, Sellers may select Buyer as a Back-Up Bidder (as defined in the Bid Procedures) or may select another Back-Up Bidder as provided in the Bid Procedures on the terms and conditions contained herein (as revised in the Auction), or may select another Back-Up Bidder as provided in the Bid and Contract Procedures Order. Buyer hereby agrees and acknowledges that it shall serve as a Back-Up Bidder if so requested.

(c)    Sellers agree that all pleadings with respect to the transactions contemplated hereby, including any reply in support thereof or any pleading relating to the assignment or assumption of Contracts, shall be provided to Buyer as soon as reasonably practicable prior to filing and shall be reasonably acceptable to Buyer. Buyer and Sellers understand and agree that such contemplated transactions are subject to approval by the U.S. Bankruptcy Court or the Canadian Court, as applicable.

Section 5.2    <u>U.S. Bankruptcy Actions</u>.  As promptly as practicable after the date hereof and the commencement of the U.S. Bankruptcy Proceeding, Sellers shall file with the U.S. Bankruptcy Court an application seeking the Bid and Contract Procedures Order, which shall, among other things, (a) approve and authorize payment of the Break-Up Fee and the Expense Reimbursement Amount, and (b) establish procedures for the conduct of the Auction. Buyer agrees that it will reasonably cooperate with Sellers in obtaining granting of the Bid and Contract Procedures Order and the recognition of the Bid and Contract Procedures Order in the CCAA Proceedings. Sellers shall file such motions or pleadings as may be appropriate or necessary to assume and assign the Closing Assumed Contracts and to determine the amount of the Cure Costs.

Section 5.3    <u>CCAA and Bankruptcy Court Filings</u>.

(a)    Buyer and Sellers shall take all actions as may be reasonably necessary to cause the Canadian Sale Order and U.S. Sale Order to be issued, entered and become Final Orders, including furnishing affidavits, declarations or other documents or information for filing with the Canadian Court and U.S. Bankruptcy Court. Buyer agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining granting and entry of the Canadian Sale Order and the U.S. Sale Order including a finding of adequate assurance of future performance by Buyer, including furnishing affidavits or other documents or information for filing with the Canadian and U.S. Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" Buyer under Section 363(m) of the Bankruptcy Code.

(b)    Sellers shall use their commercially reasonable efforts, subject to U.S. Bankruptcy Court and Canadian Court availability and approval, to (i) hold the Auction, unless an Auction is not required to be held pursuant to the terms of the Bid Procedures, on or before May 19, 2023 and (ii) file and have entered the Canadian Sale Order and U.S. Sale Order on or before May 31, 2023.

(c)     The Parties shall consult with each other regarding pleadings that any of them intends to file with the Canadian Court and the U.S. Bankruptcy Court in connection with, or which might reasonably affect the U.S. Bankruptcy Court's approval of the U.S. Sale Order or the Canadian Court's approval of the Canadian Sale Order, including, with respect to Debtors, sharing in advance any drafts thereof for Buyer's review and comment.  Each Seller shall promptly provide Buyer and its outside legal counsel with copies of all notices, filings and Orders of the Canadian Court and U.S. Bankruptcy Court that such Seller has in its possession (or receives) pertaining to the Canadian Sale Order or U.S. Sale Order, or any other Order related to any of the transactions contemplated hereby, but only to the extent such papers are not publicly available in the CCAA Proceedings or the docket of the U.S. Bankruptcy Court or otherwise made available to Buyer and its outside legal counsel.  No Seller shall seek any modification to the Canadian Sale Order or U.S. Sale Order by the Canadian Court or U.S. Bankruptcy Court (as the case may be) or any other Governmental Entity of competent jurisdiction to which a decision relating to the CCAA Proceedings or Bankruptcy Proceeding has been appealed, in each case, without the prior written consent of Buyer (not to be unreasonably withheld, conditioned or delayed).

(d)     If the U.S. Sale Order, Canadian Sale Order or any other Orders of the U.S. Bankruptcy Court or Canadian Court relating to this Agreement or the transactions contemplated hereby are appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to any such Order), Sellers shall promptly notify Buyer in writing thereof and subject to rights otherwise arising from this Agreement, Sellers shall use commercially reasonable efforts to prosecute such appeal, petition or motion and obtain an expedited resolution of any such appeal, petition or motion with input from Buyer.

<u>ARTICLE VI</u>

<u>COVENANTS</u>

Section 6.1     <u>Access and Information</u>.

(a)     From the date hereof through the Closing Date, subject to <u>Section 6.1(b)</u>, Buyer will be entitled, through its Representatives, to have reasonable access to the Scheduled Employees, the Transferred Assets, the Business and the Assumed Liabilities.  Any such access will be conducted upon reasonable advance notice and under reasonable circumstances and will be subject to restrictions under COVID-19 Measures and applicable Law.  Sellers will direct and use their commercially reasonable efforts to cause their Representatives to cooperate with Buyer and Buyer's Representatives in connection with such access, and Buyer and its Representatives will cooperate with Sellers and their Representatives; <u>provided</u> that: (i) any such access shall be conducted at Buyer's expense, in accordance with applicable Law (including applicable privacy and competition laws), under the supervision of Sellers' personnel and in such a manner as to maintain confidentiality and not to interfere with the normal operations of the Business of Sellers and their Affiliates; (ii) in no event will the foregoing permit any sampling, invasive testing or analysis of soil, groundwater, building materials or other media including any investigations of the sort generally referred to as a Phase II or detailed environmental site investigation; and (iii) the foregoing shall not require Sellers to disclose information or materials (A) protected by attorney-client, attorney work product or other legally recognized privileges or immunity from disclosure

or the disclosure of which would result in the disclosure of any trade secrets of third parties or violate any applicable Laws related to the exchange of information or any obligation of any Seller with respect to confidentiality; or (B) relating to other bids or potential bids for any of the Transferred Assets.

(b)     All information received pursuant to this Section 6.1 shall be governed by the terms of the Confidentiality Agreement.

Section 6.2     Interim Operations of the Business.  Except (a) (i) as required by applicable Law including any COVID-19 Measures, (ii) the DIP Financing or (iii) as authorized by any Order of the U.S. Bankruptcy Court or the Canadian Court, which Order is consistent with this Agreement, (b) as otherwise expressly contemplated by this Agreement or another Transaction Document, (c) with the prior written consent of Buyer (such consent not to be unreasonably withheld, conditioned or delayed), (d) as set forth on Schedule 6.2 of the Seller Disclosure Schedule, (e) as reasonably undertaken, consistent with actions taken by similarly situated industry participants and, except where not reasonably practicable in light of an imminent threat to health and safety, in prior consultation with Buyer, to respond to the actual or anticipated effects on the Business of COVID-19 or COVID-19 Measure, or (f) to the extent related to any Excluded Assets or Excluded Liabilities, during the period from the date hereof to and through the Closing Date, Sellers will use best efforts to conduct the Business in the Ordinary Course and maintain the Transferred Assets in their current condition, ordinary wear and tear excepted, including by making all payments in the respect of wages, benefits and pensions, due (or with respect to wages, accrued) to the Unionized Employees up to the Closing Date; *provided that* in the event that the Seller does not make all such payments (including in respect of accrued wages), then such aggregate amount shall be in good faith estimated by the Seller and the Buyer and deducted from the Purchase Price on Closing.  For greater certainty, Seller will not sell, dispose or otherwise transfer howsoever the Specified Inventory. For clarity, in this Section 6.2, any reference to "wages" does not include vacation pay that is accrued but unused in the Ordinary Course as of the Closing Date.

Section 6.3     Cooperation; Status Updates; Regulatory Filings.

(a)     Cooperation.  Subject to the terms and conditions set forth in this Agreement, the Orders of the U.S. Bankruptcy Court and the Canadian Court, the Parties shall cooperate with each other and use their respective reasonable commercial efforts to: (i) take or cause to be taken all actions reasonably necessary, proper or advisable on their part under this Agreement or applicable Law to consummate the transactions contemplated hereby as promptly as reasonably practicable in accordance with the Bid Procedures; (ii) execute, acknowledge and deliver in proper form any further documents, certificates, agreements and other writings, and take such other action as such other Party may reasonably require, in order to effectively carry out the intent of the Transaction Documents; (iii) make or cause to be made all registrations, filings, notifications, submissions and applications with, to give all notices to and to obtain any consents, governmental transfers, approvals, Orders, qualifications and waivers from any Governmental Entity necessary for the consummation of the transactions contemplated hereby; (iv) not to take any action prior to the Closing that would reasonably be expected to prevent, materially impair or materially delay the consummation of the transactions contemplated hereby, except to the extent such action is otherwise expressly contemplated by this Agreement or the Bid Procedures; (v) provide the other

Party with cooperation and take such actions as such other Party may reasonably request in connection with the consummation of the transactions contemplated hereby; and (vi) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the transactions contemplated hereby.

(b)    Unless otherwise agreed by Sellers and Buyers in writing, effective as of the Closing Date, Sellers shall take or cause to be taken all actions necessary, proper or advisable on their part to redeem or otherwise have cancelled the Bond and the other Conway Material Bond Agreements including the Conway Lease Agreement such that legal title to all of the Conway Lease Assets is duly and validly assigned and transferred to Structurlam U.S. or Buyer (pursuant to the U.S. Sales Order), all of which shall be effected (i) without any Liabilities to Buyer (including for any period from and after the Closing), unless Liabilities are paid and settled in full by Sellers prior to the Closing and (ii) in a manner that permits all of the Conway Lease Assets to be and constitute Transferred Assets, to be transferred to, or as directed by, Buyer on the Closing.

(c)    Status Updates. Each of Sellers and Buyer shall promptly notify the other Party or Parties, as applicable, in writing (email being sufficient) of the occurrence, to such Parties' or Party's, as applicable, knowledge, of any event or condition, or the existence of any fact or circumstance, that would reasonably be expected to result in any of the conditions set forth in Article VII not being satisfied as of a reasonably foreseeable Closing Date.

(d)    Regulatory Filings.    Sellers and Buyer shall prepare and file as promptly as practicable all documentation to effect any necessary notices, reports and other filings and to obtain as promptly as practicable all consents, clearances, registrations, approvals, permits and authorizations necessary or advisable to be obtained from any Governmental Entity in order to consummate the transactions contemplated hereby within five Business Days after the date of this Agreement.

(e)    Reasonable Best Efforts.

(i)    Without limiting the generality of the foregoing, Buyer and Sellers agree to take or cause to be taken the following actions:

(A)    the prompt use of its reasonable best efforts to avoid the entry of any permanent, preliminary or temporary injunction or other decree, decision, determination or judgment that would reasonably be expected to delay, restrain, prevent, enjoin or otherwise prohibit consummation of the transactions contemplated hereby;

(B)    the defense through litigation on the merits of any claim asserted in any court, agency or other proceeding by any Person or entity, including any Governmental Entity, seeking to delay, restrain, prevent, enjoin or otherwise prohibit consummation of the transactions contemplated hereby; and

(C)    the prompt use of its best efforts to take, in the event that any Order is entered or issued, or becomes reasonably foreseeable to be entered or issued, in any regulatory proceeding or inquiry of any kind that would make consummation of the transactions contemplated hereby in accordance with the terms of this Agreement unlawful or that would reasonably be expected to delay, restrain, prevent, enjoin or otherwise

29

prohibit consummation of the transactions contemplated hereby, any and all steps (including the appeal thereof or the posting of a bond necessary to resist, vacate, modify, reverse, suspend, prevent, eliminate or remove such actual, anticipated or threatened Order) so as to permit such consummation on a schedule as close as possible to that contemplated by this Agreement.

Section 6.4    Tax Matters.

(a)    Transfer Taxes.    All documentary, stamp, transfer, including land transfer, registration charges, including motor vehicle registration, sales, including GST/HST, provincial sales, use, value added, excise, consumption, gross receipt, turnover, and other similar non-income Taxes and all filing and recording fees (and any penalties and interest associated with such Taxes and fees) arising from or relating to the consummation of the transactions contemplated hereby (collectively, "Transfer Taxes") will be borne by Buyer, regardless of the Party on whom liability is imposed under the provisions of the Laws relating to such Transfer Taxes, provided that all such Transfer Taxes with respect to the transfer of real property assets of Sellers located in the U.S. shall not exceed US$200,000.  Upon the reasonable request of any Seller, Buyer will furnish proof of the payment of those Transfer Taxes to the appropriate Governmental Entity, where permitted. Sellers and Buyer will consult and cooperate in timely preparing and making all filings, Tax Returns, reports and forms as may be required to comply with the provisions of the Laws relating to such Transfer Taxes, and will cooperate and otherwise take commercially reasonable efforts to obtain any available refunds for or exemptions from such Transfer Taxes, including preparing exemption certificates and other instruments as are applicable to claim available exemptions from the payment of Transfer Taxes under applicable Law and executing and delivering such affidavits and forms as are reasonably requested by the other Party.  Without limiting the generality of the foregoing, the Parties will:

(i)    complete and sign a joint election under subsection 167(1) of the ETA on or before the Closing Date to avoid the application of GST/HST to the purchase and sale of the Transferred Assets, to the extent applicable.  Buyer will duly file the election with the appropriate Governmental Entity within the time permitted under the ETA (the "Joint Election"); and

(ii)    to the extent any Seller has received any amount in respect of an obligation to deliver goods or services, and Buyer has agreed to assume that obligation under this Agreement, Transferred Assets having a fair market value equal to that amount are being transferred to Buyer under this Agreement as payment by such Seller for Buyer's agreement to assume that obligation, and the Parties will file an election pursuant to the provisions of subsections 20(24) and 20(25) of the ITA, and any corresponding provisions of any other applicable Tax Law, within the prescribed time period.

(b)    Asset Taxes.  Sellers shall be allocated and bear all Asset Taxes for any period or portion thereof ending prior to the Closing Date, and Buyer shall be allocated and bear all Asset Taxes for any period or portion thereof that begins at or after the Closing Date.  For purposes of this Section 6.4(b), (i) Asset Taxes that are based upon or related to income or receipts or imposed on a transactional basis (other than such Asset Taxes described in clause (ii)), shall be allocated to the period in which the transaction giving rise to such Asset Taxes occurred, and (ii) Asset Taxes

that are ad valorem, property or other Asset Taxes imposed on a periodic basis pertaining to a Straddle Period shall be allocated between the portion of such Straddle Period ending immediately prior to the Closing Date and the portion of such Straddle Period beginning at the Closing Date by prorating each such Asset Tax based on the number of days in the applicable Straddle Period that occur before the date on which the Closing Date occurs, on the one hand, and the number of days in such Straddle Period that occur on or after the date on which the Closing Date occurs, on the other hand. For the avoidance of doubt, to the extent any Seller has prepaid or deposited any amounts of any Asset Taxes prior to the Closing, Seller shall receive credit for such amounts in determining payments of Asset Taxes. Buyer shall be responsible for the preparation and timely filing of any Tax Returns and the payment to the applicable Governmental Entity of all Asset Taxes that become due or payable on or after the Closing Date, provided that to the extent any such Tax Returns relate to a Straddle Period, Sellers shall have the right to review and comment upon such Tax Returns prior to the filing thereof and Buyer shall incorporate any such reasonable comments that are timely provided. Sellers shall be responsible for the preparation and timely filing of any Tax Returns and payment to the applicable Governmental Entities of all Asset Taxes that become due or payable prior to the Closing Date.

(c)    Purchase Price Allocation.

(i)    As promptly as practicable after the Closing Date, but no later than 45 days thereafter, Buyer will prepare and deliver to Sellers, an allocation schedule setting forth the amounts to be allocated among Sellers and among the Transferred Assets of each Seller, pursuant to (and to the extent necessary to comply with) Section 1060 of the Code and the applicable regulations promulgated thereunder (or, if applicable, any similar provision under state, local or foreign Law or regulation, or for purposes of the ITA) (the "Proposed Allocation Statement"). Sellers will have 20 Business Days following delivery of the Proposed Allocation Statement during which to notify Buyer in writing (an "Allocation Notice of Objection") of any objections to the Proposed Allocation Statement, setting forth in reasonable detail the basis of their objections. If Sellers fail to deliver an Allocation Notice of Objection in accordance with this Section 6.4(c)(i), the Proposed Allocation Statement will be conclusive and binding on all Parties and will become the "Final Allocation Statement." If Sellers submit an Allocation Notice of Objection, then for 20 Business Days after the date Buyer receives the Allocation Notice of Objection, Buyer and Sellers will use their commercially reasonable efforts to agree on the allocations. Failing such agreement within 20 Business Days of such notice, the unresolved allocations will be submitted to an independent, nationally recognized accounting firm mutually agreeable to Buyer and Sellers, which firm will be instructed to determine its best estimate of the allocation schedule based on its determination of the unresolved allocations and provide a written description of the basis for its determination within 45 Business Days after submission, such written determination to be final, binding and conclusive. The allocations determined by such accounting firm (or those on the Proposed Allocation Statement to the extent Sellers did not object) will be conclusive and binding on all Parties and will become the "Final Allocation Statement." The fees and expenses of such accounting firm will be apportioned 50% to Sellers and 50% to Buyer. For the avoidance of doubt, in administering any Action, the U.S. Bankruptcy Court shall not be required to apply the Final Allocation Statement in determining the manner in which the Purchase Price should be allocated as between Sellers and their respective estates.

(ii)    Except to the extent otherwise required by a "determination" within the meaning of Section 1313(a) of the Code or by applicable Law, or as agreed to between the Parties as a result of any proposed assessment or reassessment by a relevant Tax authority, Sellers and Buyer and their respective Affiliates will report, act and file Tax Returns (including, but not limited to IRS Form 8594) in all respects and for all purposes consistent with the Final Allocation Statement and neither Sellers nor Buyer will take any position (whether in audits, Tax Returns, or otherwise) that is inconsistent with the Final Allocation Statement.

(d)    <u>Cooperation and Audits</u>.  Buyer and Sellers will cooperate fully with each other regarding Tax matters and will make available to the other as reasonably requested all information, records and documents relating to Taxes with regard to the Transferred Assets, Unionized Employees and Continuing Employees until the expiration of the applicable statute of limitations or extension thereof or the conclusion of all audits, appeals or litigation with respect to such Taxes. Notwithstanding anything in this <u>Section 6.4(d)</u> to the contrary, Sellers, Buyer and their respective Affiliates shall not be required to provide to Sellers and their Affiliates or Buyer and its Affiliates, as the case may be, any records, Tax Returns or any other information, in each case, which includes any information not solely related to the Transferred Assets, Unionized Employees or Continuing Employees.

Section 6.5    <u>Employment Matters</u>.

(a)    <u>Schedule 6.5(a)</u> sets forth the names of all individuals who are Seller Employees as of the date hereof and (x) whose job responsibilities relate to the ownership, operation or use of the Transferred Assets or (y) whom Buyer and Sellers have otherwise designated as Scheduled Employees (the individuals set forth on <u>Schedule 6.5(a)</u>, as such Schedule may be updated in accordance with this <u>Section 6.5(a)</u>, the "<u>Scheduled Employees</u>").  <u>Schedule 6.5(a)</u> also sets forth, for each Scheduled Employee as applicable, the Scheduled Employee's job title, date of hire, annual base salary and target bonus opportunity for 2023 (the "<u>Scheduled Employees Schedule</u>"). The Scheduled Employees Schedule shall be held in confidence and shall not be filed with the U.S. Bankruptcy Court or the Canadian Court (unless under seal). From time to time following the date hereof (and not later than 15 Business Days prior to the expected Closing Date), to the extent necessary, Sellers shall update the Scheduled Employees Schedule to reflect any changes thereto permitted by this Agreement. Sellers shall provide Buyer with any such updated Scheduled Employees Schedule at least 12 Business Days prior to the expected Closing Date.  Buyer may add Seller Employees to <u>Schedule 6.5(a)</u> by providing written notice of such additions to Sellers not later than 15 Business Days prior to the expected Closing Date.

(b)    At least ten Business Days prior to the expected Closing Date, Buyer shall provide Sellers with its list of Target Employees.  For clarity, this list of Target Employees shall include (and may only include) all Unionized Employees.

(c)    At least ten Business Days prior to the expected Closing Date, Buyer shall deliver to Sellers the form of written offer of employment that is to be provided to the Target Employees that are not Unionized Employees (if any) in accordance with the requirements set out in <u>Section 6.5(d)</u>, and agrees to consider in good faith any comments provided by Sellers on such form.

32

(d)     No later than seven Business Days prior to the expected Closing Date, Buyer shall, in its sole discretion, in consultation with Sellers, offer employment in writing to each of the Target Employees who are not Unionized Employees and are not independent contractors effective as of the Closing, if any.

(e)     No later than seven Business Days prior to the expected Closing Date, Buyer shall, in its sole discretion, offer to retain the services of the Target Employees who are independent contractors on terms and conditions substantially similar to the terms and conditions of each such Target Employee's contract with the applicable Seller.

(f)     No later than seven Business Days prior to the expected Closing Date, Buyer shall present all Unionized Employees with an Employment Confirmation Letter in the form attached hereto at Exhibit D confirming each Unionized Employee's continuing employment on the same terms and conditions as set forth in the Collective Agreement.

(g)     No later than two Business Days prior to the expected Closing Date, Buyer shall deliver to Sellers a list identifying: (i) each Unionized Employee who has signed the Employment Confirmation Form referenced in Section 6.5(f); and (ii) each Target Employee who is not a Unionized Employee who has then accepted Buyer's offer of employment or engagement (each Target Employee who accepts such offer on or prior to the Closing Date and commences employment or engagement with Buyer, a "Continuing Employee"), and a list identifying: (A) each Unionized Employee that has not signed the Employment Confirmation Form referenced in Section 6.5(f); and (B) each Target Employee who has then rejected Buyer's offer of employment or engagement. In the event any, some or all of the Target Employees (who are not Unionized Employees) do not accept offers of employment or engagement with Buyer, no Material Adverse Effect shall have been deemed to occur solely due to such refusal.

(h)     [Reserved].

(i)     At the Closing, Buyer will be a successor employer in respect of, and will assume all obligations under and will become bound by, the Collective Agreement governing the terms and conditions of employment of the Unionized Employees, including the obligation to continue the employment of the Unionized Employees under applicable Laws, and shall recognize the service of the Unionized Employees for all purposes, including, without limitation, all Seller Plans, vacation, service awards and all post-Closing severance and termination obligations, as if they had been employed by Buyer since their individual dates of hire by the applicable Sellers or any predecessor of the applicable Seller.

(j)     To the extent required by the Collective Agreement or applicable laws, Buyer shall (i) cause any pre-existing conditions or limitations and eligibility waiting periods under any group health plans of Buyer or its Affiliates to be waived with respect to the Unionized Employees and their eligible dependents, (ii) give each Unionized Employee credit for the plan year in which the Closing Date occurs towards applicable deductibles and annual out-of-pocket limits for medical expenses incurred prior to the Closing Date for which payment has been made and (iii) give each Unionized Employee service credit for such Unionized Employee's employment with Sellers since such Unionized Employee's date of hire with Sellers as set forth on Schedule 6.5(a) for all purposes, including but not limited to termination entitlements, vesting, benefit accrual (including

determination of severance benefits) and eligibility to participate under each applicable benefit plan of Buyer or its Affiliates, as if such service had been performed with Buyer, except for benefit accrual under defined benefit pension plans, for purposes of qualifying for subsidized early retirement benefits or to the extent it would result in a duplication of benefits.

(k)    [Reserved].

(l)    Buyer will assume all Liabilities in respect of Unionized Employees (but not Continuing Employees who are not Unionized Employees) which may become payable to, receivable by, or accrued in favor of the Unionized Employees at any point prior to the Closing Date and Buyer will assume all Liabilities in respect of Continuing Employees and Unionized Employees that arise or are incurred or accrued following the Closing Date, including premiums for employment insurance, workers' compensation, any obligations under any Seller Plans, any obligations under the Collective Agreement, any Liabilities under workers' compensation or similar Laws, accrued statutory holiday pay, fees, wages, accumulated overtime, accumulated paid time off, salaries, commissions, bonuses, accumulated vacation with pay credits or entitlements and other employee benefits or claims.

(m)    Nothing in this Agreement is intended to (i) be treated as an amendment of any particular Seller Plan, (ii) prevent Buyer or any of its Affiliates from amending or terminating any compensation or benefit plan of Buyer or its Affiliates (including any Transferred Seller Plan) on or after the Closing Date in accordance with their terms the Collective Agreement (where applicable) and applicable Law, or (iii) prevent Buyer or any of its Affiliates from terminating the employment of any Continuing Employee.  No current or former employee of Sellers or any beneficiary or dependent thereof is entitled to any third party beneficiary or other rights under this Section 6.5 or under any other provisions of this Agreement with respect to the compensation, terms and conditions of employment and/or benefits that may be provided to any such employee or beneficiary or dependent by Sellers, Buyer or any of its Affiliates or under any benefit plan (including any Transferred Seller Plans) which Sellers, Buyer or any of its Affiliates may maintain, other than what is legally required in accordance with the Collective Agreement or applicable Laws.

Section 6.6    Confidentiality.    Each Party acknowledges that the information being provided to it in connection with the transactions contemplated hereby is subject to the terms of the Confidentiality Agreement.  The terms of the Confidentiality Agreement are incorporated into this Agreement by reference in their entirety (and the Confidentiality Agreement shall continue in full force and effect until the Closing, at which time all obligations under the Confidentiality Agreement shall terminate (other than those which expressly survive the termination thereof pursuant to its terms)).  If, for any reason, the Closing does not occur, the Confidentiality Agreement shall continue in full force and effect in accordance with its terms.  Buyer acknowledges and understands that this Agreement, before it becomes otherwise publicly available, may be publicly filed in the U.S. Bankruptcy Court or the Canadian Court and further made available by Sellers to prospective bidders and that, except as prohibited herein, such disclosure will not be deemed to violate any confidentiality obligations owing to Buyer, whether pursuant to this Agreement, the Confidentiality Agreement or otherwise. Sellers acknowledge that from and after the Closing, all non-public information relating to the Transferred Assets and the Assumed Liabilities, will be valuable and proprietary to Buyer and its Affiliates.  Sellers agree

that, from and after the Closing, no Seller will disclose to any Person any information relating to Buyer and its Affiliates, the Transferred Assets or the Assumed Liabilities, except as required by Law, Order, U.S. Bankruptcy Court requirement, Canadian Court requirement, or as otherwise becomes available in the public domain other than through any action by any Seller in violation of its obligations under this <u>Section 6.6</u>.

Section 6.7    <u>Personal Information</u>.    The collection, use and disclosure of Personal Information by Buyer before the Closing is restricted to those purposes that relate to the transactions contemplated by this Agreement, and Buyer will protect that Personal Information by security safeguards appropriate to the sensitivity of the information. If, for any reason, the Closing does not occur, the Personal Information will be returned to Sellers or destroyed within a reasonable time. Following the Closing, Buyer will: (i) use and disclose the Personal Information transferred to it under the terms of this Agreement solely for the purposes for which that Personal Information was collected or permitted to be used or disclosed before the transaction was completed, or otherwise as permitted by applicable Law including applicable privacy laws; (ii) protect that Personal Information by security safeguards appropriate to the sensitivity of the information; (iii) notify the individuals who are the subject of the Personal Information, including the Continuing Employees, that the transaction has been completed that the their Personal Information has been disclosed to Buyer; and (iv) give effect to any withdrawal of consent made to the collection, use, and disclosure of the Personal Information in accordance with applicable Law including applicable privacy laws.

Section 6.8    <u>Publicity</u>.    Except as required by the U.S. Bankruptcy Court in connection with the Bankruptcy Proceeding, or the Canadian Court in connection with the CCAA Proceedings, as applicable, any disclosure statement that the Debtors may file in connection with the Bankruptcy Proceeding or the CCAA Proceedings and any public disclosure issued by SLP pursuant to its contractual obligations under any confidentiality agreement or as required by Law or as required to be disclosed by Buyer pursuant to applicable securities laws or the rules and policies of any applicable stock exchange or quotation system, Buyer and Sellers will not issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other Parties, which approval may not be unreasonably withheld, except that such consent shall not be required in connection with ordinary or required pleadings made by any Debtor in the U.S. Bankruptcy Court or the Canadian Court or if disclosure is otherwise required by applicable Law, by the U.S. Bankruptcy Court or by the Canadian Court; <u>provided</u>, <u>however</u>, that Buyer or Sellers, as applicable, will use its or their commercially reasonable efforts consistent with such applicable Law, U.S. Bankruptcy Court requirement or Canadian Court requirement to consult with the other Parties with respect to the text of any such required disclosure.

Section 6.9    <u>Maintenance of Books and Records</u>.    After the Closing Date, Buyer shall until the sixth anniversary of the Closing Date, preserve, maintain and retain all books, records, other documents and electronically stored information Related to the Business, including the Books and Records, in existence on the Closing Date and, subject to compliance with applicable Law, make the same available for inspection and copying by Sellers, any of Sellers' successors or assigns or any trustee in bankruptcy and, in each case, any of their respective Representatives for any reasonable business purpose or compliance with any obligation under any applicable Law, during normal business hours of the Business upon reasonable request and upon reasonable notice.

Section 6.10    Insurance Matters.

(a)    Sellers shall, and shall cause their Affiliates to, assign, to the extent assignable, to Buyer any and all proceeds owing to Sellers under Sellers' or any of their Affiliates' third party insurance policies written prior to the Closing in connection with (i) the damage or destruction of any of the Transferred Assets from and after the date of this Agreement and prior to the Closing that is, or would have been but for such damage or destruction, included in the Transferred Assets or (ii) any Assumed Liability (other than, in the case of this clause (ii), where insurance proceeds are directly or indirectly funded by Sellers or any of their Affiliates through self-insurance or other similar arrangements); provided that, Sellers shall not be required to, or to cause their Affiliates to, assign to Buyer any Excluded Insurance Proceeds. If such proceeds are not assignable, Sellers agree to pay any such proceeds received by them or any of their Affiliates to Buyer promptly upon the receipt thereof.

(b)    Except as set forth in Section 1.1(n), from and after the Closing, the Business, the Transferred Assets and the Assumed Liabilities shall cease to be insured by Sellers' or their Affiliates' insurance policies or by any of their self-insurance programs or other similar arrangements, and Buyer (i) agrees on or prior to Closing to arrange for its own insurance policies (including self-insurance or similar arrangements funded directly or indirectly by Buyer or any of its Affiliates) with respect to the Business, the Transferred Assets and the Assumed Liabilities covering all periods from and after the Closing and (ii) without prejudice to any right to indemnification under this Agreement or any other Transaction Document, agrees not to seek, through any means, to benefit from any of Sellers' or their Affiliates' insurance policies which may provide coverage for claims relating in any way to the Business.

Section 6.11    Wallis Lease Extension. From and after the signing of this Agreement, Sellers and Buyer shall work together in good faith to obtain an extension of the Wallis Lease on terms satisfactory to Buyer. Buyer shall be permitted to communicate directly with the Lessor to settle satisfactory terms for the extension. In the event that Buyer reaches a satisfactory extension of the Wallis Lease, Sellers will properly execute and sign the same as requested by Buyer.

Section 6.12    [Reserved].

Section 6.13    Environmental. Buyer acknowledges and agrees that Sellers shall not be obligated to provide a site disclosure statement under the Environmental Management Act (BC) and the regulations thereto with respect to any Transferred Leased Property located in the Province of British Columbia.

Section 6.14    Conduct of Sellers. Until the earlier of the termination of this Agreement under Section 8.1 or the Closing, except (a) (i) as required by applicable Law including any COVID-19 Measures, (ii) the DIP Financing, or (iii) as authorized by any Order of the U.S. Bankruptcy Court or the Canadian Court, which Order is consistent with this Agreement, (b) as otherwise expressly contemplated by this Agreement or another Transaction Document, (c) with the prior written consent of Buyer (such consent not to be unreasonably withheld, conditioned or delayed), (d) as set forth in Schedule 6.14, (e) as reasonably undertaken, consistent with actions taken by similarly situated industry participants and, except where not reasonably practicable in light of an imminent threat to health and safety, in prior consultation with Buyer, to respond to the

actual or anticipated effects on the Business of COVID-19 or COVID-19 Measures, or (f) to the extent related to any Excluded Assets or Excluded Liabilities, during the period from the date hereof to and through the Closing Date, Sellers will (x) operate the Transferred Assets only in the Ordinary Course consistent with past practice, (y) preserve intact the Transferred Assets, reasonable wear and tear excepted, and as necessary to keep all of the Transferred Assets in substantially the same condition as at the date hereof, and (z) shall not:

(a)      sell, assign, license, transfer, convey, or waive or release any right or claim relating to any of the Transferred Assets, lease, surrender, relinquish or otherwise dispose of any portion of the Transferred Assets;

(b)      increase the total number of employees working as part of the Transferred Assets by more than 5%, except for construction workers in the Ordinary Course consistent with past practice;

(c)      except as required by the terms of and in accordance with any key employee retention program or key employee incentive program implemented by Sellers, the Collective Agreement, any other written employment or engagement agreement currently in effect between the applicable Seller and the employee, or applicable Laws, increase the compensation payable (whether through the payment of, or agreement to pay, bonus amounts or otherwise) to any employees; provided that the foregoing shall not apply to employees working as part of the Transferred Assets for an amount of up to an additional 5% of any such employee's compensation;

(d)      subject any portion of the Transferred Assets to any encumbrance, except for Permitted Encumbrances;

(e)      incur any capital expenditures (other than for reasonably necessary repairs and Ordinary Course maintenance) for an amount greater than US$250,000;

(f)      amend or modify in any material respect or terminate any Closing Assumed Contract or Additional Assumed Contract;

(g)      take any action that could reasonably be expected to result in a Material Adverse Effect on the value of the Transferred Assets;

(h)      sell, lease, remove from the Transferred Owned Property, transfer, license or otherwise dispose of, abandon or permit to lapse, fail to take any material action necessary to maintain, enforce or protect, or permit or create any encumbrance (other than Permitted Encumbrances) on any of the Transferred Assets; or

(i)      agree or commit to do any of the foregoing.

Nothing contained in this Agreement is intended to give Buyer or its Affiliates, directly or indirectly, the right to control or direct the Business prior to the Closing.

Section 6.15    Notification of Certain Matters.

(a)    Sellers will promptly notify Buyer of: (i) any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement; (ii) any notice or other communication from any Governmental Entity related to or in connection with the transactions contemplated by this Agreement; (iii) promptly upon discovery thereof, any variances from, or the existence or occurrence of any event, fact or circumstance arising after the execution of this Agreement that would reasonably be expected to cause, any of the representations and warranties contained in Article III to be untrue or inaccurate such that the condition set forth in Section 7.2(a) will not be able to be satisfied. If the subject matter of any such notification required by the previous sentence requires any change in the Seller Disclosure Schedule, Sellers shall deliver to Buyer prior to the Closing a supplement to such Seller Disclosure Schedule (the "Updated Schedules") with such change; provided that in no event will any Updated Schedule serve to amend, supplement or modify the Schedules for purposes of Section 7.2(a) or limit the remedies available to Buyer under or with respect to this Agreement; provided, further that if the Closing occurs, the Updated Schedules will be considered and deemed to be part of the Seller Disclosure Schedule for all purposes under this Agreement, and each reference in this Agreement to a particular Seller Disclosure Schedule will mean such Seller Disclosure Schedule in, or as updated by, the Updated Schedules; and (iv) the occurrence of any fact or circumstance that could reasonably be expected to have a Material Adverse Effect.

(b)    Buyer will promptly notify Sellers of any Actions relating to or involving or otherwise affecting Buyer or its Affiliates that, if pending on the date of this Agreement, would have been required to have been disclosed pursuant to Section 4.4 or that relate to the transactions contemplated by this Agreement.

Section 6.16    Transfer of Permits.

(a)    From and after the date hereof, Sellers, on the one hand, and Buyer, on the other hand, shall reasonably cooperate to transfer to Buyer as of the Closing Date all Permits included in the Transferred Assets.

(b)    In addition, at any time prior to the Closing Date, Buyer may, at its sole discretion and at its sole expense, request for Sellers to maintain in effect any Permit for up to three months after the Closing for the purposes of passing through the benefits of such Permit to Buyer, and (i) provided Buyer timely pays any costs associated with such Permit, including any costs referred to in clause (iii) below and to the extent practicable and permitted by applicable Law, Sellers shall use commercially reasonable efforts to maintain in effect such Permit, (ii) Sellers and Buyer shall use commercially reasonable efforts to agree in writing on arrangements for the purposes of passing through the benefits of such Permit to Buyer, and (iii) any such arrangements described in the foregoing shall be at the sole expense of Buyer.

Section 6.17    Sellers' Obligations. Each of Sellers hereby acknowledges and agrees that their representations and warranties made hereunder are made jointly and severally, and their respective covenants and obligations under this Agreement are joint and several responsibilities. Each of Sellers agrees to be jointly and severally responsible for any damage, loss, cost and expense for which either of them may be responsible hereunder.

## ARTICLE VII

## CONDITIONS TO CLOSING

Section 7.1    <u>Conditions Precedent to Each Party's Obligations</u>.  The Parties' obligations to consummate the transactions contemplated hereby are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by the Parties in whole or in part to the extent permitted by applicable Law):

(a)    there shall not be in effect any Order of a Governmental Entity of competent jurisdiction or any Law preventing, restraining, enjoining, making illegal or otherwise prohibiting the consummation of the transactions contemplated hereby;

(b)    the U.S. Bankruptcy Court shall have entered the U.S. Sale Order, and the U.S. Sale Order shall be in full force and effect and not subject to a stay and shall have become a Final Order; and

(c)    the Canadian Sale Order and the Assignment Orders (if applicable) shall have been issued by the Canadian Court and shall have become Final Orders.

Section 7.2    <u>Conditions Precedent to Obligations of Buyer</u>. The obligation of Buyer to consummate the transactions contemplated hereby is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Buyer in whole or in part to the extent permitted by applicable Law):

(a)    (i) the representations of Sellers contained in the first sentence of Section 3.1 and in Section 3.3 shall be true and correct in all material respects (without giving effect to any materiality limitations, such as "material," "in all material respects" and "Material Adverse Effect" set forth therein) on and as of the Closing, except to the extent expressly made as of an earlier date, in which case such representations and warranties shall be true and correct in all material respects (without giving effect to any materiality limitations, such as "material," "in all material respects" and "Material Adverse Effect" set forth therein) as of such earlier date; and (ii) all other representations of Sellers contained in this Agreement (without giving effect to any materiality limitations, such as "material," "in all material respects" and "Material Adverse Effect" set forth therein) shall be true and correct on and as of the Closing, except to the extent expressly made as of an earlier date, in which case such representations and warranties shall be true and correct as of such earlier date, except for any failure of any such representation and warranty to be so true and correct that has not had or would not reasonably be likely to have, individually or in the aggregate, have a Material Adverse Effect;

(b)    Sellers shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by them prior to or on the Closing Date including delivery of those items set forth in <u>Section 2.5</u>;

(c)    Buyer shall have received from Sellers a certificate signed by an authorized officer of Sellers on behalf of Sellers certifying that the conditions set forth in <u>Section 7.2(a)</u>, <u>Section 7.2(b)</u> and <u>Section 7.2(e)</u> have been satisfied;

(d)    the Conway Material Bond Agreements shall be redeemed or cancelled as contemplated by <u>Section 6.3(b)</u>, in form and substance reasonably satisfactory to Buyer;

(e)    Since the date of this Agreement there shall not have occurred any Material Adverse Effect;

(f)    Seller shall have performed all actions required of Sellers pursuant to this Agreement to convey title to the Transferred Owned Property to Buyer, free and clear of all Liens pursuant to Section 363 of the Bankruptcy Code, subject only to the Permitted Encumbrances, and a licensed title company or companies reasonably satisfactory to Buyer (the "<u>Title Company</u>") shall be irrevocably committed to issue to Buyer a title policy, insuring Buyer's fee simple title to the Transferred Owned Property, subject only to the Permitted Encumbrances, which policy shall be reasonably in form and substance to Buyer (the "<u>Title Policy</u>"), subject to Buyer's payment of any required premiums and fees to the Title Company and delivery of such documentation by Buyer as required by the Title Company in order to issue to Buyer the Title Policy, <u>provided</u> that in the event Title Company shall be unable or unwilling to provide the Title Policy notwithstanding Seller's and Buyer's fulfillment of the foregoing requirements, Seller may select a replacement title insurer, which shall be a nationally recognized title insurance company reasonably acceptable to Buyer, to provide the Title Policy; and

(g)    The form of U.S. Sale Order shall be in a form reasonably acceptable to Buyer.

Section 7.3    <u>Conditions Precedent to Obligations of Sellers</u>. The obligations of Sellers to consummate the transactions contemplated hereby are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Sellers in whole or in part to the extent permitted by applicable Law):

(a)    the representations and warranties of Buyer contained in this Agreement shall be true and correct on and as of the Closing, except to the extent expressly made as of an earlier date, in which case such representations and warranties shall be true and correct as of such earlier date, except for any failure of any such representation and warranty to be so true and correct as would not, individually or in the aggregate, reasonably be expected to prevent the ability of Buyer to consummate the transactions contemplated hereby and deliver the Purchase Price pursuant to <u>Section 2.1</u>;

(b)    Buyer shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by Buyer prior to or on the Closing Date; and

(c)    Sellers shall have received from Buyer a certificate signed by an authorized officer of Buyer on behalf of Buyer certifying that the conditions set forth in <u>Section 7.3(a)</u> and <u>Section 7.3(b)</u> have been satisfied.

Section 7.4    <u>No Frustration of Closing Conditions</u>.  Neither Buyer nor Sellers may rely on the failure of any condition to their respective obligations to consummate the transactions contemplated hereby set forth in <u>Section 7.1</u>, <u>Section 7.2</u> or <u>Section 7.3</u>, as the case may be, to be satisfied if such failure was caused by such Party's or its Affiliates' failure to use its reasonable best efforts (or such other applicable efforts standard expressly contemplated hereby) to satisfy the

conditions to the consummation of the transactions contemplated hereby or by any other breach of a representation, warranty, or covenant hereunder.

ARTICLE VIII

TERMINATION

Section 8.1    Termination of Agreement. This Agreement may be terminated prior to the Closing as follows:

(a)    by mutual written consent of Buyer and Sellers;

(b)    automatically, upon the consummation of a Competing Transaction, or the U.S. Bankruptcy Court approves a Competing Transaction;

(c)    by either Party, upon written notice to the other Party:

(i)    if the Closing has not occurred by 5:00 p.m., prevailing Eastern time, on or before sixty (60) days after the date of this Agreement (the "Termination Date"), which date may be extended by mutual written agreement of the Parties or otherwise pursuant to Section 8.1(d)(i) or Section 8.1(e)(i);

(ii)    if there is in effect a final non-appealable Order of a Governmental Entity of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby (it being agreed that the Parties will promptly appeal any adverse determination which is appealable and pursue such appeal in accordance with their respective obligations under Section 6.3(e)(i)(C) unless and until this Agreement is terminated pursuant to this Section 8.1);

(iii)    if the Bankruptcy Proceeding is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code or if the CCAA Proceedings are dismissed; or

(iv)    if Buyer is not selected as a Successful Bidder or a Back-Up Bidder (each as defined in the Bid Procedures) upon entry of the U.S. Sale Order or Canadian Sale Order, as applicable.

(d)    by Buyer, upon written notice to Sellers:

(i)    in the event of a material breach by Sellers of any representation or warranty or any covenant or agreement contained in this Agreement that (A) would result in any of the conditions set forth in Section 7.1 or Section 7.2 not being satisfied if such breach remained uncured as of the Closing and (B) such breach is incapable of being cured prior to the Termination Date or, if capable of being cured, such breach has not been cured within 30 days after the giving of written notice by Buyer to Sellers of such breach; provided that Buyer is not then in material breach of any representation, warranty, covenant or agreement contained in this Agreement; provided, further, that in the event that Buyer provides such written notice to Sellers within 30 days of the Termination Date, then the Termination Date shall be extended until the end of the 30-day cure period set forth in this Section 8.1(d)(i);

41

(ii)     if, following entry by the U.S. Bankruptcy Court or the Canadian Court of the U.S. Sale Order or the Canadian Sale Order, respectively, the U.S. Sale Order or the Canadian Sale Order (as applicable) is materially amended, modified or supplemented without Buyer's prior written consent or is voided, reversed or vacated; or

(iii)     if (A) all of the conditions set forth in Section 7.1 and Section 7.3 have been satisfied or waived (other than those that, by their nature, are to be satisfied at the Closing, all of which are capable of being satisfied at the Closing), (B) Buyer has irrevocably confirmed by written notice to Sellers that (1) all conditions set forth in Section 7.2 have been satisfied (other than those that, by their nature, are to be satisfied at the Closing) or that it would be willing to waive any unsatisfied conditions in Section 7.2 if the Closing were to occur, and (2) they are ready, willing and able to consummate the Closing and (C) Sellers fail to consummate the Closing within two Business Days following the date the Closing should have occurred pursuant to Section 2.3; provided, however, that any purported termination by Sellers pursuant to Section 8.1(c)(i) shall be deemed to be a termination by Buyer pursuant to this Section 8.1(d)(iii) if Buyer is entitled to terminate this Agreement pursuant to this Section 8.1(d)(iii) at the time of such termination.

(e)     by Sellers, upon written notice to Buyer:

(i)     in the event of a breach by Buyer of any representation or warranty or any covenant or agreement contained in this Agreement, if (A) such breach would result in a failure of a condition set forth in Section 7.1 or Section 7.3 to be satisfied if such breach remained uncured as of the Closing and (B) such breach is incapable of being cured prior to the Termination Date or, if capable of being cured, such breach has not been cured within 30 days after the giving of written notice by Sellers to Buyer of such breach; provided that Sellers are not then in material breach of any representation, warranty, covenant or agreement contained in this Agreement; provided, further, that in the event that Sellers provide such written notice to Buyer within 30 days of the Termination Date, then the Termination Date shall be extended until the end of the 30-day cure period set forth in this Section 8.1(e); or

(ii)     if (A) all of the conditions set forth in Section 7.1 and Section 7.2 have been satisfied or waived (other than those that, by their nature, are to be satisfied at the Closing, all of which are capable of being satisfied at the Closing), (B) Sellers have irrevocably confirmed by written notice to Buyer that (1) all conditions set forth in Section 7.3 have been satisfied (other than those that, by their nature, are to be satisfied at the Closing) or that it would be willing to waive any unsatisfied conditions in Section 7.3 if the Closing were to occur, and (2) they are ready, willing and able to consummate the Closing and (C) Buyer fails to consummate the Closing within two Business Days following the date the Closing should have occurred pursuant to Section 2.3; provided, however, that any purported termination by Buyer pursuant to Section 8.1(c)(i) shall be deemed to be a termination by Sellers pursuant to this Section 8.1(e)(ii) if Sellers are entitled to terminate this Agreement pursuant to this Section 8.1(e)(ii) at the time of such termination.

Section 8.2     Effect of Termination.     In the event of termination of this Agreement pursuant to Section 8.1, this Agreement shall become void and of no effect; provided, however,

42

that the provisions set forth in this <u>Section 8.2</u>, <u>Section 8.3</u>, <u>Article IX</u> and in the Confidentiality Agreement shall survive the termination of this Agreement; <u>provided</u>, <u>further</u>, that nothing in this <u>Section 8.2</u> shall be deemed to release any Party from liability for any willful or material breach of this Agreement prior to termination.

Section 8.3    <u>Break-Up Fee and Expense Reimbursement Amount</u>.  In consideration of Buyer and its Affiliates having expended considerable time and expense in connection with this Agreement and the negotiation thereof, and the identification and quantification of assets to be included in the Transferred Assets, and to compensate Buyer as a stalking-horse bidder in connection with the Auction, should Seller enter into a written binding agreement with respect to a Competing Transaction, then in such event, Buyer shall be entitled to:

(a)    the Expense Reimbursement Amount, not to exceed US$600,000; and

(b)    an amount equal to US$1,800,000 (the "<u>Break-Up Fee</u>").

No bidder other than Buyer shall be entitled to a Break-Up Fee or Expense Reimbursement Amount.  For the avoidance of doubt, (x) the Break-Up Fee and Expense Reimbursement Amount shall be free of any Liens and shall be payable or credited to Buyer only upon closing of the sale of the Transferred Assets (or a material portion of them) and (y) notwithstanding anything contained herein to the contrary, (i) Buyer shall have the right, but not the obligation, to increase its bid for the Transferred Assets at the Auction, and (ii) the amount of the Break-Up Fee and Expense Reimbursement Amount, once triggered pursuant to the terms of this Agreement, shall act as a credit toward any Closing by the Buyer as the high bidder or as the Backup Bidder (as defined in the Bid Procedures).  Notwithstanding anything to the contrary set forth in this Agreement, Buyer agrees that the amount of the Break-Up Fee and the Reimbursement Amount credited to Buyer against the Purchase Price at the Closing as set forth in Section 2.1 (the "<u>Closing Credit Amount</u>")  shall be reduced to the extent such credit would result in the Sellers receiving less than US$60,000,000 in proceeds at the Closing, taking into consideration (i) any amount of the Deposit of the Winning Bidder (as such terms are defined in the Bidding Procedures) under a Competing Transaction that is payable to Sellers pursuant to the Bidding Procedures and is not disputed by the Winning Bidder, or if disputed (such amount, a "<u>Disputed Amount</u>"), such dispute has been resolved in favor of Sellers prior to the Closing and (ii) the purchase price paid by Buyer at the Closing (taking into account the Deposit Amount payable to Sellers by Buyer in accordance with <u>Section 2.2</u>); <u>provided</u>, that if any Disputed Amount is excluded from consideration under the foregoing subclause (i) because such amount remained in dispute at the time of the Closing and such Disputed Amount is later disbursed to Sellers (or Sellers' representative) following the Closing, Sellers (or Sellers' representative) shall calculate the amount that would have been credited to Buyer at the Closing pursuant to this <u>Section 8.3</u> had the Disputed Amount been undisputed at the Closing (the "<u>Final Credit Amount</u>"), and Sellers (or Sellers' representative) shall pay Buyer the difference between the Final Credit Amount and the Closing Credit Amount, by wire transfer of immediately available funds to an account directed by Buyer, without further consideration from Buyer.

ARTICLE IX

MISCELLANEOUS

Section 9.1    Survival.  The Parties agree that the representations, warranties, covenants or agreements contained in this Agreement (other than in respect to Section 3.21, Section 6.6 and this Article IX) will not survive the Closing hereunder, and none of the Parties will have any liability to each other after the Closing for any breach of such representations, warranties, covenants or agreements which may be made, or Action instituted, after the Closing. Notwithstanding the foregoing, the covenants and agreements that by their terms are to be satisfied after the Closing Date shall survive until satisfied in accordance with their terms.

Section 9.2    Notices.    Unless otherwise set forth herein, all notices and other communications, including consents and waivers, to be given or made hereunder shall be in writing and shall be deemed to have been duly given or made on the date of delivery to the recipient thereof if received prior to 5:00 p.m. in the place of delivery and such day is a Business Day (or otherwise on the next succeeding Business Day) if (a) served by personal delivery or by recognized overnight courier service upon the Person for whom it is intended, (b) delivered by registered or certified mail, return receipt requested or (c) sent by email, as provided in this Section 9.2; provided that the email is confirmed orally or in writing by the recipient thereof (excluding out-of-office replies or other automatically generated responses):

To Buyer:

>   Mercer International Inc.
>   Suite 1120, 700 West Pender Street
>   Vancouver, B.C. V6C 1G8
>   Telephone: (604) 639-4610
>   Attn:  Brian Merwin, Vice President Corporate Development
>   Email: brian.merwin@mercerint.com

With a copy to:

>   Sangra Moller LLP
>   1000 Cathedral Place
>   925 West Georgia Street
>   Vancouver, B.C. V6C 3L2
>   Telephone: (604) 692-3022
>   Attn:  Harjit Sangra
>   Email: hsangra@sangramoller.com

>   and

>   Stearns Weaver Miller et al.
>   150 West Flagler Street
>   Suite 2200
>   Miami, Florida 33130
>   Attention: Drew M. Dillworth

44

Email: ddillworth@stearnsweaver.com

To Sellers or Debtors:

(a) If prior to the Closing:

> c/o SLP Holdings Ltd.
> 2176 Government Street
> Penticton, BC, Canada V2A 8B5
> Telephone: (888) 858 9887
> Attn:  Matthew Karmel
> Email:  mkarmel@structurlam.com

With a copy to:

> Paul Hastings LLP
> 1117 S. California Avenue
> Palo Alto, CA 94304
> Telephone: (650) 320-1800
> Attn:  Todd Schwartz
> Email:  toddschwartz@paulhastings.com
>
> and
>
> Gowling WLG (Canada) LLP
> 2300 – 550 Burrard Street
> Vancouver, BC
> Telephone: (604) 891-2778
> Attn:  Jonathan Ross
> Email:  jonathan.ross@gowlingwlg.com

(b) If following the Closing:

> c/o Alvarez & Marsal Canada
> 925 West Georgia Street, Suite 902
> Vancouver, BC V6C 3L2
> Telephone: (604) 639 0849
> Attn: Anthony Tillman
> Email:  atillman@alvarezandmarsal.com

With a copy to:

> Paul Hastings LLP
> 1117 S. California Avenue
> Palo Alto, CA 94304
> Telephone: (650) 320-1800

45

Attn:   Todd Schwartz
Email:  toddschwartz@paulhastings.com

and

Gowling  WLG (Canada) LLP
2300 – 550 Burrard Street
Vancouver, BC
Telephone:  (604) 891-2778
Attn:    Jonathan Ross
Email:  jonathan.ross@gowlingwlg.com

or to such other Person or addressees as may be designated in writing by the Party to receive such notice as provided above; provided, however, that copies to outside counsel are for convenience only and the provision of a copy to outside counsel does not constitute notice or alter the effectiveness of any notice, request, instruction or other communication otherwise made or given in accordance with this Section 9.2.

Section 9.3    Entire Agreement; Amendments and Waivers.  This Agreement together with the other agreements referred to herein, including the Transaction Documents, the Escrow Agreement and the Confidentiality Agreement represent the entire understanding and agreement between the Parties with respect to the subject matter hereof and supersede all prior discussions and agreements between the Parties with respect to the subject matter hereof.  This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed, in the case of an amendment, supplement or change, by the Parties, or in the case of a waiver, by the Party against whom enforcement of such waiver is sought.  The waiver by any Party of a breach of any provision of this Agreement will not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder will operate as a waiver thereof, nor will any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  All remedies hereunder are cumulative and are not exclusive of any other remedies provided by Law.

Section 9.4    Assignment.  This Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  Nothing in this Agreement will create or be deemed to create any third party beneficiary rights in any Person or entity not a party to this Agreement.  No assignment of this Agreement or of any rights or obligations hereunder may be made by either Sellers or Buyer (by operation of law or otherwise) without the prior written consent of the other Parties and any attempted assignment without the required consents will be void; provided, however, that (a) Buyer may assign some or all of its rights or delegate some or all of its obligations hereunder to one or more Affiliates, including to effect the purchase and transfer of the Canadian Assets and the U.S. Assets to different Affiliates and (b) Sellers may assign some or all of their rights or delegate some or all of their obligations hereunder to successor entities (including any liquidating trust) pursuant to a Chapter 11 plan confirmed by the U.S. Bankruptcy Court or as permitted by the CCAA, in the case of each of clause (a) and (b) above, without any other Party's consent.  No assignment or delegation of any

obligations hereunder will relieve the Parties of any such obligations. Upon any such permitted assignment, the references in this Agreement to Sellers or Buyer will also apply to any such assignee unless the context otherwise requires.

Section 9.5    Expenses.   Except as otherwise expressly provided in this Agreement, including as set forth in Section 8.3, whether or not the transactions contemplated hereby are consummated, each of Sellers, on the one hand, and Buyer, on the other hand, will bear its own expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and all proceedings incident thereto.

Section 9.6    Governing Law.   This Agreement will be governed by and construed in accordance with the internal Laws of the State of Delaware without giving effect to any choice or conflict of Law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of the Parties shall be determined in accordance with such Laws.

Section 9.7    Specific Performance.

(a)    The Parties agree that irreparable damages would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached, and that damages at Law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement, and, accordingly, any Party will be entitled to injunctive relief to prevent any such breach, and to specifically enforce the terms and provisions of this Agreement without the necessity of posting bond or other security against it or proving damages, including without limitation specific performance of such covenants, promises or agreements (including to cause each Party to consummate the Closing and to make the payments and Transfer contemplated by this Agreement) or an Order enjoining a Party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement. The rights set forth in this Section 9.7 will be in addition to any other rights which a Party may have at Law or in equity pursuant to this Agreement.

(b)    The Parties hereby agree not to raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches of this Agreement by Buyer or Sellers, as applicable, and to specifically enforce the terms and provisions of this Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the respective covenants and obligations of Buyer or Sellers, as applicable, under this Agreement all in accordance with the terms of this Section 9.7.

Section 9.8    Submission to Jurisdiction; Consent to Service of Process; Waiver of Jury Trial.

(a)    Without limiting any Party's right to appeal any Order of the U.S. Bankruptcy Court, (i) the U.S. Bankruptcy Court will retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, in

each case, relating to the U.S. Bankruptcy Proceedings, the U.S. Bankruptcy Court or the Bankruptcy Code, and (ii) any and all proceedings related to the foregoing will be filed and maintained only in the U.S. Bankruptcy Court, and the Parties hereby consent to and attorn to the jurisdiction and venue of the U.S. Bankruptcy Court for such purposes and will receive notices at such locations as indicated in Section 9.2. The Parties hereby irrevocably waive, to the fullest extent permitted by applicable Law, any objection which they may now or hereafter have to the laying of venue of any such Action brought in such courts or any defense of inconvenient forum for the maintenance of such dispute. Each of the Parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(b)     Each of the Parties hereby consents to process being served by any other Party in any Action by delivery of a copy thereof in accordance with the provisions of Section 9.2; provided, however, that such service will not be effective until the actual receipt thereof by the Party being served.

(c)     Each Party to this Agreement waives any right to trial by jury in any Action regarding this Agreement or any provision hereof.

Section 9.9     Interpretation; Construction.

(a)     The Article and Section headings contained in this Agreement are solely for the purpose of reference, are not part of the agreement of the Parties and shall not in any way affect the meaning or interpretation of this Agreement.

(b)     Unless otherwise specified in this Agreement or the context otherwise requires: (i) the words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement; (ii) any reference to the masculine, feminine or neuter gender shall include all genders, the plural shall include the singular and the singular shall include the plural; (iii) all Preamble, Recital, Article, Section, clause, Schedule and Exhibit references used in this Agreement are to the preamble, recitals, articles, sections, clauses, schedules and exhibits to this Agreement; (iv) wherever the word "include," "includes" or "including" is used in this Agreement, it shall be deemed to be followed by the words "without limitation;" (v) the terms "date hereof" and "date of this Agreement" mean the date first written above; (vi) with respect to the determination of any period of time, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding"; (vii) (A) any reference to "days" means calendar days unless Business Days are expressly specified and (B) any reference to "months" or "years" shall mean calendar months or calendar years, respectively, in each case unless otherwise expressly specified; (viii) the word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other thing extends and such phrase shall not mean simply "if"; and (ix) each accounting term not otherwise defined in this Agreement has the meaning commonly applied to it in accordance with GAAP.

(c)     Unless otherwise specified in this Agreement, any deadline or time period set forth in this Agreement that by its terms ends on a day that is not a Business Day shall be automatically extended to the next succeeding Business Day.

(d)    Unless otherwise specified in this Agreement or the context otherwise requires, all references to any (i) statute in this Agreement include the rules and regulations promulgated thereunder and all applicable guidance, guidelines, bulletins or policies issued or made in connection therewith by a Governmental Entity, and (ii) Law in this Agreement shall be a reference to such Law as amended, re-enacted, consolidated or replaced as of the applicable date or during the applicable period of time.

(e)    Unless otherwise specified in this Agreement, all references in this Agreement (i) to any Contract, other agreement, document or instrument (excluding this Agreement) mean such Contract, other agreement, document or instrument as amended, supplemented or otherwise modified from time to time in accordance with the terms thereof and, unless otherwise specified therein, include all schedules, annexes, addendums, exhibits and any other documents attached thereto or incorporated therein by reference, and (ii) to this Agreement mean this Agreement (taking into account the provisions of Section 9.3) as amended, supplemented or otherwise modified from time to time in accordance with Section 9.3.

(f)    With regard to each and every term and condition of this Agreement, the Parties understand and agree that the same have or has been mutually negotiated, prepared and drafted, and that if at any time the Parties desire or are required to interpret or construe any such term or condition or any agreement or instrument subject thereto, no consideration shall be given to the issue of which Party actually prepared, drafted or requested any term or condition of this Agreement.

(g)    All capitalized terms in this Agreement (including the Exhibits and Schedules hereto) shall have the meaning set forth in Exhibit A, except as otherwise specifically provided herein. Each of the other capitalized terms used in this Agreement has the meaning set forth where such term is first used or, if no meaning is set forth, the meaning required by the context in which such term is used.

Section 9.10    Severability.  The provisions of this Agreement shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof. If any provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other authority of competent jurisdiction to be invalid, void or unenforceable, or the application of such provision, covenant or restriction to any Person or any circumstance, is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision, covenant or restriction to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application of such provision, in any other jurisdiction and the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

Section 9.11    Counterparts and Electronic Execution.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same Agreement. Delivery of an executed signature page to this Agreement

by any Party by electronic transmission shall be as effective as delivery of a manually executed copy of this Agreement by such Party.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the Parties have executed or caused this Agreement to be executed as of the date first written above.

**MERCER INTERNATIONAL INC.**

By: _____
Name: Juan Carlos Bueno
Title: Chief Executive Officer

IN WITNESS WHEREOF, the Parties have executed or caused this Agreement to be executed as of the date first written above.

**SLP HOLDINGS LTD.**

By: *Shawn Turkington*
DocuSigned by:
B8FE79D0C861448...
Name: Shawn Turkington

Title: Authorized Signatory

**STRUCTURLAM MASS TIMBER CORPORATION**

By: *Shawn Turkington*
DocuSigned by:
B8FE79D0C861448...
Name: Shawn Turkington

Title: Authorized Signatory

**STRUCTURLAM MASS TIMBER U.S., INC.**

By: *Shawn Turkington*
DocuSigned by:
B8FE79D0C861448...
Name: Shawn Turkington

Title: Authorized Signatory

**NATURAL OUTCOMES, LLC**

By: *Shawn Turkington*
DocuSigned by:
B8FE79D0C861448...
Name: Shawn Turkington

Title: Authorized Signatory

*[Signature Page to Asset Purchase Agreement]*

**EXHIBIT A**
**Defined Terms**

In this Agreement, the following terms have the meaning specified in this <u>Exhibit A</u>.

"<u>Accounts Payable</u>" means all trade accounts payable and other obligations of payment to any Person to the extent attributable to a Transferred Asset or otherwise Related to the Business.

"<u>Accounts Receivable</u>" means all trade accounts receivable and other rights to payment from any Person.

"<u>Acquisition</u>" has the meaning set forth in the Recitals.

"<u>Action</u>" shall mean any action, suit, claim (including a counterclaim or cross claim), grievance, summons, mediation, prosecution, hearing, inquiry, examination, right, cause of action, complaint, litigation, investigation, audit, proceeding, arbitration or other similar dispute of any kind whatsoever.

"<u>Additional Assumed Contract</u>" means the executory Seller Contracts listed on <u>Schedule 1.1(i)</u> as modified by Buyer from time to time pursuant to <u>Section 1.6(b)</u> between the date hereof and two Business Days prior to the Closing Date (the "<u>Additional Assumed Contracts Schedule</u>"), to the extent not included in Excluded Assets.

"<u>Additional Assumed Contracts Schedule</u>" has the meaning set forth in the definition of "<u>Additional Assumed Contracts</u>".

"<u>Affiliate</u>" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by or under common control with such Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made (for purposes of this definition, the term "control" (including the correlative meanings of the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by Contract or otherwise).

"<u>Agreement</u>" has the meaning set forth in the Preamble.

"<u>Allocation Notice of Objection</u>" has the meaning set forth in <u>Section 6.4(c)(i)</u>.

"<u>Asset Taxes</u>" means ad valorem, property, excise, severance, production, sales, GST/HST, use or similar Taxes (excluding, for the avoidance of doubt, any Income Taxes and Transfer Taxes) based upon or measured by the ownership or operation of the Business.

"<u>Assignment and Assumption Agreements</u>" has the meaning set forth in <u>Section 2.4(e)</u>.

"<u>Assignment Order</u>" means an Order of the Canadian Court made in the CCAA Proceedings, in form and substance acceptable to Parties, acting reasonably, assigning to Buyer the rights and obligations of Sellers under an Closing Assumed Contract for which a consent, approval or waiver necessary for the assignment of such Closing Assumed Contract has not been obtained.

"Assumed Liabilities" has the meaning set forth in Section 1.3.

"Auction" means the auction to be conducted for the sale of the Transferred Assets under the Bid Procedures.

"Avoidance Action" means any avoidance claims, right or cause of action under Chapter 5 of the Bankruptcy Code or any analogous state law, the BIA, the CCAA, or Canadian provincial fraudulent conveyance or fraudulent preference legislation in each case, that relates to the Transferred Assets.

"Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. § 101 *et seq.*

"Bankruptcy Proceeding" has the meaning set forth in the Recitals.

"BIA" means the Bankruptcy and Insolvency Act (Canada).

"Bid Procedures" has the meaning set forth in the Recitals.

"Bid and Contract Procedures Order" has the meaning set forth in the Recitals.

"Bond" or "Bonds" means any or all of the Conway Taxable Industrial Development Revenue Bond (Structurlam U.S. Project), Series 2019, in the aggregate principal amount of not to exceed $75,000,000, issued pursuant to the Indenture and legally and beneficially owned by Natural Outcomes.

"Bond Purchase Agreement" means the bond purchase agreement dated December 27, 2019 between Conway as lessor, Natural Outcomes, and approved by Structurlam U.S., the lessee.

"Books and Records" means all books, ledgers, files, papers, reports, plans, records, manuals and other materials (in any form or medium) related to the Transferred Assets or the Business, including all advertising materials, client and customer lists, supplier and vendor lists, purchase orders, sales and purchase invoices, production and operations reports, technical manuals, information and records, photos, drawings and schematics, personnel and employment records, financial and accounting records and all written paper correspondence with or to any Governmental Entity including letters, minutes and official contact reports, but excluding any such items to the extent (a) they are included in or primarily related to any Excluded Assets or Excluded Liabilities, (b) any Law prohibits their transfer, (c) they are subject to legal privilege (other than title opinions) or (d) any transfer thereof otherwise would subject any Seller or any of its Affiliates to any material liability and is identified on the Seller Disclosure Schedule.

"Break-Up Fee" has the meaning set forth in Section 8.3(b).

"Business" has the meaning set forth in the Recitals.

"Business Day" means any day ending at 11:59 p.m., prevailing Eastern time, other than a Saturday, a Sunday, a day on which banks in New York, New York or British Columbia, Canada are authorized or required by Law, executive order or other governmental action to close, or a day on which their administrative offices are closed due to COVID-19 Measures or any other Order of a relevant Governmental Entity.

"Buyer" has the meaning set forth in the Preamble.

"Buyer Accounts Receivable" means all Accounts Receivable arising after the Closing Date.

"Canadian Assets" means those Transferred Assets hereunder as the same relate to the Business as carried on by Sellers in Canada.

"Canadian Court" has the meaning set forth in the Recitals.

"Canadian Orders" mean the Canadian Sales Order and any other Order of the Canadian Court issued and entered in the CCAA Proceedings in respect of the asset purchase transaction contemplated in this Agreement.

"Canadian Plans" means all Seller Plans in which Seller Employees who are based in Canada are eligible to participate.

"Canadian Sale Order" means an Order of the Canadian Court, substantially in the form of Exhibit E hereto, with such changes as may be agreed by Buyer and Sellers, each acting reasonably, approving the transactions contemplated by this Agreement and vesting the Transferred Assets in Buyer, free and clear of all encumbrances, other than the Permitted Encumbrances.

"CCAA" shall have the meaning ascribed thereto in the Recitals of this Agreement.

"CCAA Proceedings" shall have the meaning ascribed thereto in the Recitals of this Agreement.

"Closing" has the meaning set forth in Section 2.3.

"Closing Assumed Contracts" has the meaning set forth in Section 1.1(g).

"Closing Credit Amount" has the meaning set forth in Section 8.3.

"Closing Date" has the meaning set forth in Section 2.3.

"Code" means the Internal Revenue Code of 1986.

"Collective Agreement" has the meaning set forth in Section 3.11.

"Competing Transaction" has the meaning set forth in Section 5.1(a).

"Confidentiality Agreement" means that certain Non-Disclosure Agreement, dated as of February 24, 2023 by and between Buyer and SLP.

"Contaminant" means any solid, liquid, gas, offensive odor, heat, sound, vibration or radiation that results directly or indirectly from human activities that may cause an adverse environmental effects.

A-3

"Continuing Employee" has the meaning set forth in Section 6.5(f).

"Contract" means any contract, purchase order, service order, sales order, indenture, note, bond, lease, sublease, license or other agreement that is legally binding upon a Person or its property.

"Conway" means the City of Conway, Arkansas, a municipal corporation organized and existing under the Laws of the State of Arkansas.

"Conway Lease Agreement" means the lease agreement dated December 27, 2019 between Conway as lessor and Structurlam U.S. as lessee.

"Conway Lease Assets" means all of the assets leased by Conway to Structurlam U.S. pursuant to the terms of the Conway Lease Agreement (including real property).

"Conway Material Bond Agreements" mean, collectively, the Bond, the Indenture, the Conway Lease Agreement, the Bond Purchase Agreement, the Recognition of Prior Interests, Non-Disturbance and Attornment Agreement, the PILOT Agreement and such other agreements and documents set forth at paragraph 3 of Schedule 3.8 of the Seller Disclosure Schedule and not expressly set forth in this defintion.

"Covered Representations" has the meaning set forth in Section 4.9(a).

"COVID-19 Measures" means any quarantine, "shelter in place", "stay at home", workforce reduction, social distancing, shutdown, closure, sequester or any other Law or Order or guideline or recommendation by any Governmental Entity in connection with or in response to COVID-19.

"Cure Costs" means (a) with respect to the Bankruptcy Proceeding, monetary amounts that must be paid and obligations that otherwise must be satisfied under Sections 365(b)(1)(A) and (B) of the Bankruptcy Code or in connection with the assumption and/or assignment of any Closing Assumed Contract, as agreed upon by the Parties or determined by the U.S. Bankruptcy Court pursuant to the procedures in the Bid and Contract Procedures Order or (b) with respect to the CCAA Proceedings, with respect to any Closing Assumed Contract for which a required consent to assignment has not been obtained and is to be assigned to Buyer in accordance with the terms of the Assignment Order, the amounts, if any, required to be paid to remedy all of Sellers' monetary defaults existing as at the Closing Date under such Closing Assumed Contract (or such other amounts as may be agreed by Buyer and the counterparty to such Closing Assumed Contract), and with respect to any Closing Assumed Contract to be assigned on consent, where consent is required, the amount, if any, required to be paid to a counterparty to secure its consent to the assignment of the applicable Closing Assumed Contract by any of Sellers to Buyer (which amount shall be set out on the form of contractual consent agreed to by Buyer and the counterparty to such Closing Assumed Contract).

"D&O Insurance Claims" shall have the meaning set forth in Section 1.1(h).

"Debtors" means SLP, Structurlam Mass Timber Corporation, a British Columbia company, Structurlam U.S., and Natural Outcomes.

"Deposit Amount" has the meaning set forth in the Recitals.

"Designation Deadline" shall have the meaning set forth in Section 1.6(b).

"DIP Financing" means that certain Secured Superpriority Debtor-in-Possession Credit Agreement, by and among Sellers and Bank of Montreal, to be entered upon the authorization of the U.S. Bankruptcy Court pursuant to an order, among other things, authorizing Sellers to obtain postpetition financing.

"Disputed Amount" has the meaning set forth in Section 8.3.

"Environment" means the ambient air, all layers of the atmosphere, all water including surface water and underground water, all land, all living organisms and the interacting natural systems that include components of air, land, water, living organisms and organic and inorganic matter, and includes indoor spaces.

"Environmental Law" means any applicable Law relating in any way to the protection of the Environment, environmental assessment, Hazardous Substances (including the use, manufacture, handling, transportation, production, disposal, discharge, storage or emission of Hazardous Substances), occupational health and safety, protection of any form of plant or animal life, natural resources or transportation of dangerous goods, including the principles of common law and equity.

"Environmental Liability" means any Liability arising under Environmental Law, including (a) any Liability arising from (i) any actual or alleged violation of any Environmental Law, (ii) any actual or alleged generation, use, handling, transportation, storage, treatment, disposal, release, or threatened release of, or exposure to, any Hazardous Substances at any facility or location, and (iii) any Liability arising under Environmental Law relating to any formerly owned, leased, or operated properties or any former, closed, divested, or discontinued business operations, and (b) any Liabilities arising under Environmental Law assumed or retained by Contract, operation of Law, or otherwise.

"Equitable Exception" has the meaning set forth in Section 3.3(b).

"ERISA" means the Employee Retirement Income Security Act of 1974.

"Escrow Agent" has the meaning set forth in the Recitals.

"Escrow Agreement" means that certain Escrow Agreement, dated as of April 19, 2023, between SLP and the Escrow Agent.

"ETA" means the *Excise Tax Act* (Canada) and all regulations thereunder, each as amended from time to time.

"Excluded Actions" has the meaning set forth in Section 1.2(p).

"Excluded Assets" has the meaning set forth in Section 1.2.

"Excluded Contracts" has the meaning set forth in Section 1.2(m).

A-5

"Excluded Insurance Proceeds" has the meaning set forth in Section 1.2(a).

"Excluded Liabilities" has the meaning set forth in Section 1.4.

"Expense Reimbursement Amount" means the aggregate amount of all reasonable and documented out of pocket costs, expenses and fees incurred by Buyer in connection with evaluating, negotiating, documenting and performing the transactions contemplated by this Agreement and the Transaction Documents, including fees, costs and expenses of any professionals (including financial advisors, outside legal counsel, accountants, experts and consultants) retained by or on behalf of Buyer in connection with or related to the authorization, preparation, investigation, negotiation, execution and performance of this Agreement, the transactions contemplated hereby, including the Bankruptcy Proceeding, the CCAA Proceedings and other judicial and regulatory proceedings related to such transactions, which amount shall be payable as set forth in Section 8.3(a).

"FCPA" has the meaning set forth in Section 3.9(b).

"Final Allocation Statement" has the meaning set forth in Section 6.4(c)(i).

"Final Credit Amount" has the meaning set forth in Section 8.3.

"Final Order" means an Order (a) as to which no appeal, leave to appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed (in cases in which there is a date by which such filing is required to occur, or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject Order in all material respects without the possibility for further appeal thereon), (b) in respect of which the time period for instituting or filing an appeal, leave to appeal, motion for rehearing or motion for new trial shall have expired (in cases in which such time period is capable of expiring), and (c) as to which no stay is in effect.

"Financial Statements" has the meaning set forth in Section 3.5.

"Fixtures and Equipment" means all furniture, furnishings, vehicles, equipment, machinery, tools, fixtures, rolling stock, construction materials, accessions and all other personal and mixed property, operational and nonoperational, wherever located that are Related to the Business or used in the Business including all trade fixtures, supplies, including maintenance and repair supplies and spares (including grease, oils, chemicals and containers in which any of them are stored), desks, chairs, tables, tools, all computer equipment, telephones, other office equipment, motor vehicles, replacement parts, and all other tangible personal property, including any of the foregoing purchased subject to any conditional sales or title retention agreement in favor of any other Person each of which that is Related to the Business.

"Further Assignment Notice" shall have the meaning set forth in Section 1.6(c).

"GAAP" means United States generally accepted accounting principles.

"Governmental Entity" means any domestic or foreign governmental or regulatory authority, agency, commission, body, court, council or other legislative, executive or judicial governmental authority, agency, commission, department, board or entity, or any political

subdivision thereof, including without limitation the U.S. Bankruptcy Court and the Canadian Court, or any person acting under the authority of any of the foregoing (including any arbitrator with the authority to bind the parties at Law) or any other authority, agency, commission, department, association or board charged with the administration, regulation or enforcement of Laws.

"GST/HST" means the goods and services tax and the harmonized sales tax imposed under the ETA.

"Hazardous Substance" means any Contaminant, underground or above-ground tanks, pollutant, dangerous or potentially dangerous substance, noxious or toxic substance, hazardous material or substance, waste (including subject waste, liquid industrial waste, other industrial waste, toxic waste, corrosive waste and hazardous waste) and deleterious substance, and includes (without limitation) any flammables, explosives, fuel, micro-organism, radioactive material, lead, asbestos, asbestos containing materials, polycholorinated biphenyls ("PCB"), PCB-containing equipment or materials, pesticides, defoliants, fungi (including without limitation mould or spores arising from fungi), chlorofluorocarbons, hydrocholorofluorocarbons, urea formaldehyde foam insulation, radon gas, chemicals, substances and agents known or believed to cause cancer or reproductive toxicity, toxic substances, petroleum and petroleum-based substances, electrical or magnetic fields, and any other solid, liquid, gas, vapor, odor, heat, sound, vibration, radiation, micro waves, substance, organic or inorganic matter, condition or chemical, biological or physical agent of any nature or kind that is now or hereafter prohibited, controlled, monitored or regulated pursuant to Environmental Laws.

"Identified Contract" has the meaning set forth in Section 1.6(a).

"Income Taxes" means any income, franchise or similar Taxes.

"Indenture" means the trust indenture dated as of December 27, 2019, by and between the lessor and the trustee, relating to the Bond, and any indentures supplemental thereto.

"Initial Order" has the meaning set forth in the Recitals.

"Intellectual Property" means all intellectual property rights arising in any jurisdiction of the world, including with respect to any of the following: (a) trademarks, service marks, trade dress, trade names, and other indicia of origin, applications and registrations for the foregoing, and all goodwill associated therewith and symbolized thereby (collectively, "Trademarks"); (b) patents and patent applications, including divisions, continuations, continuations-in-part and renewal applications, and including renewals, re-examinations, extensions and reissues; (c) industrial designs, integrated circuit topographies, and mask works; (d) trade secrets and proprietary rights in confidential information; (e) copyrights, applications and registrations therefor, and renewals, extensions, restorations and reversions thereof, and the benefit of any waivers of moral rights; and (f) Internet domain names.

"Interim Period" has the meaning set forth in Section 1.7(a).

"Intracompany Payables" means all account, note or loan payables recorded on the books of Sellers or any of its Affiliates for goods or services purchased by or provided to the Business,

or advances (cash or otherwise), debt or any other extensions of credit to the Business by and/or among Sellers or any of its Affiliates, whether current or non-current or due.

"Intracompany Receivables" means all account, note or loan receivables recorded on the books of Sellers or any of its Affiliates for goods or services sold or provided by the Business to Sellers or any of its Affiliates or advances (cash or otherwise) debt or any other extensions of credit (including the bond) made by the Business to Sellers or any of its Affiliates, whether current or non-current or due.

"Inventory" means all inventory Related to the Business, of the Business, produced in the Business or used in the Business, wherever located, and includes, for greater certainty, all Specified Inventory, and including all finished goods, raw materials, work in progress, packaging, supplies and parts whether held at any location or facility of Sellers or any of their Affiliates or in transit to Sellers or any of their Affiliates, in each case as of the Closing Date, other than in the case of the Specified Inventory, which shall be as observed by representatives of the Buyer on the Observation Date.

"IP Assignment Agreement" has the meaning set forth in Section 2.5(i).

"IRS" has the meaning set forth in Section 3.12.

"ITA" means the *Income Tax Act* (Canada) and all regulations thereunder, each as amended from time to time.

"Joint Election" has the meaning set forth in Section 6.4(a)(i).

"Knowledge" means, with respect to each Seller, the actual knowledge of the Persons set forth on Schedule 1.1(a) after reasonable inquiry into the relevant subject matter, and, with respect to Buyer, the actual knowledge of Dave Ure and Brian Merwin after reasonable inquiry into the relevant subject matter.

"Law" means any federal, state, provincial, local or municipal law, bylaw, statute or ordinance, common law, or any rule, regulation, standard, judgment, Order, criteria, protocols, codes of practices, writ, injunction, decree, arbitration award, agency requirement, license, Permit or other lawful requirements of any Governmental Entity now or hereafter in force.

"Lessor" means Eagle Home Ltd., in relation to the Wallis Lease.

"Liabilities" means any and all judgments, debts, liabilities, commitments, costs, expenses, adverse claim, duty, responsibility, commitment, loss, expenditure, charge, fee, penalty, fine, contribution, obligations of any kind, whether fixed, contingent or absolute, matured or unmatured, liquidated or unliquidated, accrued or not accrued, asserted or not asserted, known or unknown, determined, determinable or otherwise, whenever or however arising (including, whether arising out of any contract or tort based on negligence, strict liability or product liability).

"Lien" or "encumbrance" means any lien (as defined in section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), charge, mortgage, deed of trust, option, pledge, security interest or similar interests, title defects,

hypothecations, easements, rights of way, encroachments, judgments, conditional sale or other title retention agreements and other similar impositions, imperfections or defects of title or restrictions on transfer or use.

"Material Adverse Effect" means any effect, event, change, occurrence, condition or state of facts which has had, individually or when considered together with any other effects, events, changes, occurrences, conditions or states of facts, a materially adverse effect on the financial condition, properties, assets, business or results of operations of the Business; provided, however, that in no event shall an effect, event, change, occurrence, condition or state of fact resulting from the following, either alone or in combination, be deemed to constitute or be taken into account in determining whether there has occurred a Material Adverse Effect: (i) any change in the Canadian, United States or foreign economies or financial markets in general, (ii) any economic conditions that generally affect the industries or markets in which Sellers conduct the Business, (iii) any change arising in connection with acts of God, natural disasters, earthquakes, epidemics, plagues, pandemics, disease outbreaks, illnesses or public health events (including the COVID-19 virus and any non-human epidemic, plague, pandemic or other similar disease outbreak or illness), the declaration of a national emergency, hostilities, acts of war, sabotage or terrorism or military actions or any escalation or material worsening of any such epidemics, plagues, pandemics, disease outbreaks, illnesses or public health events or hostilities, acts of war, sabotage or terrorism or military actions, (iv) any change in applicable Laws or accounting rules or the interpretation or enforcement thereof, (v) any actions required or expressly permitted to be taken by Sellers pursuant to this Agreement or any actions taken by Sellers or the other Debtors at Buyer's written request; (vi) any action not taken by Sellers at Buyer's written request; (vii) the execution, performance, public announcement, pendency or consummation of this Agreement, the Bankruptcy Proceeding or the CCAA Proceedings, (viii) the termination of any Seller Contract by any party thereto other than Sellers, or the termination or expiration by its terms of any Seller Contract, on or prior to such time as it is to be assumed by Buyer as a Closing Assumed Contract or Additional Assumed Contract hereunder, (ix) the refusal of any, some or all of the Target Employees (who are not Unionized Employees) to accept offers of employment or engagement with Buyer or the resignation of any Target Employees (who are not Unionized Employees) prior to the Closing resulting in the inability of Sellers to operate the Business in the Ordinary Course; or (x) (A) any Action approved by, motion made before or Orders of the U.S. Bankruptcy Court, the Canadian Court or a court of similar jurisdiction or (B) the fact that Sellers and the other Debtors are operating as debtors-in-possession under the U.S. Bankruptcy Court, the Canadian Court or a court of similar jurisdiction; provided, however, that with respect to clauses (i), (ii), (iii) and (iv), such effects, events, changes, occurrences, conditions or states of facts will not be excluded to the extent the same disproportionately adversely affects the Business, taken as a whole, as compared to other similarly situated businesses; provided, that in no event shall any reasonably anticipated effect, event, change, occurrence, condition or state of fact arising from the commencement, pendency, conduct or prosecution of the Bankruptcy Proceeding or the CCAA Proceedings be deemed to constitute or be taken into account in determining whether there has occurred a Material Adverse Effect.

"Material Contracts" has the meaning set forth in Section 3.8(a).

"Natural Outcomes" means Natural Outcomes, LLC, a Delaware limited liability company, the purchaser and owner of the Bond.

"Necessary Consent" has the meaning set forth in Section 1.8.

"Notice of Potential Assignment" has the meaning set forth in Section 1.6(a).

"Observation Date" means March 11, 2023.

"Order" means any administrative decision or award, decree, injunction, judgment, order, quasi-judicial decision or award, ruling or writ of any arbitrator, mediator or Governmental Entity.

"Ordinary Course" means the conduct of the Business, consistent with the normal day-to-day customs, practices and procedures of the Business, taking into account any changes to such practices as may have occurred since and as a result of the outbreak of COVID-19, including compliance with COVID-19 Measures.

"Party" and "Parties" have the meaning set forth in the Preamble.

"Permit" means any consent, license, permit, waiver, approval, authorization, certificate, certification (including those certifications set forth at Schedule 3.4(a) of the Sellers Disclosure Schedule), registration, variance, waiver, filing or similar right issued by, obtained from or made with a Governmental Entity.

"Permitted Encumbrance" means (a) any Liens that are expressly permitted by the U.S. Sale Order or Canadian Sale Order, as applicable, to remain attached to the Transferred Assets following the Closing, (b) any Lien on the Transferred Assets that will be expunged, released or discharged at the Closing by operation of the U.S. Sale Order or Canadian Sale Order, as applicable, (c) undetermined or inchoate liens, charges and privileges (including mechanics', construction, carriers', workers', repairers', storers' or similar liens) which, individually or in the aggregate, are not material, arising or incurred in the Ordinary Course, (d) servitudes, easements, restrictions, encroachments, covenants, rights of way and other similar rights or restrictions in real property, or any interest therein, whether registered or unregistered, which, individually or in the aggregate, are not material to the Business, and (e) unregistered Liens for Taxes, assessments or similar charges incurred in the Ordinary Course that are not yet due and payable.

"Person" means any natural person, corporation, company, partnership (general or limited), limited liability company, trust or other entity.

"Personal Information" means, collectively, all relevant data or information constituting the personal information relating to any identifiable natural person, including employees, customers, and other individuals, that has been collected or otherwise obtained by Sellers in the conduct of the Business and that is in Sellers' possession or custody.

"PILOT Agreement" means the agreement for payments in lieu of taxes dated December 27, 2019, by and between the Conway as lessor and Structurlam U.S. as lessee.

"Proposed Allocation Statement" has the meaning set forth in Section 6.4(c)(i).

"Purchase Price" has the meaning set forth in Section 2.1.

"Rebate Program" means the "Create Rebate Program" under the Consolidated Incentive Act of 2003 of the State of Arkansas.

"Recognition of Prior Interests, Non-Disturbance and Attornment Agreement" means the recognition of prior interests, non-disturbance and attornment agreement dated December 27, 2019 between Structurlam U.S., Natural Outcomes, Conway, Simmons Bank and Bank of Montreal.

"Related to the Business" means exclusively related to, or used exclusively in connection with, the Business as carried on by Sellers prior to the Closing.

"Representatives" means with respect to a Person, such Person's officers, directors, employees, stockholders, partners, members, managers, agents, attorneys, accountants, consultants, advisors and other representatives.

"Retained Accounts Receivable" means the Accounts Receivable arising on and prior to the Closing Date.

"Sale Hearing" means a sale hearing held pursuant to the Bid Procedures.

"Scheduled Employees" has the meaning set forth in Section 6.5(a).

"Scheduled Employees Schedule" has the meaning set forth in Section 6.5(a).

"Securities Act" means the Securities Act of 1933.

"Seller Contracts" means any Contracts to which any Seller is a party.

"Seller Disclosure Schedule" means the disclosure schedule delivered to Buyer by Sellers prior to the Closing Date, and as modified by Seller from time to time between the date hereof and the Closing Date, except to the extent that the modification relates to a Material Adverse Effect.

"Seller Employees" means the current employees and independent contractors (including those on leave from work due to sickness, disability, temporary layoff, leave of absence, disability or other non-active status or any statutory leave and the Unionized Employees) of Sellers.

"Seller Plan" means any employee benefit or compensation plan, program, policy, practice, agreement, Contract, arrangement or other obligation, in each case, which is sponsored, contributed to or maintained by, or required to be sponsored, contributed to or maintained by, or with respect to which any liability or potential liability is borne by any Seller.

"Sellers" has the meaning set forth in the Preamble.

"SLP" has the meaning set forth in the Preamble.

"Specified Inventory" means all inventory Related to the Business, of the Business, produced in the Business or used in the Business, including all finished goods, raw materials, work in progress, packaging, supplies, parts and steel components, whether held at any location or facility of Sellers or any of their Affiliates or in transit to Sellers or any of their Affiliates, for, or

in relation to, campus buildings "six" and "eight" under construction or planned construction or constructed for, or on behalf of, Walmart Inc. and/or its Affiliates by the Sellers.

"Straddle Period" means any Tax period beginning before and ending on or after the Closing Date.

"Structurlam U.S." has the meaning set forth in the Preamble.

"Subsidiary" means, with respect to any Person, any other Person of which at least a majority of the securities or ownership interests having by their terms ordinary voting power to elect a majority of the board of directors or other Persons performing similar functions is directly or indirectly owned or controlled by such Person and/or by one or more of its Subsidiaries.

"Target Employees" means the Scheduled Employees to whom the Buyer, in its sole discretion, agrees to make offers of employment or engagement, and includes all Unionized Employees.

"Tax Returns" means any return, report, declaration, election, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto and any amendment thereof.

"Taxes" means any and all taxes, duties, fees, premiums, assessments, imposts, levies, rates, withholdings, dues, government contributions, and other charges of any kind imposed by any Governmental Entity, whether direct or indirect, together with all interest, penalties, fines, additions to tax or other additional amounts imposed in respect thereof, including, without limitation, all income, profits, environmental, stamp, gross receipts, premium, value added, severance, property, production, sales, harmonized sales, goods and services, use, duty, license, excise, franchise, payroll, unemployment, employment, disability, escheat and unclaimed property, transfer, registration, or mortgage tax.

"Termination Date" has the meaning set forth in Section 8.1(c)(i).

 "Title Company" has the meaning set forth in Section 8.1(c)(i).

"Title Policy" has the meaning set forth in Section 8.1(c)(i).

"Trademarks" has the meaning set forth in the definition of "Intellectual Property."

"Transaction Documents" means this Agreement and all other ancillary agreements to be entered into by, or documentation delivered by, any Party pursuant to this Agreement and includes, for greater clarity, the Assignment and Assumption Agreements and the IP Assignment Agreement.

"Transfer" means to sell, assign, transfer, convey and deliver.

"Transfer Taxes" has the meaning set forth in Section 6.4(a).

"Transferred Assets" has the meaning set forth in Section 1.1.

"<u>Transferred Intellectual Property</u>" means the Intellectual Property, owned by Sellers and listed on <u>Schedule 1.1(f)</u>.

"<u>Transferred Leased Property</u>" means all real property that is the subject of the Transferred Leases, together with any right, title and interest of Sellers in and to the leasehold estates created thereby and subject to the terms, conditions, covenants and obligations set forth in the applicable instruments.

"<u>Transferred Leases</u>" means the leases and subleases governing real property used or leased by the Business, all of which are set forth on <u>Schedule 1.1(c)</u>.

"<u>Transferred Owned Property</u>" means the real property owned by Sellers, all of which is listed on Schedule 1.1(d), which real property forms part of the Conway Lease Assets.

"<u>Transferred Seller Plans</u>" has the meaning set forth in <u>Section 1.1(l)</u>.

"<u>U.S.</u>" means the United States of America.

"<u>U.S. Assets</u>" means those Transferred Assets hereunder as the same relate to the Business as carried on by Sellers in the U.S.

"<u>U.S. Bankruptcy Court</u>" has the meaning set forth in the Recitals.

"<u>U.S. Orders</u>" means the U.S. Sale Order and any other Order of the U.S. Bankruptcy Court, issued and entered in the Bankruptcy Proceeding in respect of the asset purchase transaction contemplated by this Agreement.

"<u>U.S. Sale Order</u>" means an Order entered by the U.S. Bankruptcy Court or other court of competent jurisdiction approving the transactions contemplated by this Agreement and vesting the Transferred Assets in Buyer, free and clear of all Liens, claims, encumbrances, and interests other than Permitted Encumbrances. For the avoidance of doubt, the U.S. Sale Order may be in the form of a stand-alone sale order under Sections 363 and 365 of the Bankruptcy Code or may be included in an Order that also confirms a plan of reorganization.

"<u>Unionized Employees</u>" means all employees whose terms and conditions of employment are governed by the Collective Agreement.

"<u>Virtual Data Room</u>" means the virtual data room administered by Miller Buckfire & Co., LLC in connection with the transactions contemplated herein and containing the documents and information relating to the Business, the Subsidiaries and the Transferred Assets, and made available in electronic form to Buyer and its Representatives.

"<u>Wallis Lease</u>" means the lease of 1716 Wallis Road, Okanagan Falls, dated May 31, 2018 between Structurlam Mass Timber Corporation as lessee and Eagle Home Ltd. as lessor ending May 31, 2023.

**<u>EXHIBIT 3</u>**

AUCTION AND SALE NOTICE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| STRUCTURLAM MASS TIMBER U.S., INC., *et al.*,[1] | ) Case No. 23-10497 (CTG) |
|  | ) |
|  | ) (Jointly Administered) |
| Debtors. | ) |
|  | ) |

## NOTICE OF ORDER APPROVING PROCEDURES
## RELATED TO THE AUCTION AND SALE OF THE DEBTORS' ASSETS

**PLEASE TAKE NOTICE** that, on April [ ● ], 2023, the above-captioned debtors and debtors in possession (collectively, the "Debtors"), filed the *Debtors' Motion Seeking Entry of an Order (A)(I) Approving Bidding Procedures, (II) Approving Stalking Horse Protections and Debtors' Entry into Stalking Horse Purchase Agreement (III) Scheduling the Bid Deadline and the Auction, (IV) Scheduling Hearings and Objection Deadlines with Respect to the Sale, (V) Approving the Form and Manner of the Notice Thereof, (VI) Approving Contract Assumption and Assignment Procedures, and (VII) Granting Related Relief and (B)(I) Approving the Sale of the Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances, (II) Approving Assumption and Assignment of Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* [Docket No. [ ● ]] (the "Motion").[2]

**PLEASE TAKE FURTHER NOTICE** that, on April [ ● ], 2023, the United States Bankruptcy Court for the District of Delaware (the "Court") entered that certain order approving, among other things, the implementation of the Bidding Procedures, in connection with the sale of all, substantially all, or any combination of the Debtors' assets [Docket No. [ ● ]], a copy of which is annexed hereto as **Exhibit I** (the "Bidding Procedures Order"). A copy of the Bidding Procedures is annexed hereto as **Exhibit II**. Pursuant to the Bidding Procedures Order, a final hearing to approve the Auction, if any, and the Sale is scheduled to take place on [May 26], 2023, at [10:00 a.m. (prevailing Eastern Time)].

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number or Canadian business number, as applicable, include: Structurlam Mass Timber U.S., Inc. (6287); Natural Outcomes, LLC (n/a); Structurlam Mass Timber Corporation (5050); and SLP Holdings Ltd. (3114).  The location of the Debtors' headquarters is:  2176 Government Street, Penticton, British Columbia, Canada V2A 8B5.  The address of the registered agent for Structurlam Mass Timber U.S., Inc. is: 8 The Green, Suite A, Dover, Delaware 19901.

[2]   All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion or the Bidding Procedures Order (defined herein), as applicable.

1

**PLEASE TAKE FURTHER NOTICE** that, to ensure that the Auction and Sale process maximizes value for the benefit of the Debtors' estates, the following key dates and deadlines have been established by the Debtors, pursuant to the Bidding Procedures Order:

(a)    <u>Bid Deadline</u>.  May 18, 2023, at 4:00 p.m. (prevailing Eastern Time), is the deadline by which Bids for the Assets (as well as the deposit and all other documentation required under the Bidding Procedures for Qualified Bidders) must be submitted.

(b)    <u>Sale Objection Deadline</u>.  May 18, 2023, at 4:00 p.m. (prevailing Eastern Time) is the deadline (the "<u>Sale Objection Deadline</u>") by which all objections to the Sale, other than a Contract Objection or Winning Bidder Adequate Assurance Objection, must be filed with the Court.  Replies to any such objections shall be filed with the Court by May 25, 2023, at 12:00 p.m. (prevailing Eastern Time).

(c)    <u>Contract Objection Deadline</u>.  May 18, 2023, at 4:00 p.m. (prevailing Eastern Time) is the deadline (the "<u>Contract Objection Deadline</u>") by which Counterparties to Executory Contracts must file with the Court and serve on the Objection Notice Parties an objection with respect to (i) the assumption and assignment of the Counterparty's Executory Contract (including, without limitation, on the basis that the Stalking Horse Purchaser cannot provide adequate assurance of future performance) or (ii) the Cure Amount for any of its Executory Contracts.

(d)    <u>Auction</u>.  May 19, 2023, at 10:00 a.m. (prevailing Eastern Time) is the date and time that the Auction, if any, will be held via videoconference, or such later date, time, and location, as selected by the Debtors.

(e)    <u>Winning Bidder Adequate Assurance Objection Deadline</u>.  May 24, 2023, at 4:00 p.m. (prevailing Eastern Time) is the deadline (the "<u>Winning Bidder Adequate Assurance Objection Deadline</u>") by which, in the event that the Stalking Horse Purchaser is not the Winning Bidder, Counterparties to Executory Contracts must file with the Court and serve on the Objection Notice Parties an objection with respect to the provision of adequate assurance of future performance by a Winning Bidder or Back-Up Bidder that is not the Stalking Horse Purchaser.

(f)    <u>Sale Hearing</u>.  The hearing approving the Sale to the Winning Bidder shall take place before the Court on May 26, 2023, at 10:00 a.m. (prevailing Eastern Time).

*[Remainder of Page Intentionally Left Blank]*

Dated: April 24, 2023
      Wilmington, Delaware

**CHIPMAN BROWN CICERO & COLE, LLP**

*/s/ Mark L. Desgrosseilliers*
William E. Chipman, Jr. (No. 3818)
Robert A. Weber (No. 4013)
Mark L. Desgrosseilliers (No. 4083)
Mark D. Olivere (No. 4291)
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Telephone:    (302) 295-0191
Email:        chipman@chipmanbrown.com
             weber@chipmanbrown.com
             desgross@chipmanbrown.com
             olivere@chipmanbrown.com

*Proposed Conflicts Counsel to Debtors and Debtors in Possession*

# **EXHIBIT I**

BIDDING PROCEDURES ORDER

# **EXHIBIT II**

BIDDING PROCEDURES

**EXHIBIT 4**

CURE NOTICE

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| STRUCTURLAM MASS TIMBER U.S., INC., *et al.*,[1] | ) Case No. 23-10497 (CTG) |
| | ) |
| | ) (Jointly Administered) |
| Debtors. | ) |
| | ) |

**NOTICE OF (I) POTENTIAL ASSUMPTION AND
ASSIGNMENT OF CONTRACTS AND LEASES AND (II) CURE
AMOUNTS AND ADEQUATE ASSURANCE IN CONNECTION THEREWITH**

**You are receiving this notice because you may be a counterparty to a contract or lease with the above-captioned debtors and debtors in possession.  Please read this notice carefully as your rights may be affected by the potential transactions described herein.**

a.    On May 11, 2021, the above-captioned debtors and debtors in possession (collectively, the "Debtors"), filed the *Debtors' Motion Seeking Entry of an Order (A)(I) Approving Bidding Procedures, (II) Approving Stalking Horse Protections and Debtors' Entry into Stalking Horse Purchase Agreement (III) Scheduling the Bid Deadline and the Auction, (IV) Scheduling Hearings and Objection Deadlines with Respect to the Sale, (V) Approving the Form and Manner of the Notice Thereof, (VI) Approving Contract Assumption and Assignment Procedures, and (VII) Granting Related Relief and (B)(I) Approving the Sale of the Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances, (II) Approving Assumption and Assignment of Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* [Docket No. [ ● ]] (the "Motion").[2]

b.    On April [ ● ], 2023, the United States Bankruptcy Court for the District of Delaware (the "Court") entered that certain order approving, among other things, the implementation of the Bidding Procedures in connection with the sale of all, substantially all, or any combination of the Debtors' assets [Docket No. [ ● ]] (the "Bidding Procedures Order") a copy of which is attached hereto as **Exhibit I**, approving certain relief requested in the Motion, including (a) the Bidding Procedures, a copy of which is attached hereto as **Exhibit II**, and (b) procedures for the assumption and assignment of executory contracts and unexpired leases in

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number or Canadian business number, as applicable, include: Structurlam Mass Timber U.S., Inc. (6287); Natural Outcomes, LLC (n/a); Structurlam Mass Timber Corporation (5050); and SLP Holdings Ltd. (3114).  The location of the Debtors' headquarters is:  2176 Government Street, Penticton, British Columbia, Canada V2A 8B5.  The address of the registered agent for Structurlam Mass Timber U.S., Inc. is: 8 The Green, Suite A, Dover, Delaware 19901.

[2]    All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion or the Bidding Procedures Order (defined herein), as applicable.

connection with the Sale (collectively, the "Executory Contracts"). Pursuant to the Bidding Procedures Order, a final hearing to approve the Sale (the "Sale Hearing") is scheduled to take place on May 26, 2023, at 10:00 a.m. (prevailing Eastern Time) before the Honorable [ ● ], United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Delaware, 824 N. Market Street, 6th Floor, Courtroom No. [ ● ], Wilmington, Delaware 19801.

c.    The Debtors hereby provide notice (the "Cure Notice") that they may assume and assign the Executory Contracts listed on **Exhibit III**, attached hereto, to the Stalking Horse Purchaser or, if the Stalking Horse Purchaser is not selected as the Winning Bidder for the Debtors' Assets in accordance with the Bidding Procedures, then the Winning Bidder. The Debtors' records reflect that, other than the cure amounts listed on the Cure Notice (the "Cure Amount"), there are no defaults under such Executory Contracts. The Cure Notice also sets forth any proposed assurance of future performance (the "Adequate Assurance") with respect to each Executory Contract.

d.    To the extent that a Counterparty to an Executory Contract objects to a proposed assumption and assignment of such Executory Contract or the proposed Cure Amount or Adequate Assurance for such Executory Contract, such Counterparty must file and serve and objection (a "Contract Objection"). Any Contract Objection must (i) be in writing; (ii) comply with the Bankruptcy Rules and the Local Rules; (iii) be filed with the Clerk of the Court, 824 North Market Street, 3rd Floor, Wilmington, Delaware 19801 **on or before 4:00 p.m. (prevailing Eastern Time) on May 18, 2023** (the "Contract Objection Deadline"), and proof of service of such Contract Objection upon the Objection Notice Parties shall be filed with the Court as and when required by the Local Rules; (iv) be served upon the Objection Notice Parties; and (v) state with specificity the grounds for such objection, including, without limitation, the fully liquidated Cure Amount and the legal and factual bases for any unliquidated Cure Amount that the Counterparty believes is required to be paid under section 365(b)(1)(A) & (B) of the Bankruptcy Code for the Assigned Contract, along with the specific nature and dates of any alleged defaults, the pecuniary losses, if any, resulting therefrom, and the conditions giving rise thereto and any objection to the provision of Adequate Assurance by the Stalking Horse Purchaser.

e.    In the event that the Stalking Horse Purchaser is not the Winning Bidder, the deadline to object to the provision of Adequate Assurance by a Winning Bidder or Back-Up Bidder that is not the Stalking Horse Purchaser (a "Winning Bidder Adequate Assurance Objection") shall be **12:00 p.m. (prevailing Eastern Time) on May 24, 2023**, and any Winning Bidder Adequate Assurance Objections must be filed and served in the same manner as Contract Objections.

f.    If any Contract Objection or Winning Bidder Adequate Assurance Objection is timely filed, and the parties are unable to consensually resolve the dispute, such objection will be resolved at the Sale Hearing.

g.    If any Contract Objection or Winning Bidder Adequate Assurance Objection is not satisfactorily resolved, the Winning Bidder may determine that such Executory Contract should be rejected and not assigned, in which case the Winning Bidder will not be responsible for any Cure Amount or Adequate Protection with respect to such contract.

h.      If you do not timely file and serve an objection as stated above, the Court may grant the relief requested in the Motion with no further notice or hearing and any party to an Executory Contracts that is so assumed will deemed to have consented to the assumption and assignment of the assigned contract and the Cure Amount, if any, and will be forever barred from objecting to the assumption and assignment of such assigned contract and rights thereunder, including the Cure Amount, if any, and from asserting any other claims related to such assigned contract against the Debtors or the Winning Bidder.

i.      Notwithstanding the foregoing, the inclusion of Executory Contracts on **Exhibit III** hereto, does not (a) obligate the Debtors to assume any Executory Contract listed thereon or obligate the Winning Bidder to take assignment of such Executory Contract; or (b) constitute any admission or agreement of the Debtors that such Executory Contract is an executory contract or unexpired lease.  Only those Executory Contracts that are included on a schedule of assumed and assigned contracts attached to the definitive sale agreement with the Winning Bidder (including amendments or modifications to such schedules in accordance with such agreement) will be assumed and assigned to the Winning Bidder.

*[Remainder of Page Intentionally Left Blank]*

Dated: April 24, 2023
      Wilmington, Delaware

**CHIPMAN BROWN CICERO & COLE, LLP**


_/s/ Mark L. Desgrosseilliers_
William E. Chipman, Jr. (No. 3818)
Robert A. Weber (No. 4013)
Mark L. Desgrosseilliers (No. 4083)
Mark D. Olivere (No. 4291)
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Telephone:    (302) 295-0191
Email:       chipman@chipmanbrown.com
            weber@chipmanbrown.com
            desgross@chipmanbrown.com
            olivere@chipmanbrown.com

_Proposed Conflicts Counsel to Debtors and Debtors
in Possession_

## **EXHIBIT I**

BIDDING PROCEDURES ORDER

**EXHIBIT II**

BIDDING PROCEDURES

# **EXHIBIT III**

EXECUTORY CONTRACTS

# EXHIBIT B

## Sale Order

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| STRUCTURLAM MASS TIMBER U.S., INC., *et al.*,[1] | ) Case No. 23-10497 (CTG) |
| | ) |
| | ) (Jointly Administered) |
| Debtors. | ) |
| | ) **Re:  Docket Nos [ ● ]** |

**ORDER (I) AUTHORIZING (A) SALE OF ASSETS FREE AND CLEAR OF ALL
LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS AND (B) THE DEBTORS'
ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS
AND UNEXPIRED LEASES; AND (II) GRANTING RELATED RELIEF**

Upon the *Debtors' Motion Seeking Entry of an Order (A)(I) Approving Bidding Procedures, (II) Approving Stalking Horse Protections and Debtors' Entry into Stalking Horse Purchase Agreement, (III) Scheduling the Bid Deadlines and the Auction, (IV) Scheduling Hearings and Objection Deadlines with Respect to the Sale, (V) Approving the Form and Manner of Notice Thereof, (VI) Approving Contract Assumption and Assignment Procedures, and (VII) Granting Related Relief and (B)(I) Approving the Sale of the Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances, (II) Approving Assumption and Assignment of Executory Contracts and Unexpired Leases and (III) Granting Related Relief* [Docket No. ● ] (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively,

---

[1]   The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number or Canadian business number, as applicable, include: Structurlam Mass Timber U.S., Inc. (6287); Natural Outcomes, LLC (n/a); Structurlam Mass Timber Corporation (5050); and SLP Holdings Ltd. (3114);  The location of the Debtors' headquarters is:  2176 Government Street, Penticton, British Columbia, Canada V2A 8B5.  The address of the registered agent for Structurlam Mass Timber U.S., Inc. is: 8 The Green, Suite A, Dover, Delaware 19901.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or the Purchase Agreement (as defined herein), as applicable; *provided* that in the event of any conflict with respect to the meaning of a capitalized term between the Motion and the Purchase Agreement, the meaning ascribed to such term in the Purchase Agreement shall control.

the "Debtors")[3] for entry of an order (this "Order"), among other things, (a) authorizing the sale (the "Sale") of the Transferred Assets (as defined in the Purchase Agreement (as defined below)) to Mercer International Inc. (or any permitted assignee pursuant to the terms of the Purchase Agreement, the "Buyer"), pursuant to the Asset Purchase Agreement dated April [ ● ], attached hereto as **Exhibit 1** and incorporated herein by reference as if set forth herein (together with all other documents contemplated thereby, as such agreement has been or may be amended, restated or supplemented, the "Purchase Agreement"), free and clear of all Liens, Claims, and Interests (each as defined below) with the exceptions of the Assumed Liabilities and Permitted Encumbrances (each as defined in the Purchase Agreement); (b) authorizing the assumption and assignment of certain executory contracts and unexpired leases to the Buyer; (c) authorizing the Debtors to pay the net proceeds from the Sale, up to the amount of the DIP Obligations and the Prepetition Obligations (each as defined below), to Bank of Montreal as lender under (i) the Debtors' debtor-in-possession financing facility (in such capacity, the "DIP Lender," such facility, the "DIP Facility," and the obligations under such facility, the "DIP Obligations") and (ii) the Debtors' prepetition secured lending facility (in such capacity, the "Prepetition Lender," such facility, the "Prepetition Facility," and the obligations under such facility, the "Prepetition Obligations"); and (d) granting related relief, all as more fully set forth in the Motion; and the Court having entered the *Order (I) Approving Bidding Procedures, (II) Approving Stalking Horse Protections and Debtors' Entry into Stalking Horse Purchase Agreement, (III) Scheduling the Bid Deadlines and the Auction, (IV) Scheduling Hearings and Objection Deadlines with Respect to the Sale, (V) Approving the Form and Manner of Notice Thereof, (VI) Approving Contract Assumption*

---

[3]    All references to the "Debtors" shall include the debtors and their estates.

*and Assignment Procedures, and (VII) Granting Related Relief* [Docket No. ●] (the "Bidding Procedures Order"); and the auction (the "Auction") for the Transferred Assets, if any, having been held on [ ● ]; and the Buyer's bid having been declared the Winning Bid; and the Debtors having filed the *Notice of Winning Bidder* [Docket No. [ ● ]] identifying the Buyer as the Winning Bidder for the Transferred Assets in accordance with the Bidding Procedures Order; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors and their estates, their creditors, and all other parties in interest; and the Court having jurisdiction to consider the matters raised in the Motion pursuant to 28 U.S.C. § 1334; and the Court having authority to hear the matters raised in the Motion pursuant to 28 U.S.C. § 157; and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and consideration of the Motions and the requested relief being a core proceeding that the Court can determine pursuant to 28 U.S.C. § 157(b)(2)(A), (M), (N) and (O); and due and proper notice of the Motion and the hearing to consider the Motion having been given, and it appearing that no other or further notice need be provided; and the Court having reviewed and considered the Motion and the *Declaration of* [*Matthew Karmel*] *in Support of the Debtors' Sale Motion* [Docket No. [ ● ]] (the "[Karmel] Declaration"); and the Court having held a hearing to consider the Motion on May [ ● ], 2023 (the "Sale Hearing") at which time all interested parties were offered an opportunity to be heard regarding the Motion, the Purchase Agreement and the transactions contemplated by the Purchase Agreement (the "Transactions"); and the Court having found that the relief requested in the Motion is in the best interests of the Debtors, their creditors, their estates, and all other parties in interest; and the Court having reviewed and considered the objections, if any, to the Motion (collectively, the "Objections"); and based upon and as demonstrated by the [Karmel] Declaration, the evidence proffered or adduced at the Sale Hearing, and the arguments of counsel made on the record at the

Sale Hearing; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, **IT IS HEREBY FOUND AND DETERMINED THAT**:

**Findings of Fact and Conclusions of Law**

A.    The findings of fact and conclusions of law herein constitute the Court's findings of fact and conclusions of law for the purposes of Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any findings of facts are conclusions of law, they are adopted as such.  To the extent any conclusions of law are findings of fact, they are adopted as such.

**Jurisdiction and Venue**

B.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Without limiting the generality of the foregoing, this Court has exclusive *in rem* jurisdiction over the Transferred Assets pursuant to 28 U.S.C. § 1334(e), as such Transferred Assets are property of the Debtors' chapter 11 estates, and, as a result of such jurisdiction, this Court has all necessary power and authority to grant the relief contained herein.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N).  Venue in this district is proper under 28 U.S.C. §§ 1408 and 1409.

**Statutory Predicates**

C.    The statutory and other legal bases for the relief requested in the Motion are sections 105(a), 363, and 365 of the Bankruptcy Code, as supplemented by Bankruptcy Rules 2002, 6004, 6006, 9007, 9008 and 9014.   The consummation of the Transactions contemplated by the Purchase Agreement and this Order is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and the Debtors and the Buyer and their affiliates have complied with all of the applicable requirements of such sections and rules in respect of the Transactions.

4

## **Notice**

D.      As evidenced by the affidavits and/or certificates of service filed with the Court, proper, timely, adequate, and sufficient notice of the Motion, the Bidding Procedures, the Auction, the Sale (and the Transactions contemplated in connection therewith), the assumption and assignment to the Buyer of the executory contracts and unexpired leases specified as of the date hereof pursuant to the Purchase Agreement or as may be subsequently designated to be an "Additional Assumed Contract" (as defined in the Purchase Agreement) in accordance with Section 1.6(b) of the Purchase Agreement (collectively, the "Assigned Contracts"), the Cure Costs (as defined below), the Sale Hearing, and all deadlines related thereto, has been provided, as relevant, in accordance with sections 102(1), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007, 9008, and 9014, and in compliance with the Bidding Procedures Order, to all interested persons and entities.

E.      The Debtors served notices substantially in the form included in the Notice of (I) Potential Assumption and Assignment of Contracts and (II) Cure Amounts and Adequate Assurance in Connection Therewith [Docket No. [ ● ]] (each a "Notice of Assumption and Assignment"), in accordance with the Bidding Procedures Order, identifying, among other things, the Cure Costs (as defined below).  The Debtors served (or, with respect to any Additional Assumed Contracts (as defined in the Purchase Agreement), will serve) the Notice of Assumption and Assignment on each of the non-Debtor counterparties to the Assigned Contracts.  The service of the Notice of Assumption and Assignment was sufficient under the circumstances and in full compliance with the Bidding Procedures Order, and no further notice need be provided in respect of the Debtors' assumption and assignment to the Buyer of the Assigned Contracts or the Cure Costs.  All non-Debtor counterparties to the Assigned Contracts have had an adequate opportunity to object to the assumption and assignment of the Assigned Contracts and the Cure Costs.

F.      The notice described in the foregoing paragraphs is good, sufficient, and appropriate under the circumstances, and no other or further notice of the Motion, the Bidding Procedures, the Auction, the Sale (and the Transactions contemplated in connection therewith), the assumption and assignment to the Buyer of the Assigned Contracts, the Cure Costs, the Sale Hearing, and all deadlines related thereto is or shall be required.

### Marketing and Sale Process

G.      The Sale of the Transferred Assets to the Buyer pursuant to the Bidding Procedures is duly authorized pursuant to sections 363(b)(1) and 363(f) of the Bankruptcy Code and Bankruptcy Rule 6004(f).  As demonstrated by (i) evidence proffered or adduced at the Sale Hearing and (ii) the representations of counsel made on the record at the Sale Hearing, the Debtors and their professionals, agents, and other representatives have marketed the Transferred Assets and conducted all aspects of the sale process, including the solicitation of bids for an Auction, in good faith and in compliance with the Bidding Procedures and the Bidding Procedures Order.  The marketing process undertaken by the Debtors and their professionals, agents, and other representatives with respect to the Transferred Assets has been adequate and appropriate and reasonably calculated to maximize value for the benefit of all stakeholders.  The Bidding Procedures and the Auction were duly noticed, were substantively and procedurally fair to all parties, including all Potential Bidders and including with respect to all provisions governing credit bidding, and were conducted in a diligent, non-collusive, fair, and good-faith manner.

H.      [The auction contemplated in the Bidding Procedures Order was conducted in good faith, without collusion, and in accordance with the Bidding Procedures Order on [ ● ].  At the conclusion of the Auction, the Debtors (in consultation with Bank of Montreal) selected the Buyer as the Winning Bidder for the Transferred Assets in accordance with the Bidding Procedures Order.]

I.      The Debtors' determinations that the offer reflected in the Purchase Agreement constitutes the highest or otherwise best offer for the Transferred Assets and that the Sale Transaction and the Purchase Agreement maximize value for the benefit of the Debtors' estates are valid and sound exercises of the Debtors' business judgment (exercised in consultation with Bank of Montreal).

J.      The Winning Bid (as defined in the Bidding Procedures Order and which is memorialized in the Purchase Agreement) is in accordance and compliance with the Bidding Procedures Order and constitutes the highest or otherwise best offer for the Transferred Assets.

K.      The Debtors have demonstrated good, sufficient, and sound business purposes and justifications for consummation of the Sale and Transactions contemplated by the Purchase Agreement in accordance with the requirements of section 363(b) of the Bankruptcy Code.

L.      The Purchase Agreement provides fair and reasonable terms for the purchase and sale of the Transferred Assets, and reasonable opportunity has been given to any interested party to make a higher or otherwise better offer for the Transferred Assets.

M.      The Buyer has complied in all respects with the Bidding Procedures Order and all other applicable orders of the Court in negotiating and entering into the Purchase Agreement.

N.      [After completion of the Auction and the Debtors' selection of the Buyer as the Winning Bidder, the Debtors and the Buyer negotiated and finalized in good faith and at arm's length the Purchase Agreement and all related documents necessary to consummate the Sale Transaction.]

O.      Approval of the Purchase Agreement pursuant to sections 105(a) and 363 of the Bankruptcy Code is necessary to maximize the value of the Debtors' assets.

P.      Neither the Purchase Agreement nor the Transactions contemplated thereunder constitute a *sub rosa* chapter 11 plan.  The Purchase Agreement does not specify the terms of, or any distributions under, any subsequent chapter 11 plan by the Debtors (other than provisions that are consistent with the sale of the Transferred Assets under the Purchase Agreement and the relief granted hereunder).

Q.      Approval of the Motion and the Purchase Agreement, and the prompt consummation of the Transactions contemplated thereby, will maximize the value of the Debtors' estates and are in the best interests of the Debtors, their chapter 11 estates, their creditors, and other parties in interest.

R.      The Debtors conducted a robust, sufficient marketing process, and (i) the Purchase Agreement and total consideration to be provided by the Buyer thereunder constitutes the highest or otherwise best offer received by the Debtors for the Transferred Assets, (ii) the bidding procedures utilized were designed to yield the highest or otherwise best bids for the Debtors' assets; (iii) the Purchase Agreement and the completion of the Transactions will present the best opportunity to realize the value of the Transferred Assets and avoid further decline and devaluation of the Transferred Assets; (iv) there is risk of deterioration of the value of the Transferred Assets if the Sale is not consummated promptly; and (v) the Purchase Agreement and the consummation of the Transactions will provide greater value to the Debtors' estates than would be provided by any other presently available alternative.

S.      The total consideration to be provided by the Buyer under the Purchase Agreement constitutes (i) fair value, (ii) fair, full, and adequate consideration, (iii) reasonably equivalent value, and (iv) reasonable market value for the Transferred Assets for purposes of the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, and any

other applicable laws of the United States, any state, territory, or possession thereof or the District of Columbia.

T.      The terms of the Purchase Agreement and the Transactions contemplated therein are fair and reasonable under the circumstances of the Debtors' businesses and these Chapter 11 Cases.

## Corporate and Organizational Authority

U.      The Transferred Assets constitute property of the Debtors' estates and title thereto is vested in the Debtors' estates within the meaning of section 541 of the Bankruptcy Code.  The Debtors (i) have full corporate and other organizational power and authority to execute the Purchase Agreement and all other documents contemplated thereby, and the Sale to the Buyer has been duly and validly authorized by all necessary corporate and other organizational action, (ii) have all of the corporate and other organizational power and authority necessary to consummate the Sale and the Transactions contemplated by the Purchase Agreement, (iii) have taken all corporate and other organizational action necessary to authorize and approve the Purchase Agreement and the consummation by the Debtors of the Sale and the Transactions contemplated thereby, and (iv) require no consents or approvals, other than those expressly provided for in the Purchase Agreement, to consummate the Transactions.

## Highest and Best Offer; Business Judgment

V.      The Debtors have demonstrated a sufficient basis to enter into the Purchase Agreement, sell the Transferred Assets on the terms outlined therein, and assume and assign the Assigned Contracts to the Buyer under sections 363 and 365 of the Bankruptcy Code.  All such actions are appropriate exercises of the Debtors' business judgment and in the best interests of the Debtors, their creditors, their estates and other parties in interest.  Approval of the Sale pursuant

to the Purchase Agreement at this time is in the best interests of the Debtors, their creditors, their estates, and all other parties in interest.

W.     The offer of the Buyer, upon the terms and conditions set forth in the Purchase Agreement, including the total consideration to be realized by the Debtors thereunder, (i) is the highest and best offer received by the Debtors after extensive marketing, including through the Bidding Procedures, (ii) is in the best interests of the Debtors, their creditors, their estates and other parties in interest and (iii) constitutes full and adequate consideration, is fair and reasonable and constitutes reasonably equivalent value, fair consideration, and fair value for the Transferred Assets under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, and under the laws of the United States, any state, territory, possession, or the District of Columbia.  Taking into consideration all relevant factors and circumstances, no other entity has offered to purchase the Transferred Assets for greater economic value to the Debtors or their estates.

X.     There has been no showing that any of the Debtors or Buyer (i) has entered into the Purchase Agreement or proposes to consummate the Transactions for the purposes of hindering, delaying, or defrauding the Debtors' present or future creditors or (ii) is entering into the Purchase Agreement or proposing to consummate the Transactions fraudulently, for the purpose of statutory or common law fraudulent conveyance and fraudulent transfer claims, whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof or the District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing.

Y.     The sale of the Transferred Assets outside a chapter 11 plan pursuant to the Purchase Agreement neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of a chapter 11 plan of the Debtors.

**Opportunity to Object**

Z.      A reasonable opportunity to object or be heard with respect to the Motion, the Bidding Procedures, the Sale (and the Transactions contemplated in connection therewith), the assumption and assignment to the Buyer of the Assigned Contracts, the Cure Costs, the Sale Hearing, and all deadlines related thereto has been afforded to all interested persons and entities.

**Good Faith Purchaser; Arm's Length Sale**

AA.      The Purchase Agreement was negotiated, proposed, and entered into by the Debtors and the Buyer without collusion, in good faith, and from arm's length bargaining positions. Neither the Debtors, the Buyer, nor any parent or affiliate of the Buyer has engaged in any conduct that would cause or permit the Purchase Agreement or the Sale to be avoided under section 363(n) of the Bankruptcy Code.

BB.      The Buyer is a good-faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby.

CC.      Neither Buyer nor any of its affiliates, members, officers, directors, shareholders, or any of their respective successors or assigns is an "insider" or "affiliate" of any of the Debtors, as those terms are defined in sections 101(31) and 101(2) of the Bankruptcy Code, and the Buyer's professionals, agents, and other representatives have complied in all respects with the Bidding Procedures Order and all other applicable orders of this Court in negotiating and entering into the Purchase Agreement.  The Purchase Agreement complies with the Bidding Procedures Order and all other applicable orders of this Court.

**Free and Clear Transfer Required by Buyer**

DD.      The Buyer would not have entered into the Purchase Agreement and would not consummate the Sale, if each of the Sale and the assumption and assignment of the Assigned Contracts to the Buyer were not free and clear of all Liens, Claims, and Interests of any kind or

11

nature whatsoever (with the exceptions of: (i) the Assumed Liabilities; (ii) any Permitted Encumbrances; or (iii) as more fully set forth in Paragraphs 9–11 of this Order), or if the Buyer would, or in the future could, be liable for any of the Excluded Liabilities except to the extent expressly provided in this Order.  For the avoidance of doubt, subject to Paragraphs 9–11 of this Order, neither the Buyer nor any of its affiliates shall have any responsibility whatsoever with respect to the Excluded Liabilities, which shall remain the responsibility of the Debtors before, on, and after the Closing.

EE.    As of the Closing, pursuant and subject to the terms of the Purchase Agreement and this Order, the transfer of the Transferred Assets and of the Assumed Liabilities and the Sale will effect a legal, valid, enforceable, and effective transfer of the Transferred Assets and will vest the Buyer with all of the Debtors' rights, title, and interests in the Transferred Assets free and clear of all Liens, Claims, and Interests of any kind or nature whatsoever (with the exceptions of the Assumed Liabilities and any Permitted Encumbrances).

### Satisfaction of Section 363(f)

FF.    The Debtors may sell the Transferred Assets free and clear of any and all Liens, Claims, and Interests of any kind or nature whatsoever (with the exception of any Permitted Encumbrances), including any rights or claims based on any putative successor or transferee liability, as set forth herein, because, in each case, one or more of the standards set forth in section 363(f)(1)–(5) of the Bankruptcy Code has been satisfied.  All parties in interest, including, without limitation, any holders of Liens, Claims, and/or Interests, and any non-Debtor counterparties to the Assigned Contracts, that did not object, or who withdrew their objection, to the Sale, the Motion, the assumption and assignment of the applicable Assigned Contract, or the associated Cure Cost are deemed to have consented to the relief granted herein pursuant to section 363(f)(2) of the Bankruptcy Code.

## Assigned Contracts

GG.    The Debtors have demonstrated (i) that it is an exercise of their sound business judgment to assume and assign the Assigned Contracts to the Buyer in each case in connection with the consummation of the Sale and (ii) that the assumption and assignment of the Assigned Contracts to the Buyer is in the best interests of the Debtors, their estates, and creditors, and other parties in interest.  The Assigned Contracts being assigned to the Buyer are an integral part of the Transferred Assets being purchased by the Buyer and, accordingly, such assumption, assignment, and cure of any defaults under the Assigned Contracts are reasonable and enhance the value of the Debtors' estates.  Any non-Debtor counterparty to an Assigned Contract that has not actually filed with the Court an objection to such assumption and assignment in accordance with the terms of the Motion is deemed to have consented to such assumption and assignment.

## Cure Costs and Adequate Assurance

HH.    The Debtors and the Buyer, as applicable, have, including by way of entering into the Purchase Agreement, and agreeing to the provisions therein relating to the Assigned Contracts, (i) cured, or provided adequate assurance of cure, of any default existing prior to the date hereof under any of the Assigned Contracts within the meaning of section 365(b)(1)(A) of the Bankruptcy Code and (ii) provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof under any of the Assigned Contracts within the meaning of section 365(b)(1)(B) of the Bankruptcy Code and the Buyer has, based upon the record of these proceedings, including the evidence adduced at the Sale Hearing, provided adequate assurance of its future performance of and under the Assigned Contracts pursuant to sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code.  The Buyer's agreement under the Purchase Agreement to perform the obligations under the Assigned Contracts after the Closing shall constitute adequate assurance of future performance under the

Assigned Contracts being assigned to the Buyer within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code. The Cure Costs are hereby found to be the sole amounts necessary to cure any and all defaults under the Assigned Contracts under section 365(b) of the Bankruptcy Code.

## Time Is of the Essence; Waiver of Stay

II.     Time is of the essence in consummating the Sale. In order to maximize the value of the Transferred Assets, it is essential that the sale and assignment of the Transferred Assets occur within the time constraints set forth in the Purchase Agreement. Accordingly, there is cause to waive the stays contemplated by Bankruptcy Rules 6004 and 6006.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

## Motion is Granted

1.     The relief requested by the Motion is granted as set forth herein.

## Objections Overruled

2.     All objections to the entry of this Order or to the relief granted herein, whether filed, stated on the record before this Court or otherwise, which have not been withdrawn, waived, or settled, and all reservations of rights included therein, are denied and overruled on the merits.

3.     Notice of the Motion, the Bidding Procedures, the Sale (and the Transactions contemplated in connection therewith), the assumption and assignment to the Buyer of the Assigned Contracts, the Cure Costs, the Sale Hearing, and all deadlines related thereto was fair and equitable under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006.

## Approval of the Purchase Agreement

4.     The Purchase Agreement, including all of the terms and conditions thereof, is hereby approved. Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Debtors are

authorized and directed to take any and all actions necessary to fulfill their obligations under, and comply with the terms of, the Purchase Agreement and to consummate the Sale pursuant to and in accordance with the terms and conditions of the Purchase Agreement and this Order, without further leave of the Court.  The Debtors are further authorized and directed to pay, without further order of this Court, whether before, at, or after the Closing, any expenses or costs, if any, that are required to be paid to consummate the Transactions contemplated by the Purchase Agreement, as set forth in the Purchase Agreement and this Order, or otherwise perform their obligations under the Purchase Agreement and this Order.

5.      The Debtors are authorized, in accordance with the Purchase Agreement, to execute and deliver, and empowered to perform under, consummate, and implement, the Purchase Agreement, together with all additional instruments, documents, and other agreements that may be reasonably necessary or desirable to implement the Purchase Agreement, and to take all further actions as may be reasonably requested by the Buyer for the purpose of assigning, transferring, granting, conveying, and conferring to the Buyer or reducing to possession, the Transferred Assets, or as may be reasonably necessary or appropriate to the performance of the obligations as contemplated by the Purchase Agreement.

6.      Buyer and the Debtors have no obligation to proceed with the Closing unless and until all conditions precedent to their respective obligations to do so, as set forth in the Purchase Agreement, have been met, satisfied, or waived in accordance with the terms of the Purchase Agreement.

### **Binding Effect of Order**

7.      This Order and the Purchase Agreement shall be binding upon all creditors of, and equity holders in, the Debtors and any and all other parties in interest, including, without limitation, any and all holders of Liens, Claims, and Interests (including holders of any rights or claims based

on any putative successor or transferee liability) of any kind or nature whatsoever, all non-Debtor parties to the Assigned Contracts, the Buyer, the Debtors and their affiliates and subsidiaries, and any trustee or successor trustee appointed in the Debtors' Chapter 11 Cases or upon a conversion to cases under chapter 7 under the Bankruptcy Code.

### Amendments to the Purchase Agreement

8.      The Purchase Agreement and any related agreements, documents, or other instruments may be modified, amended, supplemented, or restated by the parties thereto in a writing signed by such parties and in accordance with the terms thereof, without further order of this Court, provided that any such modification, amendment, supplement, or restatement does not have a material adverse effect on the Debtors' estates or any other person or entity, including Bank of Montreal.  The Purchase Agreement and this Order and the Debtors' and Buyer's obligations therein and herein shall not be altered, amended, rejected, discharged, or otherwise affected by any chapter 11 plan proposed or confirmed in these bankruptcy cases or any other relief sought from or granted by the Court without the prior written consent of the Buyer.

### Transfer of the Transferred Assets Free and Clear

9.      Subject to Paragraphs 9–11 hereof, the Buyer shall assume and be liable for only those liabilities expressly assumed pursuant to the Purchase Agreement.  Except as expressly permitted or otherwise specifically provided for in the Purchase Agreement or this Order, pursuant to sections 105(a), 363(b), 363(f), and 365(b) of the Bankruptcy Code, upon the Closing, the Transferred Assets shall be transferred to the Buyer free and clear of any and all Liens, Claims, and Interests of any kind or nature whatsoever, with the exceptions of the Assumed Liabilities and any Permitted Encumbrances, with such Liens, Claims and Interests to attach to the proceeds of such transfer to the same extent and with the same priority as such Liens, Claims and Interests had

in the Transferred Assets.  For purposes of this Order, "Liens," "Claims," and "Interests" shall mean, respectively:

     a.    any and all Encumbrances, charges, liens (statutory or otherwise), claims, mortgages, leases, subleases, hypothecations, deeds of trust, pledges, security interests, options, hypothecations, rights of use or possession, rights of first offer or first refusal (or any other type of preferential arrangement), rights of consent, rights of offset, setoff and recoupment, successor liability, easements, servitudes, restrictive covenants, interests or rights under any operating agreement, encroachments, encumbrances, restrictions on transferability of any type, any dedication under any gathering, transportation, treating, purchasing or similar agreement that is not assumed by or assigned to the Buyer, any rights that purport to give any party a right or option to effect any forfeiture, modification, right of first offer or first refusal, or consents, or termination of the Debtors' or the Buyer's interest in the Transferred Assets, any similar rights, and third-party interests or any other restrictions or limitations of any kind with respect to the Transferred Assets (collectively, "Liens");

     b.    any and all claims as defined in section 101(5) of the Bankruptcy Code and jurisprudence interpreting the Bankruptcy Code, including, without limitation, (i) any and all claims or causes of action based on or arising under any labor, employment or pension laws, labor or employment agreements, including any employee claims related to worker's compensation, occupational disease, or unemployment or temporary disability, including, without limitation, claims that might otherwise arise under or pursuant to (a) ERISA (as defined below), (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age Discrimination and Employment Act of 1967 and Age Discrimination in Employment Act, as amended, (g) the Americans with Disabilities Act of 1990, (h) the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, including, without limitation, the requirements of Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the Internal Revenue Code and of any similar state law (collectively, "COBRA"), (i) state discrimination laws, (j) state unemployment compensation laws or any other similar state laws, (k) any other state or federal benefits or claims relating to any employment with the Debtors or any of their predecessors, or (l) the WARN Act (29 U.S.C. §§2101 et seq.), (ii) any rights under any pension or multiemployer plan (as such term is defined in Section 3(37) or Section 4001(a)(3) of the Employee Retirement Income Security Act of 1974 (as amended, "ERISA"), health or welfare, compensation or other employee benefit plans, agreements, practices, and programs, including, without limitation, any pension plans of the Debtors or any multiemployer plan to which the Debtors have at any time contributed to or had any liability or potential liability, (iii) any and all claims or causes of action based upon

17

or relating to any putative successor or transferee liability, (iv) any rights related to intercompany loans and receivables between the Debtors and any non-Debtor subsidiary or affiliate, (v) any Excluded Liabilities, (vi) any and all claims or causes of action based upon or relating to any unexpired and executory contract or unexpired lease to which a Debtor is a party that is not an Assigned Contract that will be assumed and assigned pursuant to this Order and the Purchase Agreement, (vii) any and all claims or causes of action based upon or relating to any bulk sales or similar law, (viii) any and all claims or causes of action based upon or relating to any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended, and any taxes arising under or out of, in connection with, or in any way relating to the operation of the Transferred Assets prior to the Closing, including, without limitation, any ad valorem taxes assessed by any applicable taxing authority, and (ix) any and all other claims, causes of action, proceedings, warranties, guaranties, rights of recovery, setoff, recoupment, rights, remedies, obligations, liabilities, counterclaims, cross-claims, third party claims, demands, restrictions, responsibilities, or contribution, reimbursement, subrogation, or indemnification claims or liabilities based on or relating to any act or omission of any kind or nature whatsoever asserted against any of the Debtors or any of their respective affiliates, subsidiaries, directors, officers, agents, successors or assigns in connection with or relating to the Debtors, their operations, their business, their liabilities, the Debtors' marketing and bidding process with respect to the Transferred Assets, the Assigned Contracts, or the Transactions contemplated by the Purchase Agreement (collectively, "Claims"); and

   c.    any and all equity or other interests of any kind or nature whatsoever in or with respect to (x) any of the Debtors or their respective affiliates, subsidiaries, successors or assigns, (y) the Transferred Assets, or (z) the Assigned Contracts (collectively, "Interests");

whether in law or in equity, known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, direct or indirect, and whether arising by agreement, understanding, law, equity or otherwise, and whether occurring or arising before, on or after the Petition Date, or occurring or arising prior to the Closing. On the Closing, the Buyer shall take title to and possession of the Transferred Assets, subject only to the Permitted Encumbrances and Assumed Liabilities, and Paragraphs 9–11 of this Order.

## **Vesting of Transferred Assets in the Buyer**

10.     The transfer of the Transferred Assets to the Buyer pursuant to the Purchase Agreement shall constitute a legal, valid, effective and final transfer of the Transferred Assets on the Closing, and shall vest the Buyer with all of the Debtors' rights, title and interests in the Transferred Assets free and clear of all Liens, Claims, and Interests of any kind or nature whatsoever (with the exceptions of the Assumed Liabilities, any Permitted Encumbrances, and subject to Paragraphs 9–11 of this Order), with such Liens, Claims and Interests to attach to the proceeds of such transfer to the same extent and with the same priority as such Liens, Claims and Interests had in the Transferred Assets.

11.     In connection with the Closing and subject in all respects to any financing documents or organizational agreements, the Buyer is hereby authorized in connection with the consummation of the Sale to allocate the Transferred Assets, including the Assigned Contracts, to and among its direct and indirect parent and subsidiary corporations (collectively, "Designees"), in a manner as it in its sole discretion deems appropriate, and to assign, lease, sublease, license, sublicense, transfer, or otherwise dispose of any of the Transferred Assets, including the Assigned Contracts, to and among its Designees with all of the rights and protections accorded to the Buyer under this Order and the Purchase Agreement with respect thereto, and the Debtors shall cooperate with and take all actions reasonably requested by the Buyer to effectuate any of the foregoing.

## **Assumption and Assignment of Assigned Contracts**

12.     Pursuant to sections 105(a) and 365 of the Bankruptcy Code, and subject to and conditioned upon the Closing, the Debtors' assumption and assignment to the Buyer of the Assigned Contracts is hereby approved, and the requirements of section 365(b)(1) of the Bankruptcy Code with respect thereto are hereby deemed satisfied.

13.     The Debtors are hereby authorized, in accordance with the Purchase Agreement, and in accordance with sections 105(a) and 365 of the Bankruptcy Code, to (i) assume and assign to the Buyer the Assigned Contracts, effective upon and subject to the occurrence of the Closing, free and clear of all Liens, Claims, and Interests of any kind or nature whatsoever (with the exceptions of the Assumed Liabilities and Permitted Encumbrances), which Assigned Contracts, by operation of this Order, shall be deemed assumed and assigned to the Buyer effective as of the Closing, and (ii) execute and deliver to the Buyer such documents or other instruments as the Buyer may deem necessary to assign and transfer the Assigned Contracts to the Buyer.

14.     Subject to Paragraph 15 hereof:

a.     The Debtors are authorized to and shall assume all of the Assigned Contracts in accordance with section 365 of the Bankruptcy Code.

b.     The Debtors are authorized to and shall assign each Assigned Contract to the Buyer in accordance with sections 363 and 365 of the Bankruptcy Code, and any provisions in any Assigned Contract that prohibit or condition the assignment of such Assigned Contract to the Buyer on the consent of the counterparty thereto or allow the non-Debtor party to such Assigned Contract to terminate, recapture, impose any penalty, condition, renewal or extension, or modify any term or condition upon the assignment of such Assigned Contract, shall constitute unenforceable anti-assignment provisions which are expressly preempted under section 365 of the Bankruptcy Code.

c.     All requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption and assignment of the Assigned Contracts by the Debtors to the Buyer have been satisfied.

d.     Upon the Closing, the Assigned Contracts shall be transferred and assigned to, and remain in full force and effect for the benefit of, the Buyer in accordance with their respective terms, notwithstanding any provision in any such Assigned Contract (including those of the type described in sections 365(b)(2), 365(e)(1) and 365(f) of the Bankruptcy Code) that prohibits, restricts, limits, or conditions such assignment or transfer.

e.     After the Debtors' transfer and assignment of the Assigned Contracts to the Buyer, in accordance with sections 363 and 365 of the Bankruptcy Code, the Buyer shall be fully and irrevocably vested in all right, title, and interest of each Assigned Contract free and clear of Liens, Claims, and Interests

20

with the exceptions of the Assumed Liabilities and Permitted Encumbrances, with such Liens, Claims and Interests to attach to the proceeds of such transfer and assignment to the same extent and with the same priority as such Liens, Claims and Interests had in the Assigned Contracts.

f.   Any portion of any Assigned Contract which purports to permit a landlord thereunder to cancel the remaining term of such Assigned Contract if the lessee discontinues its use or operation of the leased premises is void and of no force and effect, and shall not be enforceable against the Buyer, or its assignees and sublessees; and the landlords under any such Assigned Contract shall not have the right to cancel or otherwise modify the Assigned Contract or increase the rent, assert any claim, or impose any penalty by reason of such discontinuation, the Debtors having suspended or ceased operations in, on, or about the leased premises prior to the transfer and assignment of such Assigned Contract to the Buyer, the assignment of such Assigned Contract to the Buyer, or the interruption of business activities at any of the leased premises.

g.   The failure of the Debtors to enforce, at any time prior to the Closing Date, one or more terms or conditions of any Assigned Contract shall not be a waiver of such terms or conditions, or of the Buyer's rights to enforce every term and condition of the Assigned Contracts.

h.   There shall be no rent accelerations, assignment fees, increases, or any other fees charged to the Buyer as a result of the assumption, assignment, and sale of the Assigned Contracts.

15.   All defaults and all other obligations of the Debtors under the Assigned Contracts occurring, arising or accruing prior to the assignment thereof to the Buyer at Closing (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) are deemed to have been cured or satisfied by the payment of the proposed amount necessary, if any, to cure all monetary defaults, if any, under each Assigned Contract in the amounts set forth in the Notice of Assumption and Assignment or any supplemental Notice of Assumption and Assignment (or any other cure cost reached by agreement after an objection to the proposed cure cost by a counterparty to an Assigned Contract), which was served in compliance with the Bidding Procedures Order (the "Cure Costs"), and which Cure Costs were satisfied, or shall be satisfied as soon as practicable, by the Buyer, as the case may be, as

provided in the Purchase Agreement.  For all Assigned Contracts for which a Notice of Assumption and Assignment was served, the Buyer is authorized and directed to pay the Cure Costs required to be paid by such parties in accordance with the Purchase Agreement upon the Closing.  For any Assigned Contract that is designated by Buyer to be an Assigned Contract after the date of this Order in accordance with the Purchase Agreement, the Debtors shall file a Notice of Assumption and Assignment on the counterparties thereto that identifies the Cure Costs, and, to the extent no objection is received to such notice within seven (7) days of the date of mailing, such Assigned Contract shall be deemed assumed and assigned to Buyer as an Assigned Contract with the Cure Costs set forth in such notice and subject to all relief set forth herein that applies to Assigned Contracts effective as of the Closing.  To the extent a timely objection to such notice is received and a is not resolved between the Debtors and such counterparty in accordance with the procedures governing the assumption and assignment of executory contracts and leases approved in the Bidding Procedures Order, such objection will be adjudicated by this Court.

16.     Pursuant to section 365(k) of the Bankruptcy Code, the Debtors and their estates shall be relieved from any liability for any breach for any Assigned Contract that occurs after the effectiveness of such assumption and assignment to the Buyer.

17.     Notwithstanding any provision in this Order, any and all agreements and obligations of Buyer shall be and are subject to Closing in accordance with the Purchase Agreement.

## No Successorship or Transferee Liability

18.     Neither the Buyer nor any of its affiliates is or shall be deemed, as a result of the consummation of the Transactions contemplated herein, to: (a) be legal successors to the Debtors or their estates by reason of any theory of law or equity, (b) have, *de facto* or otherwise, merged with or into the Debtors, or (c) be an alter ego or a mere continuation or substantial continuation

or successor of the Debtors in any respect.  Neither the Buyer nor any of its affiliates shall assume or in any way be responsible for any liability or obligation of any of the Debtors and/or their estates, except as otherwise expressly provided in the Purchase Agreement or this Order.

### Modification of the Automatic Stay

19.     The automatic stay provisions of section 362 of the Bankruptcy Code are lifted and modified to the extent necessary to implement the terms and conditions of the Purchase Agreement and the provisions of this Order.

### Release of Liens by Creditors; Collection of Transferred Assets

20.     Except as expressly provided to the contrary in this Order or in the Purchase Agreement, the holder of any valid Lien, Claim, or Interest in the Transferred Assets shall, as of the Closing, be deemed to have waived and released such Lien, Claim, or Interest, without regard to whether such holder has executed or filed any applicable release, and such Liens, Claims and Interests shall be deemed to attach to the proceeds of such transfer to the same extent and with the same priority as such Liens, Claims and Interests had in the Transferred Assets.  Notwithstanding the foregoing and except as expressly provided in this Order or the Purchase Agreement, any such holder of such a Lien, Claim, or Interest is authorized and directed to execute and deliver any waivers, releases, or other related documentation reasonably requested by the Debtors to evidence the release of their Liens, Claims, or Interests in the Transferred Assets.  Any person or entity that has filed any financing statements, mortgages, mechanic's liens, lis pendens, or any other documents or agreements evidencing a Lien on any of the Transferred Assets conveyed pursuant to the Purchase Agreement and this Order is directed to deliver to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or releases of all Liens which the person or entity has with respect to the Transferred Assets or otherwise.

21.     In the event that such termination statements, instruments of satisfaction, or releases of all Liens (excluding Permitted Encumbrances) are not filed in accordance with the foregoing paragraph, the Debtors and the Buyer are hereby authorized to file, register, or otherwise record a certified copy of this Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all Liens in the Transferred Assets of any kind or nature whatsoever (except any Permitted Encumbrances) except as expressly provided in this Order or the Purchase Agreement.

22.     As of the Closing, the Buyer and its successors and assigns shall be designated and appointed as the Debtors' true and lawful attorney with full power of substitution in the Debtors' name and stead on behalf of and for the benefit of the Buyer, and its successors and assigns, for the following sole and limited purposes: to have the power to demand and receive any and all of the Transferred Assets and to give receipts and releases for and in respect of the Transferred Assets, or any part thereof, and from time to time to institute and prosecute against third parties for the benefit of the Buyer, its successors and assigns, proceedings at law, in equity or otherwise, which the Buyer, and its successors and assigns, may deem proper for the collection or reduction to possession of any of the Transferred Assets.

**Payment of Net Proceeds**

23.     Within three (3) business days of the Closing, the Debtors will deliver the net proceeds from Sale, up to the amount of the DIP Obligations and the Prepetition Obligations, to the DIP Lender and the Prepetition Lender, respectively, for application to the DIP Obligations in accordance with the DIP Facility and the Prepetition Obligations in accordance with the Prepetition Facility.

## Effect of Recordation of Order

24.     This Order, once filed, registered, or otherwise recorded, (a) shall be effective as a conclusive determination that, upon the Closing, all Liens, Claims, and Interests of any kind or nature whatsoever (with the exceptions of the Assumed Liabilities and any Permitted Encumbrances and except as expressly provided in this Order) existing as to the Transferred Assets prior to the Closing have been unconditionally released, discharged, and terminated and that the conveyances described herein have been effected, and (b) shall be binding upon and shall govern the acts of all persons and entities including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, local officials, notaries, protonotaries, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to, the Transferred Assets.  Each and every federal, state, and local governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the Transactions contemplated by the Purchase Agreement and this Order, including, without limitation, recordation of this Order.

## Prohibition of Actions Against the Buyer

25.     Except for the Assumed Liabilities and any Permitted Encumbrances or as expressly permitted or otherwise specifically provided for in the Purchase Agreement or this Order, the Buyer and its affiliates shall have no liability or responsibility for any liability or other obligation of the Debtors or any of their affiliates arising under or related to the Transferred Assets or otherwise.  Without limiting the generality of the foregoing, and except as otherwise specifically provided in this Order or in the Purchase Agreement, the Buyer and its affiliates shall not be liable

for any claims against the Debtors or any of their predecessors or affiliates, and the Buyer and its affiliates shall have no successor or vicarious liabilities of any kind or character including, without limitation, any theory of antitrust, warranty, product liability, environmental, successor or transferee liability, labor law, ERISA, *de facto* merger, mere continuation, or substantial continuity, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtors or any obligations of the Debtors, including, without limitation, liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Debtors' business prior to the Closing or any claims under the WARN Act or any claims related to wages, benefits, severance, or vacation pay owed to employees or former employees of the Debtors.

26.     EFFECTIVE UPON THE CLOSING, WITH THE SOLE EXCEPTIONS OF ANY ENFORCEMENT OF RIGHTS RELATED TO THE ASSUMED LIABILITIES OR ANY PERMITTED ENCUMBRANCES, AND EXCEPT AS EXPRESSLY PROVIDED BY THIS ORDER, ALL PERSONS AND ENTITIES HAVING LIENS, CLAIMS, ENCUMBRANCES, CAUSES OF ACTION OR INTERESTS OF ANY KIND OR NATURE WHATSOEVER AGAINST OR IN THE DEBTORS OR THE TRANSFERRED ASSETS OR ASSIGNED CONTRACTS SHALL BE, AND HEREBY ARE, FOREVER BARRED AND ENJOINED FROM (A) TAKING ANY ACTION THAT WOULD ADVERSELY AFFECT OR INTERFERE WITH THE ABILITY OF THE DEBTORS TO TRANSFER THE TRANSFERRED ASSETS TO THE BUYER IN ACCORDANCE WITH THE TERMS OF THIS ORDER AND THE PURCHASE AGREEMENT OR BUYER'S RIGHTS, USE, AND ENJOYMENT OF THE TRANSFERRED ASSETS AND ASSIGNED CONTRACTS IN ACCORDANCE WITH THE TERMS OF AND AS AUTHORIZED BY THIS ORDER TO THE EXTENT SUCH ACTION

RELATED TO A LIEN, CLAIM, ENCUMBRANCE, INTEREST, OR CAUSE OF ACTION ARISING ON OR PRIOR TO THE CLOSING DATE AND (B) ASSERTING, PROSECUTING, OR OTHERWISE PURSUING, WHETHER IN LAW OR IN EQUITY, IN ANY JUDICIAL, ADMINISTRATIVE, ARBITRAL, OR OTHER PROCEEDING, ANY LIENS, CLAIMS, ENCUMBRANCES, CAUSES OF ACTION, OR INTERESTS OF ANY KIND OR NATURE WHATSOEVER ARISING ON OR PRIOR TO THE CLOSING DATE AND RELATING TO (i) ANY LIEN, CLAIM, ENCUMBRANCE, CAUSE OF ACTION, OR INTEREST RELEASED PURSUANT TO THIS ORDER, (ii) THE PURCHASE AGREEMENT, (iii) THE SALE, (iv) THE TRANSACTIONS, (v) THE TRANSFERRED ASSETS, OR (vi) THE ASSIGNED CONTRACTS AGAINST THE BUYER AND ITS AFFILIATES, SUCCESSORS, DESIGNEES, ASSIGNS, OR PROPERTY, OR THE TRANSFERRED ASSETS OR ASSIGNED CONTRACTS CONVEYED UNDER THE AUTHORIZATION OF THIS ORDER IN ACCORDANCE WITH THE PURCHASE AGREEMENT.

## No Interference

27.    Following the Closing, subject to paragraphs 9–11 of this Order, no holder of a Lien, Claim, and/or Interest (with the exception of any holders of Permitted Encumbrances) in or against the Debtors or the Transferred Assets, or any other entity or person, shall interfere with the Buyer's title to or use and enjoyment of the Transferred Assets based on or related to such Lien, Claim, and/or Interest or any actions that the Debtors may take in their bankruptcy cases or any successor cases.

## Retention of Jurisdiction

28.    This Court retains jurisdiction prior to, on, and after Closing to, among other things, interpret, enforce, and implement the terms and provisions of the this Order and the Purchase Agreement, all amendments thereto, any waivers and consents thereunder, and each of the

agreements executed in connection therewith in all respects, including, without limitation, retaining jurisdiction to:  (a) compel delivery of the Transferred Assets or performance of other obligations owed to the Buyer; (b) compel performance of obligations owed to the Debtors; (c) resolve any disputes arising under or related to the Purchase Agreement; (d) interpret, implement, and enforce the provisions of this Order; (e) determine whether any lien or Encumbrance constitutes a Permitted Encumbrance, (f) determine any claim, cause, cause of action, or controversy brought by the Buyer relating to the Purchase Agreement or the Transferred Assets or that constitute Transferred Assets, and (g) protect the Buyer and its affiliates against (i) any Liens, Claims, and Interests in or against the Debtors or the Transferred Assets of any kind or nature whatsoever and (ii) any creditors or other parties in interest regarding the turnover of the Transferred Assets that may be in their possession.

## No Stay of Order

29.     Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing.  In the absence of any person or entity obtaining a stay pending appeal, the Debtors and the Buyer are free to close the Sale under the Purchase Agreement at any time pursuant to the terms thereof.

## Good Faith Purchaser

30.     The Sale contemplated by the Purchase Agreement is undertaken by the Buyer in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and Buyer has acted without collusion in undertaking and consummating the Sale and Transactions contemplated by the Purchase Agreement.  Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale to the Buyer (including the assumption and assignment by the Debtors of any of the Assigned Contracts), unless such authorization is duly stayed pending such appeal.  The Buyer is a buyer in good faith of the

Transferred Assets, and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

31.     There has been no showing that the Debtors or Buyer or its affiliates engaged in any action or inaction that would cause or permit the Transactions to be avoided or costs or damages to be imposed under section 363(n) of the Bankruptcy Code.

## Inconsistencies with Prior Orders, Pleadings or Agreements

32.     To the extent of any conflict between the Purchase Agreement and this Order, the terms of this Order shall govern.  To the extent this Order is inconsistent or conflicts with any prior order or pleading in these Chapter 11 Cases, the terms of this Order shall govern to the extent required to permit consummation of the Sale.

## Failure to Specify Provisions

33.     The failure to specifically reference any particular provisions of the Purchase Agreement or other related documents in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Purchase Agreement and other related documents be authorized and approved in their entirety.

## <u>Exhibit 1</u>

**Purchase Agreement**